Thomas J. CAPANO, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

Nos. 110 and 149, 1999.

Supreme Court of Delaware.

Submitted: June 13, 2001.
Decided: Aug. 10, 2001.

558

mington, Delaware; L. Vincent Ramunno, Esquire, of Ramunno & Ramunno, Wilmington, Delaware; Of Counsel: David A. Ruhnke, Esquire (argued), of Ruhnke & Barrett, Montclair, New Jersey; Nathan Z. Dershowitz, Esquire, Victoria B. Eiger, Esquire, and Amy Adelson, Esquire, of Dershowitz, Eiger & Adelson, New York, New York; Alan M. Dershowitz, Esquire, Cambridge, Massachusetts; Paul Shechtman, Esquire (argued), of Stillman & Friedman, P.C., New York, New York, for Appellant.

Ferris W. Wharton, Esquire (argued), Loren C. Meyers, Esquire, Timothy J. Donovan, Jr., Esquire, Thomas E. Brown, Esquire, and Elizabeth R. McFarlan, Esquire, Department of Justice, Wilmington, Delaware, for the State.

Before VEASEY, Chief Justice, WALSH, HOLLAND, STEELE, Justices, and CHANDLER, Chancellor,* constituting the Court *en Banc*.

Joseph M. Bernstein, Esquire (argued), Wilmington, Delaware; Charles M. Oberly, III, Esquire, of Oberly & Jennings, Wil-

VEASEY, Chief Justice.

TABLE OF CONTENTS

I. Introduction .................................................579
 A. Summary of Conclusions Reached on Appeal ...........................580
 1. The Lie Detector Test .......................................580
 2. Hearsay Testimony by Fahey's Psychotherapists and Friends .........581
 3. Lesser Included Offenses ........................................581
 4. Limits on Allocution.:........................................581
 5. Constitutionality of Delaware's Death Penalty Statute ...............582
 B. Summary of Background Facts Leading to Trial.......................582
 C. Summary of Facts: The State's Case ..................................583
 D. Summary of Facts: The Defense Case...................................585
II. Preliminary Statement on the Admissibility or Exclusion of Evidence.....586
III. References to Gerry Capano's Lie Detector Test .........................587
 A. Gerry's Reference to the Lie Detector Test ..............................587
 B. Lyons' Testimony about the Threat of a Polygraph Test .................590
 1. Admissibility of Lyons' Reference to the Threat of a Lie Detector
 Test.........................................................592
 2. Improper Vouching by Lyons ........................................594
 C. Harmless Error Analysis of Lyons' Testimony ...........................597
 1. Effect of Lyons' Testimony on the Credibility of Gerry's Testimony .................................................598

* Sitting by designation pursuant to Article IV, Section 12 of the Delaware Constitution and Supreme Court Rules 2 and 4(a).

 2. Untainted Evidence of Planning ................................... 602

 3. The Trial Judge's Limiting Instructions ............................ 605

IV. Hearsay Testimony by Fahey's Psychotherapists and Friends ............ 605

 A. Admissibility of Hearsay Testimony by Fahey's Psychotherapists and
Friends under the State of Mind Exception ........................... 607

 1. Whether Fahey's Statements Fall within the State of Mind Exception ................................................................. 608

 2. Whether Statements Describing Fahey's Fear of Capano May be
Presented in the State's Case-in-Chief ........................... 612

 3. Confrontation Clause Analysis of Hearsay Statements Admitted
under the State of Mind Exception ............................... 615

 B. Admission Under the State of Mind Exception of Fahey's Statements
of Facts Remembered or Believed is Harmless Error .................. 617

 C. Admissibility of Fahey's Statements to Her Psychotherapists Under
D.R.E. 803(4) ..................................................... 623

 1. Application of the Medical Diagnosis Exception ...................... 623

 2. Confrontation Clause Analysis of Statements Admitted Under the
Medical Diagnosis Exception ..................................... 626

V. Lesser Included Offenses .......................................... 627

 3. Contentions of the Parties ........................................ 628

 B. No Preclusion .................................................... 629

 C. The Evidence Here Does Not Support a Lesser Included Offense
Charge .......................................................... 630

 D. Accident Testimony Not a Basis for Lesser Includeds .................. 632

 E. No Due Process Violation .......................................... 633

VI. Admission of Evidence of Capano's Character and Prior Misconduct ..... 634

 A. MacIntyre's Gun Purchase ......................................... 635

 B. Shopa's Conversation with Capano ................................. 636

 C. Cross-Examination of Capano ...................................... 637

 D. Due Process ...................................................... 639

VII. Denial of Motion for Recusal ...................................... 639

 A. Capano's Contentions ............................................. 640

 B. Denial of Recusal Not an Abuse of Discretion ........................ 641

VIII. Investigation of Allegations of Juror Misconduct ...................... 643

 A. Juror No. 5 ....................................................... 643

 B. Juror No. 4 ....................................................... 644

IX. Questions Concerning Post-Arrest Silence--No Plain Error .............. 647

X. No Brady Violation ............................................... 649

XI. Propriety of Questions During Cross-Examination of Capano ............ 650

XII. Personal Opinions of Witnesses as to Capano's Guilt .................. 652

XIII. Capano's Absence from Office Conferences .......................... 653

XIV. Admission of Adultery Evidence During Impeachment .................. 654

XV. Plain Error--Limits on Allocution .................................. 655

 A. Introduction ...................................................... 655

 B. Capano's Exercise of His Right to Allocution ......................... 656

 C. The Sentencing Decision ........................................... 658

 D. Capano's Contentions ............................................. 659

 E. The Shelton Jurisprudence ......................................... 660

 F. Plain Error Review in This Case .................................... 662

 G. The Issue Whether Capano Was Unduly Prejudiced .................... 664

XVI. Constitutionality of Delaware's Death Penalty Statute .................. 668

 A. Right to a Jury Trial as Applied to the Penalty Hearing under the
Delaware Death Penalty Statute .................................... 668

 B. Application to the Death Penalty Statute of the United States Supreme Court's Decision in *Apprendi* ............................... 670

XVII. Aggravating Circumstance Instruction ............................... 673

XVIII. Statutorily Mandated Review of Capano's Death Sentence .............. 674

 A. Statutory Aggravating Circumstance ................................ 675

 B. Death Penalty Not Arbitrary or Capricious .......................... 675

 C. Death Penalty Proportionality Review ................................ 677

XIX. Conclusion ................................................................ 678

### I. Introduction

Thomas J. Capano was found guilty of first degree murder and sentenced to death for the murder of Anne Marie Fahey. As with all capital cases in Delaware, the proceedings here were divided into a guilt phase, a penalty hearing and a sentencing determination by the trial judge, who gave substantial weight to the jury's recommendation following the penalty hearing.

Capano was arrested for Fahey's murder in November 1997 and indicted in December 1997. His trial began in Superior Court in October 1998. The guilt phase of this proceeding before the jury was quite long, spanning approximately thirty-two trial days spread over ten weeks from October 6, 1998 to January 17, 1999. After the jury unanimously found Capano guilty of first degree murder, the penalty hearing commenced. It lasted for five days and resulted in findings by the jury on aggravating and mitigating circumstances. In the penalty phase the jury found a statutory aggravating circumstance by a vote of 11 to 1 and recommended by a vote of 10 to 2 that the trial judge find the aggravating circumstances outweighed the mitigating circumstances.

After giving proper weight to those findings, the Superior Court Judge sentenced Capano to death on March 16, 1999. This appeal followed.[1]

Capano asserts the following sixteen grounds for reversal of the conviction and sentence, in the order presented by him on this appeal—not in the order discussed in this Opinion:

1. The trial court's failure to instruct the jury on the lesser included offenses to the charged offense of Murder First Degree;

2. The admission of Fahey's hearsay statements to her psychotherapists and friends;

3. The introduction of prejudicial "bad act" and "character" evidence;

4. Evidence and argument suggesting that Gerry Capano took a lie detector test;

5. Improper cross-examination of Capano and improper remarks to the jury in closing argument;

6. Allowing witnesses to express personal opinions that Capano was guilty;

7. The trial court's failure to investigate juror bias or misconduct and to dismiss a juror for alleged misconduct;

8. Capano's absence from certain office conferences in violation of his Sixth Amendment right to be present at all stages of trial;

---

**1.** Under 11 *Del. C.* § 4209(g) an automatic appeal was docketed in this Court on March 22, 1999. While that automatic appeal was pending, Capano filed his own timely appeal on April 9, 1999. These appeals were later consolidated. Before further proceedings were undertaken in this Court, Capano moved to remand to the Superior Court to permit him to present a motion for new trial in the Superior Court. That motion to remand was granted on May 4, 1999, and this Court retained jurisdiction. After briefing and argument, the motion was denied in an opinion dated September 1, 1999. *See State v. Capano*, Del. Super., Cr. A. No. N97–11–0720, Lee, J., 1999 WL 743679 (Sept. 1, 1999) (Mem. Op.). Thereafter, while his appeal was pending, Capano filed a procedural motion requesting a limited remand in connection with his contention that the trial judge should have recused himself. The motion was denied in an opinion dated March 17, 2000. *See Capano v. State*, Del. Supr., 758 A.2d 499 (2000). The recusal issue is raised in this appeal and is discussed below.

9. The trial court's decision not to require the State to turn over to the defense evidence of Gerry Capano's drug use;

10. The trial court improperly limited Capano's allocution;

11. The trial court's charge on the aggravating circumstance that "the murder was premeditated and the result of substantial planning" was erroneous;

12. Delaware's death penalty statute is unconstitutional because it does not require unanimous jury findings with respect to aggravating circumstances;

13. Imposition of the death penalty in this case is disproportionate to the penalty imposed in other cases;

14. The trial judge was not impartial and therefore reversal is required, or in the alternative, a remand to develop facts related to this issue;

15. The trial court's inconsistent admission of evidence of marital infidelity to impeach the credibility of witnesses; and

16. The prosecutor's cross-examination of Capano concerning post-arrest silence.

### A. Summary of Conclusions Reached on Appeal

This being an appeal in a death penalty case we apply a high degree of scrutiny to the sixteen issues Capano has presented to us in this direct appeal. Four of the sixteen issues were selected for oral argument. Three of these issues were selected by Capano's appellate counsel in the first oral argument held on October 24, 2000. The fourth issue was selected *sua sponte* by the Court for additional briefing and oral argument held on June 13, 2001.

We deal in this Summary with these four issues and a fifth significant issue that was not selected for oral argument either by Capano or by the Court. The remaining eleven issues are dealt with carefully in this Opinion. But they will not be mentioned in this summary of the conclusions reached on appeal.

As to all sixteen issues we find no reversible error and we affirm the judgment of the trial court. Nevertheless, the five principal issues mentioned in this Summary raise substantial questions that have given us some areas of concern. After a thorough review of the extensive trial record, the voluminous briefs of the parties, two oral arguments and the applicable law, however, our concerns have been resolved. It is now clear to us that there is no reversible error either in the guilt phase or the penalty phase in the proceedings in the Superior Court.

### 1. The Lie Detector Test

Two major categories of evidentiary issues are dealt with at the outset in this Opinion. The first relates to Gerry Capano's testimony and that of his lawyer relating to a lie detector test. Testimony regarding the results of lie detector tests are normally inadmissible. That was not the issue here. The issue here related to references to the lie detector test involving Gerry. It was the mention of the threat of a lie detector test in testimony describing the dénouement of the government's investigation as its agents were seeking to persuade Gerry to testify against his brother.

We hold that mention of the lie detector test as the trigger point for Gerry's decision to cooperate and the related issue of his lawyer's vouching for Gerry's credibility were improper but not reversible error in light of the trial judge's limiting instruction and the totality of all the evidence presented in this long trial.

### 2. Hearsay Testimony by Fahey's Psychotherapists and Friends

Fahey's diaries, emails between Capano and Fahey and the testimony of Kim Lynch-Horstmann were admitted into evidence by agreement of both the State and Capano. That stipulated evidence painted a general picture of Fahey's state of mind, her rocky, on-again-off-again relationship with Capano and her need for psychological treatment. A central theme of this stipulated evidence involved Capano's efforts to control Fahey's life.

Over Capano's objection, the trial judge admitted other evidence offered by the State tending to show Fahey's state of mind, her attempts to seek psychiatric help and certain incidents that occurred in her relationship with Capano. That evidence, quoting Fahey, was admitted through the testimony of psychotherapists and friends. It was obvious hearsay, but it was admitted in evidence by the trial judge, often with careful limiting instructions to the jury as to its purpose, under exceptions to the hearsay rule for Fahey's state of mind and medical diagnosis or treatment.

We hold that the quotations from Fahey going to her state of mind were properly admitted under established exceptions to the hearsay rules. We further hold that certain testimony quoting Fahey's recollection of facts was inadmissible under the state of mind exception, but the admission of these factual recitations was not reversible error because the general subject matter was already subsumed in the stipulated evidence that Capano had agreed to present to the jury. We also hold, alternatively, that the psychotherapists' testimony regarding Fahey's statements to them for the purpose of diagnosis or treatment of her mental condition is independently admissible under the medical diagnosis and treatment exception to the hearsay rules.

Finally, we conclude that this application of Delaware's exceptions to the hearsay rules does not run afoul of the Confrontation Clause of the United States Constitution.

### 3. Lesser Included Offenses

Capano contends that the trial judge erred in not instructing the jury that it could convict Capano of the lesser offenses of Murder Second Degree, Manslaughter or Criminally Negligent Homicide. The trial judge concluded that there was no rational basis in the evidence for a charge to the jury on any of these lesser included offenses because: (a) the State's case, if believed by the jury, tended to show only premeditated, first degree murder, and (b) Capano's testimony that the killing was a tragic accident was the only alternative evidence offered, and Capano's testimony was consistent only with an outright acquittal.

We hold that the trial judge was correct in not instructing the jury on the lesser included offenses. We find no rational basis in this record to support the argument that the jury could acquit Capano of First Degree Murder and convict him of any of the lesser included offenses. The evidence supported only a First Degree Murder conviction or an outright acquittal. Furthermore, we find no federal constitutional violation in the decision of the trial judge to decline to instruct the jury on the lesser included offenses under the facts of this case.

### 4. Limits on Allocution

Capano contends that the trial judge improperly restricted his right, in the penalty phase, to speak in allocution directly to the jury without being sworn or subject to cross-examination. Capano had testified at length before this jury in the guilt phase and he spoke to them extensively in allocution in the penalty phase. Capano

argues that the trial judge improperly denied him the right to discuss or argue facts already in evidence at the guilt phase, and that the trial judge's harsh treatment in cutting him off in the presence of the jury unfairly prejudiced him. The question was first presented on appeal, so we review it on a plain error analysis.

We hold that the trial judge erroneously limited Capano's allocution by not permitting him to discuss or argue in allocution from facts already in the record. But we hold that this error was harmless under all the circumstances and Capano was not unduly prejudiced.

### 5. Constitutionality of Delaware's Death Penalty Statute

Based on a distinguishable recent United States Supreme Court Opinion, Capano argues that the Delaware Death Penalty Statute is unconstitutional. Capano claims that the statute unconstitutionally permits the trial judge, after a unanimous jury finding of guilt that authorizes the possibility of the death penalty, to decide to impose death without a unanimous jury recommendation in the penalty phase.

We hold that the authority relied on by Capano does not support this argument. The United States Supreme Court has never held that a judge's imposition of a death sentence following a unanimous finding of guilt by the jury and a less than unanimous recommendation of the jury in a penalty phase is a denial of the right to a jury trial or otherwise a denial of due process. We hold that the Delaware Death Penalty Statute is constitutional and was properly applied here.

Accordingly, we have found no reversible error committed by the trial court and no basis to vacate the death sentence, either on the five issues summarized above

or on any of the other issues raised on this appeal. Therefore, we affirm the judgment of the Superior Court and remand the matter for the setting of a new execution date.

### B. Summary of Background Facts Leading to Trial

The facts of this case, as developed in the evidence adduced over the course of this ten-week trial, are extensive. What follows in this section is a bare summary of some of the salient facts. More detailed facts are discussed in connection with the various sections of this Opinion dealing with specific issues presented on appeal.

Anne Marie Fahey, the scheduling secretary for Delaware's then Governor Thomas Carper, was last seen alive on Thursday, June 27, 1996, when she went to dinner with Capano in Philadelphia. Fahey's family reported on June 30, 1996, that she was missing. An extensive investigation concerning her disappearance ensued. That investigation culminated in November 1997, over sixteen months later, in Capano's arrest for her murder. Fahey's body was never found, however, and the State was unable to establish the precise manner by which Fahey died.

Capano was a well-known Delaware lawyer and former managing partner at the Wilmington office of a major Philadelphia-based law firm. He was estranged from his wife and is the father of four daughters. He has three brothers (Louis Capano, Jr., Gerard "Gerry" Capano and Joseph Capano) and one sister, Marian (Capano) Ramunno.[2]

Fahey's disappearance was a mystery for a considerable time before Capano was charged with her murder. Capano, who was the last known person to have seen

---

**2.** We sometimes refer to the defendant as "Capano" or as "Thomas" or "Tom," the first name usually being employed when referring to him in relationship to his brothers. We usually refer to the brothers by their first names (e.g., Gerry, Louis and Joseph).

her alive on June 27, 1996, was an early suspect in the investigation by the Wilmington Police. By mid-July 1996, the FBI actively joined in the investigation, and a federal grand jury heard evidence for over a year. Capano continued to deny any involvement in Fahey's disappearance and even offered various explanations for her whereabouts. Throughout the investigation and until the Fall of 1997, Gerry and Louis Capano, as well as Deborah MacIntyre, a mistress of Tom Capano, continually lied about material evidence that could have implicated Capano, even to the extent of lying to the federal grand jury.

In October 1997, Gerry's house was raided by federal agents who found illegal drugs and weapons. In November 1997 Gerry agreed to become a cooperating witness in exchange for a plea to reduced charges. Louis also began to cooperate with the authorities in November 1997 as part of a plea agreement. MacIntyre likewise eventually agreed to cooperate in exchange for an agreement not to be charged with perjury.

*C. Summary of Facts: The State's Case*

There were many witness presented by the State in its case-in-chief. The key witnesses included two of Capano's brothers, Gerry and Louis; Deborah MacIntyre; and psychotherapists and friends of Fahey. The State constructed a circumstantial theory of the case, which rested on three broad categories of evidence: (a) "motive," (b) "plan," and (c) "consciousness of guilt."

The State's "motive" evidence consisted of statements Fahey recorded in her diary and those allegedly made to her family, friends and psychotherapists. Fahey began dating Capano in March 1994. She kept this relationship, or at least its intimate nature, hidden from most of her friends and her family, and even from the psychotherapist she was seeing at the time. Her personal diaries detailed her on-again-off-again relationship with Capano. Importantly, these diaries, as read into evidence by her sister, emails between Capano and Fahey, and the testimony of Kim Lynch-Horstmann were admitted into evidence by stipulation.

In September 1995, Fahey met Michael Scanlon while she was still involved in the relationship with Capano. After a rocky beginning in her relationship with Scanlon, she fell in love with him.

Fahey suffered from a serious eating disorder. Although Capano knew about Fahey's illness, and was actively trying to get her help, Fahey hid her disorder from Scanlon. She also was afraid that Scanlon would learn of her relationship with Capano, a married man, and kept this a secret from him as well.

After Fahey began dating Scanlon, she tried to break off her relationship with Capano, who became very upset and pursued her relentlessly. In a diary entry by Fahey dated April 7, 1996, she wrote that "I have finally brought closure to Tom Capano ... what a controlling, manipulative, insecure jealous maniac." Also, one of Fahey's psychotherapists, who was treating Fahey in connection with her eating disorder (and whose bills were being paid, at least in part, by Capano) testified that, in the period between February and early April, 1996 Fahey spoke to her often about how she felt "controlled" by Capano. As her relationship with Capano became strained, her eating disorder became aggravated. By April 1996, however, Fahey had come to believe that she and Capano had established a friendship that she could manage while continuing to become more involved with Scanlon.

The State's theory was, and circumstantial evidence was offered to show, that Capano had already begun to plan Fahey's death. In February 1996, Capano told two of his brothers, Gerry and Joseph, a story

about being threatened by one or more unidentified extortionists. Capano borrowed $8,000 from Gerry, which he paid back a few days later. This loan was supposedly in connection with the extortion. Some time after borrowing the money, Gerry provided Capano with a handgun that was returned to Gerry by May of that year. Some time between February and May 1996, Capano asked Gerry if he could borrow his boat if he needed to dispose of a body.

In April 1996 Capano purchased a 162-quart marine cooler eventually used to dispose of Fahey's body. In May 1996 Capano had his mistress of seventeen years, Deborah MacIntyre, purchase a gun for him. At trial, MacIntyre testified that on May 13, 1996, Capano drove her to Miller's Gun Center where, at his request, she purchased a handgun while he waited in the car outside. She returned to the car and gave him the gun and some ammunition. MacIntyre said she never saw the gun again.[3]

On Thursday, June 27, 1996, Fahey left work at about 4:30 p.m. and went to an appointment with her psychiatrist. Afterward, Capano picked Fahey up at her Wilmington apartment and drove to a restaurant in Philadelphia for dinner. Their server at the restaurant testified that they "didn't speak to each other at all" and that Fahey looked "haggard and gaunt," and had a "somber" demeanor. Fahey was not thereafter seen alive.

On Friday morning, June 28, 1996, Thomas drove to his brother Gerry's house at about 5:30-5:45 a.m. Thomas asked to borrow Gerry's boat. Gerry testified that he asked Thomas, "Did you do it?" and Thomas replied that he had. Gerry and Thomas agreed to meet later at Thomas' house and Thomas went home.

Thomas took his wife's Suburban, a larger vehicle than his Jeep Cherokee, back to his house to await Gerry. By the time Gerry arrived at about 8:30 a.m., Capano had put a chain and lock on the cooler.

Gerry told Thomas to remove the lock and chain, and the two placed the cooler into the back of the Suburban. They drove together in the Suburban to Gerry's house in Stone Harbor, New Jersey. They carried the cooler onto Gerry's boat, and after purchasing gasoline, they took the boat approximately sixty miles out to sea and dumped the cooler over the side. The cooler did not sink, however. In an unsuccessful effort to sink the cooler, Gerry shot a hole in the cooler with a shotgun used to kill sharks. Finally, Gerry pulled the boat alongside the cooler and, after providing Thomas with two anchors, turned away while Thomas wrapped the body with the chain and weighed it down with the anchors. Gerry turned in time to see part of a human leg sink down into the ocean. Gerry rinsed out the cooler and removed the lid before tossing both back into the water and returning to Stone Harbor.

They drove back to Thomas' house in Wilmington. They carried the bloodstained love seat and rug from Thomas' "great room" to the garage where Gerry tried to cut up the love seat. Having no luck in dismantling the love seat, they placed it in a dumpster at a nearby construction site operated by their brother Louis, a developer. At this point, Gerry went home. On Saturday afternoon, June 29, 1996, Thomas bought a new rug for his great room.

The Wilmington Police conducted an initial interview with Thomas that Saturday night. They returned on Sunday after-

---

**3.** MacIntyre originally lied to investigators about their relationship and the gun purchase, but eventually admitted that her fear of losing Capano had driven her to try to protect him.

noon to search Thomas' home, conducting an escorted "walk through" with his consent.

Later that Sunday, Thomas spoke with his brother Louis and told him that Fahey had slit her wrists at his home, staining the love seat, but that she was okay. Thomas asked Louis to make sure that the dumpsters at his construction site were emptied the next day (Monday) because he had disposed of the love seat and some of Fahey's personal belongings in the dumpster. Louis ordered the dumpsters emptied on Monday even though they were not all full.

In a later search on July 31, 1996, federal investigators discovered small spots of blood on a wall in Capano's great room. The spots were compared with a sample of Fahey's blood from a blood bank through DNA testing and found to be a likely match.

The remaining relevant details of the State's case are discussed in connection with Capano's various arguments on appeal. Evidence presented in Capano's defense follows.

*D. Summary of Facts: The Defense Case*

Capano testified in his own defense that Fahey had died as a result of an accidental shooting that occurred in the great room of his house on Thursday, June 27, 1996, the night that Fahey was last seen. Capano testified that after dinner he took her back to her apartment where she dropped off some groceries he had bought for her; he then drove her to his house to watch television, arriving shortly after 10:00 p.m. Later that night, with Fahey still at his house, Capano spoke to MacIntyre over the telephone. They had a brief and unpleasant conversation in which Capano told MacIntyre that she should not come over to his house that night, as she often did.

Capano then testified that several minutes later, at around five minutes past 11:00 p.m., Fahey and Capano were sitting next to each other on a love seat in Capano's great room with the television on. According to Capano, while he and Fahey were talking on the love seat, MacIntyre arrived very upset, yelling and saying things like "Who's this?" and "Is this why you couldn't see me?" Capano said he got up from the love seat and stood to face MacIntyre, who continued yelling. Fahey began to put her pantyhose back on (Capano testified she had taken them off due to the heat) and collected her shoes, telling Capano that she wanted to leave immediately.

MacIntyre then pulled out a gun and threatened to shoot herself. Capano claims that he grabbed her arm to prevent her, causing MacIntyre to accidentally shoot Fahey behind her right ear, killing her instantly. Fahey was lying on the love seat. Capano claims that he and MacIntyre attempted to perform CPR on Fahey and then realized she could not be saved.

In order to protect himself and MacIntyre, Capano never called 911, an act that he referred to on the stand as "cowardly and selfish." Capano testified that MacIntyre dropped the gun, and he took it, as well as the bullet clip that was in MacIntyre's car. Capano made sure MacIntyre was all right and sent her home at about 11:30 p.m. In the State's case on rebuttal, MacIntyre denied these claims and said she was not at Capano's house that night.

Capano said he then cleaned up the blood and put Fahey's body in the cooler he had previously bought. Capano claimed that he went over to Fahey's apartment and arranged it to look as though she had been there. He testified that the next morning, he and Gerry dumped Fahey's body into the ocean off the side of Gerry's boat. Capano's testimony confirmed in many of its essentials

the "consciousness of guilt" evidence put forward by the State.

Capano also offered evidence to rebut the State's case based on motive and planning. Regarding his relationship with Fahey, he offered evidence that in the months before her death he and Fahey were no longer lovers but had developed a warm friendship. Emails between the two of them were offered to portray a relationship characterized by affectionate banter. Fahey confided in Capano regarding personal matters such as her therapy and would turn to him for help with items such as helping her install a new air conditioner.

Capano gave innocent explanations for the evidence of planning offered by the State. He testified that he purchased the cooler as a gift for Gerry for use on his boat. He testified that he borrowed money from Gerry in order to surprise Fahey with a gift of $25,000 in cash so that she could get help for her eating disorder. He testified that he did not ask Gerry for a gun or ask to borrow his boat or mention anything about extortionists, but that these were in essence the product of Gerry's confused imaginings resulting from Gerry's drug use.

In this regard, Capano presented expert testimony explaining the phenomenon of "confabulation" in heavy drug users. He also testified that MacIntyre bought the gun for her own protection against his advice. To explain his decision not to reveal Fahey's fate to her family and to investigators, Capano testified that he kept silent in order to protect MacIntyre, with whom he was "deeply in love." In support of this contention he offered letters written between him and MacIntyre while Capano was in jail awaiting trial.

It is against this factual backdrop that we now turn to the arguments that Capano raises on appeal.

## II. Preliminary Statement on the Admissibility or Exclusion of Evidence

■■■ The ultimate purpose of admitting or excluding evidence is to assist the jury's understanding of the underlying factual bases for its application of the law. For this reason, relevant evidence is presumptively admissible unless barred by constitutional restraints, statutory law, decisional law or court rules.[4]

■■■ Courts often provide for the admissibility of certain evidence for only limited purposes when that evidence might be barred for one purpose but admissible for another. In such instances the law requires that the trial judge instruct the jury accordingly.[5] This procedure is calculated to provide the jury with the adequate factual base and breadth of understanding that it needs to render a fair verdict consistent with the truth,[6] while striking the proper balance between relevant evidence and potential prejudice.

■■■ Normally the decision whether to admit or exclude evidence rests in the discretion of the trial judge, and the decision of the judge can be reversed only for abuse of that discretion. If objection is not made, the plain error standard of review is applied. The prejudicial effect of the proffered evidence is often the determinative consideration, requiring the trial judge to make a threshold balancing of probative value and the danger of undue prejudice.[7]

---

4. *See* Delaware Rules of Evidence (D.R.E) Rules 401, 402.

5. *See* D.R.E. 105.

6. *See* D.R.E. 102.

7. *See* D.R.E. 403.

### III. References to Gerry Capano's Lie Detector Test

Gerry Capano, one of Tom Capano's brothers, was a crucial witness for the State. His credibility was a principal and hotly contested issue. Gerry's testimony not only established the fact that he and Tom disposed of Anne Marie Fahey's body at sea, but also was offered in support of the State's theory of a planned homicide.

During the government's investigation of Fahey's disappearance, Gerry emerged as possibly a key government witness, but he was not willing to cooperate at first. After the government put pressure on him in connection with his alleged possession of drugs and firearms, Gerry agreed to cooperate with investigators.

Capano argues that references in the testimony to a polygraph (lie detector) examination in connection with the government investigation and Gerry's cooperation undermined the fairness of his trial. Gerry testified on direct examination that: (1) Tom requested an $8000 cash loan from Gerry to pay unidentified extortionists not to hurt Tom's children;[8] (2) Tom borrowed

Gerry's handgun and returned it after one or two months, well before the disappearance of Anne Marie Fahey;[9] (3) Tom asked Gerry if he could use Gerry's boat "if either one of these people that was threatening to hurt his kids were to hurt one of his kids and he was to do something to them;"[10] and (4) he and Tom used his boat to dispose at sea of a cooler containing a body.[11]

#### A. Gerry's Reference to the Lie Detector Test

Gerry testified on direct that he disclosed three of these matters to his lawyer before the police found illegal drugs and weapons in his home and before he was offered a plea agreement in exchange for his testimony against Tom.[12] In contrast, Gerry testified that he did not disclose the fact that he and Tom had discussed Tom's use of Gerry's boat to dispose of a body until after Gerry agreed to cooperate with the police and "[b]efore I went and took a lie detector test."[13]

Counsel for Tom Capano immediately moved for a mistrial on the ground that

8. Tr. of 11/9/98, at 12–13 (testifying that he lent Tom $8000 and that Tom "told me that two people were extorting him" and "were threatening to hurt his kids, ruin his career"). We refer to the trial transcript pages for certain trial days by designating the record reference as "Tr. of [month/day/year]."

9. Tr. of 11/9/98, at 16 (testifying that Tom "asked me if he could borrow a gun" because "he was afraid that the guy was going to beat him up or hurt him, come to his house and hurt him").

10. Tr. of 11/9/98, at 21.

11. Tr. of 11/9/98, at 23–49.

12. Tr. of 11/9/98, at 86–88.

13. Tr. of 11/9/98, at 88. The exact colloquy is as follows:
 Q. When did you tell him [Dan Lyons] when you first changed the story that you told him?
 A. I didn't tell him that my brother said to me that if somebody was to hurt my kids and I had to do something to them, could we use the boat.
 Q. When did you tell him that last part of the story, that if your brother—about your brother asking you if he hurt somebody, could he use the boat?
 A. When did I tell him that?
 Q. When did you tell Dan Lyons that, if you did at all?
 A. I did tell him that.
 Q. And when?
 A. Before I went and took a lie detector test.
 Before Gerry testified, the trial court ruled that Gerry could not refer to the lie detector test during his testimony, and the prosecution advised Gerry that he was not to mention the test. Tr. of 11/9/98 Office Conference, at 6–12.

Gerry's reference to the lie detector test encouraged the jury to assume that Gerry took and passed the test and was therefore telling the truth. The trial court denied the motion, ordered the unresponsive outburst stricken, and instructed the jury to disregard Gerry's lie detector remark. The court's complete instruction to the jury at this point was as follows:

Members of the jury, immediately before the luncheon break, the defense objected to the unresponsive answer of the witness to Mr. Connolly's question. The answer made reference to a lie detector test.

Such a response is inadmissible, even though the witness did not indicate whether or not he had taken such a test, or if so, what the results might have indicated.

The Courts of this state, the Federal Courts, and those of every other state, have consistently found such tests to be unreliable, and therefore inadmissible as evidence.

Therefore, you are to disregard the witness' response, and you are not under any circumstances to speculate as to whether or not he took such a test, or what the results of such a test might have been. You are to in no way consider the witness' response in your determinations.[14]

The initial problem we note is the confusion in the record about whether or not Gerry actually took the lie detector test.

In his unresponsive outburst, Gerry fixed the time of his disclosure to the government as being "before I went and *took* a lie detector test."[15] When the trial judge instructed the jury to disregard the witness' response, the trial judge said "the witness did not indicate whether or not he had taken such a test, or if so, what the results might have indicated," and admonished the jury "not under any circumstances to speculate as to whether or not he took such a test, or what the results of such a test might have been."

■ Whether or not the trial judge accurately characterized Gerry's testimony, any misstatement there may have been was harmless. The testimony was stricken and there were no later references suggesting that Gerry actually took the lie detector test. We now turn to the remainder of this issue.

■ Capano argues that the trial court abused its discretion by denying Capano's motion for a mistrial after Gerry referred to the lie detector test during his testimony. A mistrial is not automatically required, however, every time a witness mentions a polygraph test.[16] The trial court should grant a mistrial only "if the reference to the test raises an inference about the result that substantially prejudices the defendant's case" in light of all of the evidence.[17] In assessing the prejudice produced by such references, courts have considered a wide variety of factors, the most important of which are:[18] (1) the ef-

---

**14.** Tr. of 11/9/98, at 113–14.

**15.** Tr. of 11/9/98, at 88 (emphasis supplied).

**16.** *See State v. Edwards,* Me. Supr., 412 A.2d 983, 984–85 (1980) ("We do not find it necessary to require a mistrial to be automatic upon any mention of a polygraph examination by a witness.").

**17.** *Id.* at 985–86.

**18.** The State also argues that the inadvertence of the comment makes the comment less prejudicial. It matters little, however, whether the reference.was inadvertent because "the harm is done by the fact that it was said, regardless of how it arose." *Guesfeird v. State,* 300 Md. 653, 480 A.2d 800, 804 (1984); *see also People v. Yatooma,* 85 Mich.App. 236, 271 N.W.2d 184, 187 (1978) (finding that a mistrial was required although the reference to the lie detector test "was an isolated and apparently madvertent occurrence").

fectiveness of a limiting instruction, (2) the extent to which the State's case depends on the witness' testimony, and (3) the extent to which the credibility of the witness is in dispute.[19]

 With respect to Gerry's unsolicited comment, the most important factor is the effectiveness of the trial court's curative instruction. As noted above—and it is worth repeating—the trial court instructed the jury that:

> The Courts of this state, the Federal Courts, and those of every other state, have consistently found such tests to be unreliable, and therefore inadmissible as evidence.

Therefore, you are to disregard the witness' response, and you are not under any circumstances to speculate as to whether or not he took such a test, or what the results of such a test might have been.[20]

 On this point, Capano argues that the court's instruction could not prevent or even discourage unwarranted inferences by the jury about Gerry's credibility from the fact that he took or may have taken a polygraph test.[21] As a general rule, we must presume that "the jurors followed the court's instruction."[22] In the present case, we conclude that the trial judge's striking of the testimony and his immediate limiting instruction was sufficient to neutralize any prejudice to the defense from Gerry's comment about his lie detector test.[23]

---

19. *Cf. Sawyer v. State*, Del. Supr., 634 A.2d 377, 380 (1993) (describing relevant factors in reviewing denial of motion for mistrial); *see also Guesfeird*, 480 A.2d at 803–06; *Sullivan v. State*, Fla. Supr., 303 So.2d 632, 634–35 (1974), *cert. denied.* 428 U.S. 911, 96 S.Ct. 3226, 49 L.Ed.2d 1220 (1976).

20. Tr. of 11/9/98, at 113–14.

21. To support this argument, Capano cites *Guesfeird*, 480 A.2d at 806–07 (declaring a mistrial based on an inadvertent reference to a lie detector test despite a cautionary instruction because it was "arguable that rather than being curative, such an instruction might only serve to emphasize the prejudice"); *see also Nichols v. State*, Tex. Crim. App., 378 S.W.2d 335, 337 (1964) (holding that where the prosecutor asked the complainant in a statutory rape case whether she had taken a polygraph test and the witness had answered in the affirmative, "the harm done was so great that no instruction from the court could remove it.").

22. *Shelton v. State*, Del. Supr., 744 A.2d 465, 483 (2000) (citing *Claudio v. State*, Del. Supr., 585 A.2d 1278, 1280 (1991) and *Kornbluth v. State*, Del. Supr., 580 A.2d 556, 560 (1990)), *cert. denied*, 530 U.S. 1218, 120 S.Ct. 2225, 147 L.Ed.2d 256 (2000); *see also Pennell v. State*, Del. Supr., 602 A.2d 48, 52 (1991) ("This Court has repeatedly held that even when prejudicial error is committed, it will usually be cured by the trial judge's instruction to the jury to disregard the remarks.").

23. *See, e.g., Com. v. Brinkley*, Pa. Supr., 505 Pa. 442, 480 A.2d 980, 986 (1984) (denying defendant's motion for a mistrial in part because the trial judge issued "immediate and extensive instructions regarding the unreliability and inadmissibility of polygraph tests and cautioning the jury to disregard any testimony concerning such tests"); *Beal v. State*, Ind. Supr., 453 N.E.2d 190, 193 (1983) (affirming conviction despite a prosecution witness' unsolicited disclosure that she had taken a polygraph examination, primarily because "the trial court admonished the jury to disregard the statement and instructed the jury not to take it into account in their deliberations"); *Peyton v. United States*, D.C. Ct. App., 709 A.2d 65, 72–73 (1998) (finding that a "forceful" instruction to disregard a witness' comment about a lie detector test and an explanation of the lack of reliability of such tests was sufficient to minimize the prejudice to the defendant), *cert. denied*, 525 U.S. 854, 119 S.Ct. 134, 142 L.Ed.2d 108 (1998); *State v. Okumura*, 78 Hawai'i 383, 894 P.2d 80, 95 (1995) (noting in *dicta* that an instruction to disregard a witness' statement that he took a polygraph test could have " 'eradicated or minimized' " the harmful effects of the testimony); *State v. Atwood*, Ariz. Supr., 171 Ariz. 576, 832 P.2d 593, 625–26 (1992) ("[A]ny possible error was rendered harmless by the court's immediate instruction to the jury to disregard the witness's answer [referring to a lie detector test]"), *cert. denied*, 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364

## B. Lyons' Testimony about the Threat of a Polygraph Test

Before the State presented the testimony of Gerry's lawyer, Edmund (Dan) Lyons, Esquire, the State requested the trial court's permission to ask whether Lyons had warned Gerry that he could be required to take a polygraph test if he cooperated with federal investigators.[24] The defense strongly objected. In overruling the objection, the trial court permitted the State to ask the question "in a context which is modified to suggest the possibility of the test as opposed to the absolute fact that a test is going to be given."[25] The testimony by Lyons on this point proceeded as follows:

Q. Now, he had told you up to this point about going out on his boat with his brother Thomas and dumping a body, is that correct?

A. Yes, sir.

Q. He had not told you at this point about his brother Thomas asking him if he could go out and use the boat if he had to dispose of a body prior to June 28th, is that also correct?

A. That's true. He had not told me that.

Q. Now, when you met with him on October 30th of 1997, did you have information to the effect that Thomas had told him that or asked him that prior to June 28th of 1996?

A. Yes.

Q. What did you tell—specifically with respect to meeting with the federal authorities, what did you tell Gerry about whether he could or could not withhold information from the federal authorities if he made a decision to go in?

A. I told him what I would tell any other client in that situation. If you make a decision to go in, you have to go in and make full disclosure. You can't hold anything back.

If you do or if you have not told me every little detail and something comes out in the course of meeting with federal prosecutors, it will come back and bite you on the rear end, and it's just crucial, and I said this to Gerry, I need to know everything before we go in because if you hold anything back, you're going to hurt yourself.

Q. Did you also tell him prior to going in—did you also tell him at that meeting that he would or might be required to take a polygraph test?

A. Yes.[26]

The trial judge then immediately instructed the jury that this testimony was admissible for only a limited purpose, namely:

solely for the purpose of permitting you to consider its impact on the state of mind of Gerard Capano at the time he made the ensuing statement. His state of mind at that time has been placed in issue and is in issue, and you are to consider the question and answer just presented solely for that purpose.

There is no evidence that such a test was administered, and you should not speculate on that since the results would not be admitted into evidence....[27]

Putting aside for the moment the issue of potential prejudice engendered by a reference to a lie detector test, we believe that the trial judge's limiting instruction was consistent with a rational theory—namely that it was arguably preferable, on bal-

(1993), *overruled on other grounds by State v. Nordstrom*, 200 Ariz. 229, 25 P.3d 717 (2001).

24. Tr. of 11/16/98 Office Conference, at 15.

25. Tr. of 11/16/98 Office Conference, at 19.

26. Tr. of 11/16/98, at 130–31.

27. Tr. of 11/16/98, at 132. The trial judge repeated this instruction during its final charge to the jury. Tr. of 1/13/99, at 241–42.

ance, for the jury to hear, with appropriate caution, an explanation of why, at that particular moment, Gerry elected to stop lying and to tell the truth. Permitting this testimony with a limiting instruction may have been considered by the trial judge to be preferable to a course of action that would leave the jury to speculate on a wide range of scenarios for Gerry's apparent epiphany, with the risk that some of the speculative scenarios could have been irrelevant and false.

The State emphasized the impact of Lyons' testimony three times during closing arguments, observing that Gerry did not disclose the conversation about using his boat to dispose of a body until after he was threatened with a lie detector test.[28] A key reference to this testimony in the State's summation is as follows:

> But he [Gerry] told his story, his testimony, to Dan Lyons as early as April 1997, months before his house was raided. And the only piece of the puzzle he left out had to do with the defendant's request that if he killed somebody could he use the boat. That's the only piece missing. And we get that piece when on October 30th Dan Lyons, knowing that Gerry is about to come in and discuss his case with the Government, tells [Gerry] you must tell the complete truth. He threatens him with the possibility of taking a lie detector test and he says you have to tell the complete truth, you cannot hold back.
>
> I want to read you something from Dan Lyons' testimony. Remember, Dan Lyons was Gerry's lawyer and he was asked by Mr. Wharton: "What did you tell—specifically with respect to meeting with the federal authorities, what did you tell Gerry about whether he could or

could not withhold information from the federal authorities if he made a decision to go in?"

> And Mr. Lyons responded: "I told him what I would tell any other client in that situation. If you make a decision to go in, you have to go in and make full disclosure. You can't hold anything back. If you do or if you have not told me every little detail and something comes out in the course of meeting with federal prosecutors, it will come back and bite you on the rear end, and it's just crucial, and I said this to Gerry, I need to know everything before we go in because if you hold anything back, you're going to hurt yourself."
>
> Question: "Did you also tell him prior to going in—did you also tell him at that meeting that he would or might be required to take a polygraph test?"
>
> Answer: "Yes."
>
> Having advised him of that, what did he do then? Then Mr. Lyons said this—he said: "Well, I said a little bit more. I said look, you have told me everything that happened, but it is possible, and I just don't know, but it is possible that there may have been a situation in which Tom said to you I'm thinking about killing somebody or just raised the issue before June of 1996 and if you are holding that back because you just don't want to tell me or it is painful to tell me, or you want to protect your brother you are making a big mistake, because if it happened you are going to hurt yourself.[29]

Capano contends that the trial court committed reversible error by permitting the State to refer to Gerry's lie detector test during its direct examination of Lyons. The State argues that Lyons' testimony was admissible for the limited pur-

28. Tr. of 1/13/99, at 66–69.

29. Tr. of 1/13/99, at 66–68. The State also discussed at length the impact of Lyons' testimony on Gerry's credibility later in its summation. Tr. of 1/13/99, at 205–208.

pose of showing Gerry's state of mind in that he agreed to disclose incriminating evidence against his brother only after his lawyer warned him that he would have to take a lie detector test as a condition of his plea agreement. Under this theory, the State did not seek to prove that Gerry had taken and passed the lie detector test; instead the State sought to prove only a "triggering event"—that Gerry's decision to disclose the second "extortionist" conversation was triggered by the threat of a lie detector test.

The State also asserts that a reference to a lie detector test raises a concern only where the reference directly or impliedly discloses the *results* of the polygraph. Clearly, the results of a polygraph are inadmissible. Courts acknowledge, however, that "the only logical conclusion [the jurors] could deduce would be that [the witness] passed the polygraph test thus enabling him to complete his plea bargain with the State."[30]

Lyons' testimony raises two related issues: (1) whether a reference to the threat of a lie detector test may be admissible evidence and (2) whether Lyons improperly vouched for the credibility of Gerry's testimony by testifying in his capacity as an attorney and an officer of the court that he had warned Gerry about the possibility of a lie detector test.

### 1. Admissibility of Lyons' Reference to the Threat of a Lie Detector Test

As a general rule, and as the trial court instructed here, the results of polygraph tests are "inadmissible for any purpose because their scientific reliability has not been established."[31] Similarly, polygraph evidence is never admissible if it is offered to establish that a witness' version of the events is true. These rules reflect a legitimate concern that jurors will assume that the results of the polygraph are accurate and will therefore accept the witness' testimony as the truth. Put differently, the concern is that a potentially unreliable lie detector test will take the place of the jury in assessing the credibility of witnesses.[32]

---

**30.** *Brown v. State*, Ind. Supr., 587 N.E.2d 111, 112–13 (1992); *see also Guesfeird v. State*, 300 Md. 653, 480 A.2d 800, 804 (1984) ("Simply putting before the jury the fact that a lie detector test was taken can be the equivalent of revealing the results.").

**31.** *Foraker v. State*, Del. Supr., 394 A.2d 208, 213 (1978) (citations omitted); *see Melvin v. State*, Del. Supr., 606 A.2d 69, 71 (1992); *Whalen v. State*, Del. Supr., 434 A.2d 1346, 1354 (1981); *Peyton v. United States*, D.C. Ct. App., 709 A.2d 65, 70 (1998); *People v. Nash*, 244 Mich.App. 93, 625 N.W.2d 87, 91 (2000); *see also Duonnolo v. State*, Del. Supr., 397 A.2d 126, 132 (1978) ("Testimony that an accused refused to take a polygraph test, without more, amounts to impermissible comment upon the accused's Fifth Amendment right to remain silent."). Although several federal courts were forced to abandon a strict rule prohibiting the admission of polygraph test results after the United States Supreme Court decision in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113

S.Ct. 2786, 125 L.Ed.2d 469 (1993), these courts have retained a strong suspicion of polygraph evidence. *See, e.g., United States v. Cordoba*, 9th Cir., 104 F.3d 225, 227–28 (1997) ("With this holding, we are not expressing new enthusiasm for admission of unstipulated polygraph evidence. The inherent problematic nature of such evidence remains. . . . [P]olygraph evidence has grave potential for interfering with the deliberative process."); *United States v. Posado*, 5th Cir., 57 F.3d 428, 431–34 (1995) ("[W]e do not now hold that polygraph examinations are scientifically valid or that they will always assist the trier of fact, in this or any other individual case.").

**32.** *See Holtzman v. State*, Del. Supr., No. 221, 1997, Holland, J., 1998 WL 666722 (July 27, 1998) (ORDER), Order at ¶ 14 ("A fundamental premise of our criminal trial system is that 'the jury is the lie detector.' "); *United States v. Alexander*, 8th Cir., 526 F.2d 161, 168 (1975) ("When polygraph evidence is offered in evidence at trial, it is likely to be shrouded

The State nevertheless contends that evidence of the "threat" of a polygraph test is admissible, even if the results of the polygraph test are not admissible. Curiously, neither party in all the voluminous briefs[33] filed in the case before us cites *Whalen v. State*,[34] where we held, in the unique circumstances of that case, that a polygraph test may be admissible as a relevant fact in assessing the voluntariness of a defendant's confession. The *Whalen* Court reached this conclusion because the "presentation to the trier of fact of all relevant facts and circumstances is appropriate when it must assess the totality of the circumstances" surrounding the *defendant's* confession.[35]

The holding in *Whalen* preserves the rule prohibiting "the use of the results of a polygraph test without prior agreement of the parties."[36] We believe that any reference to a polygraph test is potentially mischievous. In fact, we cannot now foresee scenarios in which the potential for prejudice would not exist. At the very least, the trial court must apply enhanced scrutiny (in addition to a Rule 403 analysis) to assure that any references to a polygraph are necessary, of minimal prejudicial impact and that no other appropriate alternative evidence is available to establish the relevant operative fact sought to be admitted. The trial court must also formulate a clear cautionary instruction for the jury.[37]

*Whalen* may not be read broadly to permit references to a lie detector test to prove a limitless range of operative facts, and it must be limited to the circumstances that were present in the *Whalen* case itself.[38] Accordingly, we do not pronounce today a *per se* exclusionary rule prohibit-

---

with an aura of near infallibility, akin to the ancient oracle of Delphi."); *People v. Barbara*, Mich. Supr., 400 Mich. 352, 255 N.W.2d 171, 194 (1977) ("Further concern is based on a fear that by use of a polygraph, we run dangerously close to substituting a trial by machine for a trial by jury.").

**33.** The extensive briefs and supplemental memoranda filed by Capano and the State covered a total of 446 pages.

**34.** Del. Supr., 434 A.2d 1346, 1353–54 (1981) (admitting "the fact of" a lie detector test as evidence that the defendant's confession was voluntary). Several federal courts permit prosecutors to prove that a defendant's confession was "voluntary" by proving that the defendant made the confession after failing a polygraph test. *See, e.g., Tyler v. United States.* D.C. Cir., 193 F.2d 24, 31 (1951), *cert. denied*, 343 U.S. 908, 72 S.Ct. 639, 96 L.Ed. 1326 (1952); *United States v. Johnson*, 3d Cir., 816 F.2d 918, 923 (1987); *United States v. Miller*, 9th Cir., 874 F.2d 1255, 1262 (1989); *United States v. Kampiles*, 7th Cir., 609 F.2d 1233, 1244–45 (1979), *cert. denied*, 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980).

**35.** *Whalen*, 434 A.2d at 1353 (citing *State v. Rooks*, Del. Supr., 401 A.2d 943 (1979)). The *Whalen* Court endorsed the view that "[w]hen a confession was made during, immediately after, or as the result of test questioning, and the defendant alleges his confession was involuntary, the evidence about the test and the surrounding circumstances are considered part of the totality of the circumstances which must be evaluated." *Id.* at 1353 (citations omitted).

**36.** *Id.* at 1354.

**37.** *See* D.R.E. 105.

**38.** Although the *Whalen* Court was motivated by the need for evidence to rebut an assertion of coercion of a confession, we can identify no principled distinction between using the threat of a lie detector test as evidence of the voluntariness of a defendant's confession and using it as evidence of the motivation or timing of a witness' disclosure. Confining *Whalen* to its context (that is, to rebut an assertion of coercion of a confession), the holding does not apply to the present case, and it is not a proper authority to admit Lyons' testimony. We need not decide in this case whether *Whalen* would be overruled if its identical circumstances were to be presented in a future case.

ing any reference to a lie detector test, but we caution that one cannot rely on a broad reading of *Whalen.*

The State characterizes the "threat" of a polygraph test as an event like any other event that could cause a *witness* to change his or her testimony in one direction or the other.[39] But a lie detector test is fundamentally different from other events because its purpose as an *investigative* tool is to gauge whether a person is telling the truth.[40] In the present case, the jury may have inferred from Lyons' testimony: (1) that Gerry was *not* telling the truth before the threat of a lie detector test and (2) that he *was* telling the truth *after* the threat.[41]

The admission of Lyons' testimony relating to a threat of a polygraph test in this situation was improper because it runs the risk that a reasonable juror could infer that the witness was lying before the threat of a test but telling the truth afterward. Given the judicial suspicion of lie detector tests and the potentially prejudicial nature of the lie detector testimony described above, the threshold question is whether the trial court abused its discre-

tion in permitting the State to elicit testimony that Gerry disclosed information in response to the threat of a lie detector test[42] even for the limited purpose for which the testimony was admitted and within the context of the trial court's limiting instructions.

Under the circumstances of this case, however, we find that the trial court's admission of Lyons' reference to a lie detector test does not require a reversal of Capano's conviction. We believe there is no basis to conclude that the jury would ignore the cautionary instruction given in this case. As discussed in subsection C of this Section, we conclude that any error in allowing this testimony is harmless when viewed through the prism of the totality of the record and in light of the trial judge's limiting instruction.

### 2. Improper Vouching by Lyons

Capano also contends that Lyons' testimony taken as a whole improperly vouches for Gerry's credibility. This issue involves two related questions: (1) whether Lyons' testimony improperly attested to Gerry's

---

39. In *United States v. Piccinonna,* 11th Cir., 885 F.2d 1529, 1536 (1989) (*En Banc*), the court found two exceptions to the "per se exclusionary rule": (1) where the parties agree to its admission and (2) where the evidence is "used to impeach or corroborate the testimony of a witness at trial" and the evidence satisfies three conditions, including the Rule 403 balancing test. *Id.* The second exception implicitly acknowledges that there is no significant difference between admitting polygraph evidence to prove that a confession was voluntary and admitting the evidence to prove the credibility of a witness.

40. *See People v. Barbara,* Mich. Supr., 400 Mich. 352, 255 N.W.2d 171, 193–94 (1977) ("The fact is that the polygraph, while scientific evidence, is different from other scientific evidence. '[T]he quantity it attempts to measure the truthfulness of a witness is ... directly related to the essence of the trial process.' ") (quoting Note. *The Emergence of the*

*Polygraph at Trial,* 73 Colum. L. Rev. 1120, 1141 (1973)).

41. *Cf. Holtzman v. State,* Del. Supr., No. 221, 1997, Holland, J., 1998 WL 666722 (July 27, 1998) (ORDER), Order at ¶ 14 ("Although [the defendant] agreed to submit to the examination, the absence of presenting any evidence of a favorable outcome could lead the jury to either conclude that [the defendant] changed his mind or the 'polygraph equivalent' test results had not been favorable, since the prosecution went forward."); *State v. Edwards,* Me. Supr., 412 A.2d 983, 986 (1980) ("The jury could have inferred naturally and reasonably that she had taken the test in connection with her account of the events of the evening and that the result confirmed her account.").

42. *See Williamson v. State,* Del. Supr., 707 A.2d 350, 354 (1998) ("[W]e review for an abuse of discretion questions concerning the admissibility of evidence.").

credibility and (2) whether the State used Lyons' credentials as an experienced lawyer and former federal prosecutor to bolster Gerry's testimony.

■ At the outset, we note that the trial court admitted Lyons' testimony based on "its impact upon the state of mind of Gerard Capano at the time he made the ensuing statement [about Tom's request to use his boat]."[43] Nevertheless, it is clear that the State presented the testimony to explain why Gerry did not disclose this information until after he began to negotiate an arrangement with prosecutors.[44] Thus, the credibility of Gerry's testimony was at issue, not his state of mind at the time of his final disclosure.

■ As a general rule, a witness may not bolster or vouch for the credibility of another witness by testifying that the other witness is telling the truth.[45] The State argues that the trial court did not err in this respect because Lyons did not vouch for Gerry and did not express an opinion on the veracity of Gerry's testimony. But the cases are clear that improper vouching includes testimony that *directly or indirectly* provides an opinion on the veracity of a particular witness.[46]

■ In the present case, Lyons testified that he warned Gerry: (1) about the possibility of a lie detector test; (2) about Gerry's obligation to "make full disclosure"; and (3) not to "hold anything back" from the federal prosecutors.[47] In our view, these three points made by Lyons, when taken together, created a substantial risk that the jury would conclude that Lyons' admonitions to Gerry induced him to tell the truth to the federal prosecutors and hence to the jury. It is implicit in Lyons' testimony that Lyons believed his own admonitions to have been effective. Thus, this testimony is a subtle and indirect version of vouching for Gerry's credibility.

43. Tr. of 11/16/98, at 132. The trial court presumably issued this instruction to avoid creating a direct connection between the polygraph testimony and Gerry's credibility in the minds of the jurors.

44. During an office conference, the trial judge recognized that Gerry's credibility was at issue, observing that the defense intended to argue that Gerry fabricated the conversation with Tom about using the boat and that the State sought "to explain this last epiphany" by reference to the "threat of a possible polygraph." Tr. of Office Conference of 11/16/98, at 18.

45. *See Holtzman*, Order at ¶ 13 ("[T]he police officer's personal belief that the complainant was telling the truth was not admissible evidence."); *see also Re v. State*, Del. Supr., 540 A.2d 423, 427 (1988) (observing that an expert may not generally testify on the credibility of a defendant unless the testimony "is used to illustrate the unreliability of the defendant's statements when they are being offered as a basis for an expert opinion") (citing *Wheat v. State*, Del. Supr., 527 A.2d 269, 275

(1987)); *cf. Trump v. State*, Del. Supr., 753 A.2d 963, 967 (2000) ("'The prosecutor should not express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.'") (quoting ABA Standards for Criminal Justice § 3–5.8(b) (3d ed.1993)). Under D.R.E. 608(a). "the credibility of a witness may be attacked or supported by evidence of reputation, but subject to these limitations: (1) The evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked."

46. *See Wheat*, 527 A.2d at 275 ("The expert may not directly or indirectly express opinions concerning a particular witness' veracity or attempt to quantify the probability of truth or falsity [of a witness' statements].") ; *see also Powell v. State*, Del. Supr., 527 A.2d 276, 279 (1987) (applying the analysis in *Wheat*).

47. Tr. of 11/16/98, at 130–31. The text of the relevant passage is reproduced in the text accompanying note 26 *supra*.

The problem is compounded by the State's elicitation from Lyons of his credentials as an experienced lawyer and former federal prosecutor. This testimony highlights the potential that Lyons' status as an experienced lawyer may have imparted credibility to Gerry's testimony—owing not to Gerry's believability but to the credentials of the lawyer-witness vouching for him.[48] Given Lyons' experience with federal prosecutors, a jury would be likely to infer that Gerry did not disregard Lyons' emphatic directive to make full disclosure.

In *Graves v. State*[49] we reversed a conviction in part because the lawyer for two prosecution witnesses improperly vouched for them. Before the witnesses took the stand, the witnesses' lawyer appeared as a witness for the State and testified that he had urged the witnesses to cooperate with investigators and to "tell the truth."[50] The lawyer also testified extensively about his impressive credentials and about specific honors that he received as a criminal defense lawyer.[51] In that situation, this Court was concerned that the lawyer's "recital of his professional attainments and his standing in the legal community could serve but one purpose: that a lawyer of his standing would not represent clients who were not truthful."[52]

In the present case, the State did not exalt Lyons' credentials in the same blatant manner as in *Graves*, but Lyons did testify that he worked as a federal prosecutor for eight years and had been in private practice since 1982.[53] He also testified extensively about his dealings with federal prosecutors on Gerry's behalf. This was a subtle but clearly effective method of permitting Lyons to vouch for Gerry's truthfulness in his disclosures to federal prosecutors. There is thus a concern that the jury may have inferred that a lawyer of Lyons' experience may have believed that Gerry's testimony was credible. Although it was error to permit Lyons to testify in a manner that amounted to vouching, compounded by using Lyons' credentials to bolster Gerry's credibility, the admission of Lyons' testimony was harmless in view of the entirety of the evidence.

---

48. Lawyers often testify as fact witnesses in other contexts where their appearance as a lawyer-witness is not problematic. But a lawyer's appearance as a witness can be problematic in at least two instances: (1) where, as here, the lawyer vouches directly or indirectly for the credibility of another witness; and (2) where the lawyer is also an advocate in the same trial. *See* Delaware Lawyers' Rules of Professional Conduct Rule 3.7(a) ("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where: (1) the testimony relates to an uncontested issue; (2) the testimony relates to the nature and value of legal services rendered in the case; or (3) disqualification of the lawyer would work substantial hardship on the client."); Comment to Delaware Rules of Professional Conduct Rule 3.7 ("It may not be clear whether a statement b[y] an advocate-witness should be taken as proof or as an analysis of the proof."); *cf. In the Matter of Estate of Waters*, Del. Supr., 647 A.2d 1091, 1096–98 (1994) (holding that it was plain error for attorney to serve as trial advocate and testify on behalf of estate in will contest); *Miller v. State*, Del. Supr., No. 434, 1998, Hartnett, J., 2000 WL 313484 (Feb. 16, 2000) (ORDER), Order at ¶ 12 ("The vouching by the prosecutor as to the credibility of a witness for the State is a special concern because jurors may easily interpret vouching by the prosecutor as an official endorsement of the witness and in doing so, overlook important aspects of the witness' credibility.").

49. Del. Supr., No. 144, 1993, Walsh, J., 1994 WL 416533 (Aug. 1, 1994) (ORDER).

50. *Graves*, Order at ¶ 4 (internal quotation marks omitted).

51. *See id.*

52. *Id.* at ¶ 6.

53. Tr. of 11/16/98, at 64–65.

## C. Harmless Error Analysis
## of Lyons' Testimony

■ Under "well established" Delaware law, "[a]n error in admitting evidence may be deemed 'harmless' when 'the evidence exclusive of the improperly admitted evidence is sufficient to sustain a conviction....' "[54] In this case, we must consider the effect of the references to lie detector tests and Lyons' improper vouching testimony on the credibility of Gerry Capano's testimony. The prejudice involved here "is limited to the potential that the jury might give undue credence"[55] to the admissions Gerry made to his lawyer under threat of a lie detector test and after being counseled by the lawyer to tell the truth. In determining the effect of this potentially improper bolstering, we will consider the extent to which the State's case depends on the witness' testimony and the extent to which the credibility of the witness is in dispute.[56]

■ Although we place emphasis on the evidence put forward by the State, our harmless error jurisprudence requires us to examine the entire record.[57] Our decision in *Van Arsdall* is an instructive illustration of the scope of the analysis.[58] In

---

54. *Nelson v. State*, Del. Supr., 628 A.2d 69, 77 (1993) (quoting *Johnson v. State*, Del. Supr., 587 A.2d 444, 451 (1991)); *see also Seward v. State*, Del. Supr., 723 A.2d 365, 373 & n. 27 (1999) (citing *Gordon v. State*, Del. Supr., No. 105, 1997, Veasey, C.J., 1997 WL 812630 (Dec. 23, 1997). Order at 2 ("An error in admitting evidence is harmless only when the properly admitted evidence, taken alone, is sufficient to support a conviction.")). "Alternatively, when the evidentiary error is of a constitutional magnitude, the convictions may be sustained if the error is 'harmless beyond a reasonable doubt.' " *Nelson*, 628 A.2d at 77 (citations omitted).

This distinction is well established in federal harmless error jurisprudence. *See United States v. Bruck*, 1st Cir., 152 F.3d 40, 44 (1998) ("We ... answer[] in the negative the harmless-error inquiry appropriate for non-constitutional error: was the putative error likely to have 'had substantial injurious effect or influence in determining the jury's verdict?' ") (citation and internal quotation marks omitted); *United States v. Zehrbach*, 3d Cir., 47 F.3d 1252, 1265 (1995) (*en Banc*) ("[T]he standard of review in determining whether an error is harmless depends on whether the error was constitutional or non-constitutional."), *cert denied*, 514 U.S. 1067, 115 S.Ct. 1699, 131 L.Ed.2d 562 (1995). The Third Circuit finds a non-constitutional error harmless when "it is *highly probable* that the error did not contribute to the judgment." *Zehrbach*, 47 F.3d at 1265 (emphasis in original and citation omitted).

55. *Whalen v. State*, Del. Supr., 434 A.2d 1346, 1354 (1981).

56. *See, e.g. Kaminski v. State*, Fla. Supr., 63 So.2d 339, 340–41 (1953); *Sullivan v. State*, Fla. Supr., 303 So.2d 632, 634–35 (1974), *cert. denied*, 428 U.S. 911, 96 S.Ct. 3226, 49 L.Ed.2d 1220 (1976); *see also Sawyer v. State*, Del. Supr., 634 A.2d 377, 380 (1993) (stating factors relevant to a review of a denial of motion for mistrial).

57. *See Van Arsdall v. State*, Del. Supr., 524 A.2d 3, 10–11 (1987).

58. *See id.* at 11 (noting that "Van Arsdall himself admitted at trial that he had returned [to the crime scene]" and therefore the tainted "testimony, standing alone, appears to have established nothing with regard to the fact of Van Arsdall's presence at the scene of the crime which could have had an effect on the jury's verdict"). Courts performing harmless error analysis have considered the strength of the defendant's case as part of its analysis of the strength of the State's case, *e.g.*, the extent to which the defendant's testimony was contradicted or implausible. *See Hanrahan v. Thieret*, 7th Cir., 933 F.2d 1328, 1340 (1991) ("Supreme Court precedent also suggests the necessity and appropriateness of an analysis of [the] defense. The less believable the defense, after all, the more likely the conclusion that the constitutional error did not contribute to the conviction.") (citations omitted), *cert. denied*, 502 U.S. 970, 112 S.Ct. 446, 116 L.Ed.2d 464 (1991); *id.* at 1340 n. 29 ("[O]f course, to go beyond this inquiry and to decide [defendant's] innocence or guilt would usurp the function of the jury. To determine that one party's version of events is less believable, however, is not to make that ultimate determination."); *see also United States v.*

that case, in considering the significance of the tainted testimony in light of the defendant's admission, made on the stand at trial, as to his presence on the crime scene, we stated:

> [T]he reviewing Court must consider both the importance of the error and the strength of the other evidence presented at trial.... It is necessary to review the entire record to determine the significance of the error.... Ultimately, the Court must weigh the significance of the error against the strength of the untainted evidence of guilt to determine whether the error may have affected the judgment.[59]

We have noted that "[a]ny harmless error analysis is a case-specific, fact-intensive enterprise."[60]

It is undisputed that Gerry provided the State with important evidence from which a jury could infer that Capano began planning Fahey's murder long before her death and that he disposed of her body at sea. Capano vigorously contested Gerry's credibility on several grounds, including: (1) his plea agreement with federal prosecutors, (2) his drug use and expert testimony concerning "confabulation" of events by drug users,[61] and (3) Gerry's conversation with his mother indicating that he would fabricate facts to incriminate Tom.

### 1. Effect of Lyons' Testimony on the Credibility of Gerry's Testimony

It is clear that the State regarded Gerry as a key witness and his credibility as crucial. In closing argument, the State said that "the most important piece of evidence is Gerry's testimony."[62] The State also emphasized that "Gerry solves the case" and that "[i]f it wasn't for Gerry and Dan Lyons, he [Capano] might have got away with it."[63] Capano refers to Gerry as "a critical prosecution witness" because "the testimony that Capano had asked him whether his boat would be available if he ever should need it was the most important evidence in the case on the issue of premeditation."

But the fact that Gerry was a critical witness whose credibility was pivotal is not the end of the harmless error analysis. One must place the unfortunate lie detector reference and vouching by Lyons in the context of all the evidence, particularly the other admissible evidence corroborating Gerry's testimony.

As noted earlier, Gerry testified about several issues. Most important for our analysis, he testified concerning: (1) the "extortion story" described below and (2) the attempts to hide Fahey's death. It is crucial to examine the extent to which his testimony on these two issues was corroborated or undisputed.[64]

---

*Charley,* 10th Cir., 189 F.3d 1251, 1271 (1999) ("Furthermore, there were three aspects of Defendant's testimony that were flatly contradicted by other witnesses."), *cert. denied,* 528 U.S. 1098, 120 S.Ct. 842, 145 L.Ed.2d 707 (2000).

59. *Van Arsdall,* 524 A.2d at 10–11 (citation omitted).

60. *Dawson v. State,* Del. Supr., 608 A.2d 1201, 1204 (1992); *see also Barrow v. State,* Del. Supr., 749 A.2d 1230, 1245–46 (2000) (evaluating the record in the case and the State's theory of the case).

61. According to testimony at trial, confabulation describes a peculiar mental process in persons who engage in heavy use of alcohol

and illegal drugs. In these persons, the mind tries to fill gaps in memory by inserting "things that either the person thinks must have been what happened or maybe the person has heard that these things happened or it might have been suggested to the person or even asked as a question." Tr. of 12/14/98, at 116–17.

62. Tr. of 1/13/99, at 15 (State's Closing Argument).

63. Tr. of 1/13/99, at 207, 229.

64. *See Van Arsdall,* 524 A.2d at 11.

■ We begin with the fact that most of the testimony regarding the immediate cover-up of Fahey's death, including the disposal of her body, is either undisputed or corroborated.[65] Capano admitted to dumping Fahey's body over the side of Gerry's boat.[66] The events of that morning are corroborated by eyewitness testimony and physical evidence, such as phone records and gas receipts.[67]

The State emphasized in closing argument that when Gerry came forward with his story about the cooler, it was a story that he could not prove and might invite disbelief. But the cooler finally surfaced, having been found at sea by a fisherman.[68] Thus, Gerry's story was vindicated, and at trial the evidence of what had happened in disposing of the body was essentially undisputed. As the State argued, the cooler "is the ultimate corroboration of Gerry Capano."[69] It appears to us that much of the importance ascribed to Gerry's testimony by the State is linked to this portion of his testimony, for the reason that only Gerry could give direct testimony concerning the disposal of Fahey's body in the State's case. Tom Capano in the defense case corroborated the essence of Gerry's

testimony concerning the body disposal. This testimony does not, standing alone, show that Capano actually killed Fahey or how. But it does show a cover-up, and thus consciousness of guilt.

■ The "consciousness of guilt" evidence was not contested at trial. Thus, we must focus on the main element of Gerry's testimony that was disputed: the evidence of planning and, more specifically, the alleged conversations about extortionists. According to Gerry, Thomas approached him in February 1996 and asked to borrow $8,000 in cash.[70] Gerry testified that Tom's explanation for this request was that "a guy and a girl" were "extorting" Tom, "threatening to hurt his kids and ruin his career."[71] Gerry testified that he went to the bank, cashed a check, and gave Tom the money.[72]

Gerry further related at trial that in a later conversation, Tom said that he was scared that "the guy was going to beat him up or hurt him," and asked to borrow one of Gerry's guns.[73] Tom later returned the gun unused.[74] Finally, Gerry testified that Tom asked if he "could use the boat" if the extortionists "hurt his kids" and "he was to do something to them."[75]

65. Capano's brief says that, "The final category of evidence, which was *largely undisputed* by the defense at trial, related the steps taken by Capano after Fahey's death to dispose of physical evidence that might link him to disappearance." For example, Gerry testified that on Friday, June 28, after disposing of the body, he went to Capano's home and helped him dispose of a bloodstained couch. Tr. of 11/9/98, at 54–56.

66. Capano testified: "I used the chain and attached the two anchors that Gerry had given me and then tilted the cooler so that Anne Marie's body came out." Tr. of 12/29/98, at 110. *See Hanrahan*, 933 F.2d at 1340 (noting the appropriate use of admissions by defendant in the context of harmless error analysis).

67. Tr. of 1/4/99, at 127–28.

68. Tr. of 12/2/98, at 121–24.

69. Tr. of 1/13/99, at 54.

70. Tr. of 11/9/98, at 11–13.

71. *Id.* at 12, 21.

72. *Id.* at 13.

73. *Id.* at 16.

74. *Id.* at 19–20.

75. *Id.* at 21. The first reference to the lie detector test happened just after Gerry repeated this testimony. A curative instruction was then given. As discussed below, this statement presaging Capano's actual use of the boat is ultimately the most troublesome testimony tainted by the references to the lie detector test.

The State used this testimony as evidence of planning. Capano disputes Gerry's testimony on these points. The State's theory was that Thomas was thinking ahead about using Gerry's boat to dispose of Fahey's body, and feeding Gerry a story about extortionists so that Gerry would think there was a "legitimate" reason for this use of the boat.[76] According to the State's theory, borrowing $8,000 in cash was a premeditated attempt to support the extortionist story because Capano had at least $125,000 in his checking account at all times in February 1996, and over $150,000 on the day he borrowed the money.[77]

The State also argued that the jury could infer that Capano borrowed the gun at that time as a premeditated step toward carrying out the murder.[78] The State argued to the jury that Thomas later returned the gun to Gerry (and had MacIntyre purchase a different gun) because Thomas realized that this gun would be easily traceable to him if recovered after he used it to kill Fahey.[79] According to the

State, all of this planning connected to the extortion smokescreen took place just when Fahey was beginning to truly distance herself from Capano, supplying a timely motive.

The references to lie detector tests tended to bolster the credibility of the State's planning evidence that was centered on Gerry's testimony. Nevertheless, we find that there are significant factors in the context of the totality of the State's case militating against the likelihood that these improper references constituted such substantial prejudice to Capano that we should reverse the conviction and sentence.

First, Gerry's testimony about the extortionist story is circumstantially corroborated. The fact that Thomas borrowed $8,000 from Gerry in early February 1996 is admitted by Thomas and established by bank records offered by the State and admitted into evidence.[80] Capano's own explanation for the transaction appears strained and its credibility was strongly contested at trial.[81]

---

**76.** Tr. of 1/13/99, at 29–30 (State's Closing Argument).

**77.** Tr. of 12/29/98, at 255–56.

**78.** Tr. of 1/13/99, at 39, 51–52 (State's Closing Argument).

**79.** *Id.* at 52.

**80.** Tr. of 12/29/98, at 247–49 (introduction of checks into evidence at State exhibits 237, 238 and 239).

**81.** Capano testified that he borrowed the money, notwithstanding having over $150,000 in his account at the time, because he wanted to give Fahey $25,000 in cash as part of a plan to help her pay for therapy. *Id.* at 255–56. The reason he gave for not withdrawing his own money was that "I had made a cash withdrawal for $8,000 and then one for $9,000, and I just felt stupid doing that three days in a row at the same bank with the same lady. So that's why I asked Gerry for the $8,000 in cash." *Id.* at 244.

The State attacked this explanation on several grounds. The sequence of the transac-

tions, as evidenced by processing dates on the checks, contradicted Capano's testimony that he made two trips to the bank before asking Gerry for money. Instead, it appears that he received money from Gerry before or at the same time of his first transaction at the bank. *Id.* at 247–51. This fact contradicts the claim that "embarrassment" over a third trip to the bank was the motive for borrowing cash from Gerry.

Capano testified that he needed the cash in the first place in order to "shock" Fahey; giving her a *check* for $25,000 would not achieve that result despite the fact that she earned about $30,000 a year. *Id.* at 256–258. Even on the assumption that cash was needed to "shock" Fahey, Capano was pressed for an explanation of why he went to Gerry rather than going to another branch of his bank, just one block away from his customary branch. Such a step would have dealt with Capano's professed embarrassment at going to the same teller three days in a row. *Id.* at 251–52. Additionally, Capano was pressed for an explanation of what he had done with the money, which, according to his testimony, Fahey

Second, as with the cash, it is undisputed that Thomas accepted a gun from Gerry.[82] The corroborating evidence mitigates the impact of the lie detector evidence on the credibility of Gerry's testimony. Gerry testified that after Tom told him about the extortionists, he went to his friend Jon Burris to ask whether he knew a "leg breaker" who could help his brother.[83] Jon Burris gave testimony corroborating Gerry on this point.[84]

Another source of corroboration of Gerry's testimony is MacIntyre's testimony that Capano told *her* about extortionists as an explanation for why he wanted *her* to purchase a gun for him.[85] Additionally, MacIntyre's purchase of the gun for Capano corroborates Gerry's testimony because it leads to the inference that Capano was not a passive and reluctant recipient of Gerry's gun; rather, he was actively seeking a gun by May 1996. All of this corroboration greatly reduces the prejudicial impact of the references to the lie detector test.

■ Of significant concern is Gerry's statement that "my brother said to me that if somebody was to hurt my kids and I had to do something to them, could we use the boat."[86] Relatedly, this statement is the one most directly bolstered by both Gerry's and Lyons' references to the lie detector test. This is because according to

both of these witnesses, it is the one statement that Gerry withheld from Lyons until he was threatened with a lie detector test.[87] Although the lie detector reference certainly risks enhancing the credibility of all of Gerry's testimony, this statement is the one that is directly and specifically bolstered. The State confirms this in closing argument, saying with reference to this statement:

But [Gerry] told his story, his testimony, to Dan Lyons as early as April 1997, months before his house was raided. And the only piece of the puzzle he left out had to do with the defendant's request that if he killed somebody he could use the boat. That's the only piece missing. And we get that piece when on October 30th Dan Lyons, knowing that Gerry is about to come in and discuss his case with the Government, tells [Gerry] you must tell the complete truth. He threatens him with the lie detector test and he says you have to tell the complete truth, you cannot hold back.[88]

Thus, we must weigh the impact of this statement, in light of the rest of the State's evidence, mindful of the credence that the jury may have accorded it. But, in the context of this ten-week trial, this statement was harmless when measured against the strength of the total evidence

---

"threw ... in [his] face." Tr. of 12/30/98, at 25. The credibility of this explanation was also an issue focused on by the State. *Id.* at 28–29.

**82.** Capano testified that he reluctantly accepted the gun in order to humor Gerry. *Id.* at 235–237. He contended that he never told Gerry that he needed money to pay extortionists and that the extortionist story was essentially the product of Gerry's imagination. Tr. of 12/30/98, at 28–29. According to Capano, when Capano asked Gerry for the loan, Gerry inquired why Capano needed the money. Tr. of 12/29/98, at 232–239. Gerry then "brought up the idea of extortion," which Capano dismissed by saying "yeah, yeah, yeah...." *Id.* at 234. Capano testified to a later conversa-

tion in which Gerry, inebriated and still preoccupied by the extortionists he had supposedly invented, pressed Capano to take a gun for his own protection.

**83.** Tr. of 11/10/98, at 63–64.

**84.** Tr. of 12/12/98, at 107–08.

**85.** Tr. of 11/18/98, at 75.

**86.** Tr. of 11/9/98, at 88.

**87.** Tr. of 11/16/98, at 88–118, 130–31.

**88.** Tr. of 1/13/99, at 66 (State's Closing Argument).

against Capano, despite the State's reliance on it. Moreover, we discuss in subsection C-3 the trial court's instruction carefully limiting the purpose for which the lie detector references were admitted.

### 2. Untainted Evidence of Planning

■ Having identified the potentially tainted portion of Gerry's testimony, we next determine the extent to which "the evidence exclusive of the improperly admitted evidence is sufficient to sustain a conviction."[89] We must therefore determine whether, excluding Gerry's testimony that Tom had asked to borrow Gerry's boat in the event that Tom had to "do something to" two extortionists, the State presented sufficient untainted evidence of planning to support a conviction for first degree murder.[90] The State's theory, as developed in its closing argument, was that Tom's conversations with Gerry about extortionists were merely the beginning of the evolution of a plan to kill Fahey.[91]

Even though Capano offered innocent explanations in some instances, we conclude that a rational jury could have convicted Capano based on the following evidence of planning and motive: (1) Capano's purchase of a large cooler in April 1996; (2) his purchase of the lock and chain that he used to secure the cooler top; (3) his purchase of a gun through Debby MacIntyre in May 1996; (4) his immediate conceal-

ment of Fahey's death and disposal of her body; and (5) evidence that Fahey sought to end her romantic involvement with Capano and began dating another person early in 1996.

■ First, the jury heard evidence that Capano purchased a very large, 162-quart cooler on April 20, 1996.[92] The State presented evidence that Capano made this purchase at approximately the same time that Fahey began to distance herself from him and to become closer to Michael Scanlon.[93]

Second, the jury heard evidence that, at some point early in 1996, Capano purchased the lock and chain that he used to secure the cooler containing Fahey's body. Although Capano presented innocent explanations for these purchases, the State vigorously attacked these explanations in its rebuttal and closing. Capano testified that, around January 1996, he purchased a twelve-foot length of chain from a neighborhood hardware store to increase the traction of his car tires during the winter.[94] The State argued in its closing that it would make no sense for Capano to purchase only twelve feet of chain, without hooks, for this purpose.[95] In addition, the State presented testimony that the hardware stores in Capano's neighborhood had no record of "purchases of chain over eight feet long from January of '96 through June 28, 1996."[96]

---

**89.** *Johnson v. State,* Del. Supr., 587 A.2d 444, 451 (1991) (internal quotation marks omitted).

**90.** As the State acknowledged in its closing, because the State has no direct evidence of Capano's actions on the night of Fahey's death, the State must prove that Capano intentionally caused Fahey's death by proving that Capano planned her death in advance. Tr. of 1/13/99, at 13–14 ("I'm not going to stand here today and tell you we know exactly how Anne Marie Fahey physically died that evening. What we did say we would prove ... is that starting at least as early as February 1996 the defendant took steps to prepare him-

self for the possibility that he would kill Anne Marie Fahey.").

**91.** Tr. of 1/13/99, at 13–14 (State's Closing).

**92.** Tr. of 12/16/98, at 46–48 (Tom Capano); Tr. of 12/2/98, at 85 (John O'Neill).

**93.** Tr. of 11/3/98, at 34–35, 40 (Dr. Sullivan).

**94.** Tr. of 12/22/98, at 65–66; Tr. of 12/29/98, at 102–04.

**95.** Tr. of 1/13/99, at 74–75.

**96.** Tr. of 1/7/99, at 74–76.

Capano also testified that he purchased the lock early in 1996 because someone had broken into his locker at his country club and because the club president had issued a letter advising members to purchase locks for their lockers.[97] In rebuttal, the State presented testimony from several witnesses refuting this testimony. These witnesses testified that Capano's country club did not issue a letter advising members to purchase locks for their lockers.[98] From the State's evidence, the jury could reasonably infer that Capano purchased the lock and chain at approximately the same time as he purchased the cooler, as part of his overall plan to kill Fahey and to dispose of her body at sea.[99]

■ Third, Deborah MacIntyre testified that Capano asked her to purchase a gun for him in April 1996—at approximately the same time that Capano purchased the cooler.[100] Although MacIntyre was unable to purchase the gun for him at that point, she testified that Capano renewed his request in May 1996.[101] After MacIntyre agreed to this second request, Capano drove her to a gun shop and she purchased a handgun. MacIntyre testified

that she immediately gave the handgun to Capano and claims not to have seen it again.[102] From evidence of this transaction, the jury could infer that Capano sought to purchase a gun that could not be traced directly to him—once again, as part of his plan to kill Fahey.

■ Fourth, the State presented substantial evidence that, immediately after Fahey died, Capano concealed her death and disposed of her body and other physical evidence. Capano testified that, at about 11:35 p.m., after he abandoned his attempts to revive Fahey after the "accident," he retrieved the cooler from a crawlspace and placed Fahey's body inside.[103] At this point, he also retrieved a bottle of Clorox to remove the bloodstains on the loveseat.[104] Within approximately twenty minutes of Fahey's death, Capano drove to Fahey's nearby apartment to make a "star-69" call from her phone and to leave a gift and some perishable groceries.[105]

On cross-examination, Capano conceded that these actions, which were taken within twenty minutes of Fahey's death, were

97. Tr. of 12/22/98, at 66.

98. Tr. of 1/7/99, at 32, 38, 41, 46–48.

99. In closing argument the State emphasized that the purchases of the cooler, the lock, and the chain were key pieces of evidence that Capano planned long before June 27, 1996 to kill Fahey. Tr. of 1/13/99, at 14–16.

100. Tr. of 11/18/98, at 73–74.

101. Tr. of 11/18/98, at 77–79, 83–84, 90–91. It is worth noting that Tom returned the handgun he borrowed from Gerry between one and two months after he borrowed it in February or March of 1996. Tr. of 11/9/98, at 18–19 (Gerry Capano); Tr. of 12/16/98, at 66–67 (Tom Capano).

102. MacIntyre also testified that in February 1997, Capano prepared a false story for her to tell investigators to explain her purchase of

the handgun: "I bought the gun for myself as self defense, and because there were a lot of young people in my home, I got nervous that someone might find it, and I threw it away in the trash." Tr. of 11/18/98, at 164–65, 172. It is worth noting that MacIntyre further testified that Capano told her: "I should tell them [the police] that I saw it [the cooler] at his house, and I commented about it, and he told me he had bought it for his brother's boat." Tr. of 11/18/98, at 173–74.

103. Tr. of 12/21/98, at 197–98.

104. Tr. of 12/22/98, at 23.

105. Tr. of 12/21/98, at 200; Tr. of 12/22/98, at 20–22. "Star–69" is an automated service offered by local telephone companies by which a caller dials "*69" to receive the date, the time, and the number of the last incoming call to the telephone number.

designed to give the appearance that Fahey had been at home recently.[106] Capano testified that he knew that Fahey was not going to work the next day,[107] and thus knew that her co-workers would be unaware of her disappearance until the following Monday. At 12:05 a.m. on June 28, 1996, approximately thirty minutes after Fahey's death, Capano also made a call to the voice mail system at his law firm "to create an alibi that I was home" because he knew that the system recorded the time of incoming calls.[108] Thus Capano admits that he acted immediately and decisively to conceal his involvement in Fahey's death and to create an alibi for himself. This admission is consistent with planning, and it supports a reasonable inference that, before June 27, 1996, Capano had planned Fahey's death.[109]

Similarly, Capano's efforts to destroy physical evidence of Fahey's death are consistent with planning. By about 5:00 p.m. on Saturday, June 28, 1996—after

Thomas and Gerry Capano returned to Wilmington from disposing of Fahey's body at sea—Thomas had transported the stained loveseat from his great room to a dumpster at a construction site run by his family.[110] His brother, Louis Capano, testified that Thomas asked him to have the dumpster emptied on Monday, July 1, 1996.[111] On June 29, 1996, less than one day after Fahey's death, Thomas placed the stained rug from his great room and various cleaning materials into a dumpster at a hotel in New Jersey owned by his family's business.[112] Because Capano effectively destroyed most of the physical evidence connecting him with Fahey's death in a relatively short time span, the jury could reasonably infer that his actions were the product of a pre-arranged plan to conceal her death.

■ Fifth, the State presented evidence that Fahey sought to end her romantic involvement with Capano in January and February of 1996.[113] The State also presented evidence that Capano did

---

106. Tr. of 12/30/98, at 20.

107. Tr. of 12/21/98, at 180–82.

108. Tr. of 12/22/98, at 42-43; Tr. of 12/30/98, at 20.

109. Cf. *Hanrahan*, 933 F.2d at 1339-40:
Homer's own testimony goes a long way in meeting the State's burden and, in view of the source, must be viewed as having a more detrimental impact upon his defense than Michael's statements. See *Morrison v. Duckworth*, 929 F.2d 1180 (7th Cir.1991) (purported constitutional error held harmless when defendant's own statements admitted elements of crime); *see also Arizona v. Fulminante*, 499 U.S. 279[, 296], 111 S.Ct. 1246, 1257, 113 L.Ed.2d 302 (1991) (" '[T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct.' ") (quoting *Bruton v. United States*, 391 U.S. 123, 140, 88 S.Ct. 1620, 1630, 20 L.Ed.2d 476 (1968) (White, J., dissenting)).

110. Tr. of 12/22/98, at 93–97. Additionally, Capano also provided Gerry with an innocent explanation for their trip to Stone Harbor in the event that Gerry was questioned by police. Tr. of 12/22/98, at 94.

111. Tr. of 11/13/98, at 14–19. Louis also testified that he "saw something that could have been a sofa or a chair" in one of the dumpsters at the construction site. *Id.* at 16.

112. Tr. of 12/22/98, at 96–101. In addition, Louis Capano testified that Tom admitted to putting his loveseat and some of Fahey's personal belongings in a dumpster belonging to the Capanos' construction company. Tr. of 11/13/98, at 14–15.

113. Email message of 2/4/96 from Fahey to Capano (indicating that she had told Capano that she wanted to pursue only a platonic relationship with him); email message of 2/7/96 from Fahey to Capano ("I meant what I said on Sunday night about right now only being able to offer you my friendship. . . ."); Tr. of 11/3/98, at 34–35, 40 (Dr. Sullivan); Tr. of 10/29/98, at 10–12 (Dr. Johnson). The admission of these emails into evidence was stipulated to by the parties.

not want the relationship to end and that he was upset about Fahey's attempts to break things off between them.[114] This evidence supports the State's theory that Capano had a motive to kill Fahey because she rejected him and started to date another man.[115]

### 3. The Trial Judge's Limiting Instructions

We also note that the trial judge twice issued limiting instructions—once during Lyons' testimony and once in the final jury charge—regarding the jury's use of the lie detector evidence in their deliberations.[116] These instructions limited the jury's consideration of the contested testimony and thus reduced the prejudicial effect of the testimony. The fact that these limiting instructions tended to minimize the impact of the evidence is a factor to consider in this harmless error analysis.

Accordingly, we conclude that, although the totality of Gerry's testimony was critical to the State's case, the portion of Gerry's testimony that was tainted by Lyons'

---

**114.** Email message of 2/14/96 from Fahey to Capano ("Tommy, you scared me this weekend, starting with Friday and all the calls you placed. It really freaks me out when you call every half hour.").

**115.** Tr. of 1/13/99, at 30–51 (State's Closing).

**116.** *See supra* notes 14, 20, 27 and accompanying text.

**117.** This is true even though the State, in summation, referred to the importance of Lyons' testimony. Tr. of 1/13/99, at 15, 66, 207, 229. That reference must be viewed in light of the reality that the State had ample other evidence without Lyons' testimony. Compare the present case with *Barrow v. State*, Del. Supr., 749 A.2d 1230, 1246–47 (2000), in which we reversed a conviction because the improper statement was "particularly important to the State's effort to prove intentional killing," and provided a "necessary link" in the State's case.

vouching testimony was not an indispensable or critical part of the State's case[117] and that the State presented ample untainted evidence of planning to support Capano's conviction. On harmless error analysis, therefore, we hold that the erroneous admission of Lyons' testimony concerning Gerry's polygraph test and his improper vouching did not substantially prejudice the defense and that admission of this testimony does not warrant a reversal of Capano's conviction and sentence.[118]

### IV. Hearsay Testimony by Fahey's Psychotherapists and Friends

The State presented the testimony of three of Fahey's psychotherapists: a psychiatrist, Neil Kaye, M.D.; and two psychologists, Dr. Michele Sullivan and Dr. Gary Johnson. For the most part, this testimony related to two primary subject areas: the genesis and treatment of Fahey's emotional difficulties, including her eating disorder, and Fahey's relationship with Capano, including descriptions of specific incidents during the relationship.[119]

---

**118.** For the purposes of Capano's federal due process claim on this issue, see *Dowling v. United States*, 493 U.S. 342, 353–53, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (asserting that improper admission of evidence violates due process if it "violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions'") (citations omitted).

**119.** For example, Dr. Kaye testified that "[Fahey] was fearful of [Capano], was not convinced that he was ever going to let go...." and that "she was genuinely fearful ... that harm would come to her if she broke things off ... because she was worried about rage and anger." Tr. of 10/27/98, at 33–34. Dr. Kaye also testified about Fahey's character and testified extensively about Fahey's eating disorder. Tr. of 10/27/98, at 22 ("She was someone who was very memorable ... a very friendly, polite young woman"); *id.* at 29, 37–48. Similarly, Dr. Sullivan testified that Fahey sought to end her involvement with Capano because the relationship was "unhealthy" and

The State also presented the testimony of Fahey's sister and six of Fahey's friends. Like the psychotherapists, these witnesses testified about their conversations with Fahey concerning Fahey's relationship with Capano and her descriptions of several incidents involving Capano.[120]

In his initial briefs before this Court, Capano argued broadly that all of the testimony presented by Fahey's psychotherapists and friends is inadmissible under the hearsay rules. In his supplemental briefs and in his June 13, 2001 oral argument before the Court on this issue, however, Capano specified more carefully his hearsay arguments and the evidence to which each argument applies. The State argues that all of the disputed testimony is admissible under exceptions to the rule against hearsay and is cumulative of similar evidence that was admitted by stipulation. In any event, the State argues, if there was error admitting this evidence, it was harmless error.

Capano raises several challenges to the trial court's admission of testimony by Fahey's psychotherapists and friends recounting her description of specific examples of Capano's conduct during their relationship and her characterization of Capano as "controlling" and "jealous." First, Capano argues that the psychotherapists' testimony on these topics is not admissible under the medical diagnosis exception to the hearsay rule in D.R.E. 803(4), raising a question of first impression concerning whether that exception applies to statements made for purposes of psychotherapy—as distinct from statements made for purposes of diagnosing physical ailments. Second, he argues that the statements to the psychotherapists and Fahey's similar statements to her friends are not admissible because this testimony is a "statement of memory or belief" by Fahey and therefore does not fall within the state of mind hearsay exception. Third, Capano argues that Fahey's hearsay statements concerning her fear of Capano, although admissible under the state of mind exception, should not have been admitted during the State's case-in-chief. Capano contends that the State was not permitted to present this testimony until the

---

because he was "incredibly controlling and possessive." Tr. of 10/29/98, at 17–18. In a similar vein, Dr. Sullivan testified that Fahey was concerned that Capano would have her kidnapped. Tr. of 10/29/98, at 36, 37. Dr. Johnson testified that Fahey was "terrified" because a prominent married man whom she was dating (that is, Capano) "had come to her apartment quite late at night ... bolted the door shut" and yelled at her because she had started to date Scanlon. Tr. of 10/29/98, at 16. Dr. Johnson further testified that Fahey "felt very much controlled by" the man and that Fahey "began to want to pull away from that relationship, [but] that he was unwilling to let her do so." Tr. of 10/29/98, at 10, 13.

120. For example, Fahey's sister, Kathleen Fahey-Hosey, read extensively from Fahey's diary, Tr. of 10/28/98, at 137–56, including the following passage: "I finally have brought closure to Tom Capano. What a controlling, manipulative, insecure jealous maniac." Tr. of 10/28/98, at 155–56. Fahey's friend, Jill Morrison, similarly testified that Fahey thought that Capano was trying to control her life, Tr. of 11/4/98, at 47, and that Capano was upset about Fahey's relationship with Scanlon. Tr. of 11/4/98, at 61–62 ("He [Capano] was upset and this was because she was dating Mike [Scanlon]"). Morrison also described several incidents indicating that Capano was vindictive and that he was determined to maintain his relationship with Fahey. Tr. of 11/4/98, at 53–62. Fahey's friend Siobhan Sullivan testified that Fahey called Capano "a possessive, controlling maniac." Tr. of 11/4/98, at 161. Fahey's friend Kim Lynch-Horstmann testified that in December 1995, Capano "would e-mail her at work all the time and they were kind of obsessive e-mails." Tr. of 11/6/98, at 98. Other friends testified extensively about Fahey's relationship with Capano, about Fahey's excessive neatness, and about her eating disorder.

defense had presented evidence or raised an affirmative defense making her state of mind relevant. Finally, Capano argues that the admission of this hearsay testimony violated his federal constitutional right to confront the witnesses against him.

We focus first in Subsection A on the question whether, and to what extent, the statements of both Fahey's friends and psychotherapists are admissible under the state of mind exception of D.R.E. 803(3). In Subsection B, we consider whether the erroneous admission of statements under this exception was harmless error. Finally, in Subsection C, we deal separately, and alternatively, with the question whether the testimony of the psychotherapists is also admissible under the medical diagnosis or treatment exception of D.R.E. 803(4).

■■■■■ Claims alleging that the Superior Court erred in admitting evidence are subject to review in this Court to determine whether the trial court abused its discretion.[121] Where the trial court determines that the probative value of evidence is not "substantially outweighed by the danger of unfair prejudice" under Rule 403, this Court's review is necessarily deferential because "the trial judge is in a unique position to evaluate and balance the probative and prejudicial aspects of the evidence."[122] Claims alleging the infringement of a constitutionally protected right are subject to *de novo* review in this Court.[123]

## A. Admissibility of Hearsay Testimony by Fahey's Psychotherapists and Friends under the State of Mind Exception

In challenging the admission of the hearsay testimony presented by Fahey's psychotherapists and friends, Capano raises two related issues. First, he argues that certain of the statements do not fit within the hearsay exception for statements of the declarant's then-existing state of mind. This issue centers on the elements of Rule 803(3), particularly the provision excluding "statement[s] of memory or belief to prove the fact remembered or believed." Second, he argues that the trial court erroneously admitted Fahey's statements of her fear of Capano during the State's case-in-chief because the State may present evidence of the victim's fear of the defendant only in rebuttal after the defense raises an issue making the evidence relevant.[124] This issue assumes that Rule 803(3) is satisfied, and focuses on relevance and prejudice concerns under Rules 401 and 403.

The State contends that the contested hearsay evidence is admissible because it reveals Fahey's state of mind—that is, why Fahey wanted to end her relationship with Capano—and because it rebuts Capano's contention that they had a good ongoing relationship.[125] According to the State, the hearsay evidence therefore supports the prosecution's theory that Capano formulated a plan to kill Fahey because she was attempting to break off their relationship.

---

121. *See Williamson v. State,* Del. Supr., 707 A.2d 350, 354 (1998).

122. *Smith v. State,* Del. Supr., 560 A.2d 1004, 1007 (1989).

123. *See id.*

124. Capano's argument relies primarily on the rule set out in *State v. Porter,* Del. Super., 587 A.2d 188, 193 (1990).

125. The prosecution thus argued to the trial court that "We would have to raise … that Miss Fahey would not have just walked off and gone to Mexico or gone to Puerto Rico or gone somewhere. These are things, because we do not have a body we have to establish them, and it is those things that also make relevant all of the state of mind testimony." Tr. of 11/2/98, at 155.

Agreeing with the State, the Superior Court admitted the hearsay testimony under D.R.E. 803(3) because the court viewed the change in the relationship between Fahey and Capano as relevant to Capano's motive to murder Fahey and, consequently, to the State's theory of the case. The trial court thus concluded that "[Fahey's] state of mind becomes important"[126] and that the hearsay evidence was admissible evidence on that issue. The trial court was concerned with both the State's need to present a coherent theory of the case and the fact that Capano had raised an accident defense during opening statements that the State needed to rebut.

### 1. Whether Fahey's Statements Fall within the State of Mind Exception

D.R.E. 803(3) provides a hearsay exception for:

A statement of the declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of the defendant's will.[127]

The exclusion of statements of "memory or belief" derives from the United States Supreme Court's decision in *Shepard v. United States,* in which a witness testified that the victim had stated, "Dr. Shepard [the defendant] has poisoned me."[128] The *Shepard* Court held that this declaration was not admissible under the state of mind exception because it was a statement of "memory."[129] Specifically, the Court stated:

Declarations of intention, casting light upon the future, have been sharply distinguished from declarations of memory pointing backwards to the past. There would be an end, or nearly that, to the rule against hearsay if the distinction were ignored.

The testimony now questioned faced backward and not forward. This at least it did in its most obvious implications. *What is even more important, it spoke to a past act, and more than that, to an act by some one not the speaker.* Other tendency, if it had any, was a filament too fine to be disentangled by a jury.[130]

---

**126.** Tr. of 11/2/98, at 176–177.

**127.** This Court has established five factors to be applied in deciding whether a hearsay statement is sufficiently trustworthy to be admissible under the state of mind exception. *See Derrickson v. State,* Del. Supr., 321 A.2d 497, 503 (1974). Specifically, the statement (1) must be relevant and material; (2) must relate to an existing state of mind of the declarant at the time of its making; (3) must have been communicated in a natural manner; (4) must be made under circumstances dispelling suspicion; and (5) must contain "no suggestion of sinister motives." *Id.; see also Forrest v. State,* Del. Supr., 721 A.2d 1271, 1275–76 (1999). Although *Derrickson* was decided prior to the adoption of the current version of the Delaware Rules of Evidence, this Court has reaffirmed the use of these factors in determining whether a statement is admissible under the state of mind exception. *See Forrest,* 721 A.2d at 1276.

**128.** *See Shepard v. United States,* 290 U.S. 96, 98, 54 S.Ct. 22, 78 L.Ed. 196 (1933); *see also* 3 Federal Rules of Evidence Manual 1656 (7th ed. 1998) (referring to "*Shepard* exclusion," citing Advisory Committee notes to Fed. R. Evid. 803(3)). The state of mind hearsay exception was developed in *Mutual Life Ins. Co. v. Hillmon,* 145 U.S. 285, 295–97, 12 S.Ct. 909, 36 L.Ed. 706 (1892), in which the Supreme Court held that statements by an insured that he intends to take a trip with another person is admissible as evidence that the insured completed the acts intended. The *Shepard* Court noted that the ruling in *Hillmon* "marks the high-water line beyond which courts have been unwilling to go." *Shepard,* 290 U.S. at 105, 54 S.Ct. 22.

**129.** *Shepard,* 290 U.S. at 106, 54 S.Ct. 22.

**130.** *Id.* (emphasis added); *see also United States v. Donley,* 3d Cir., 878 F.2d 735, 737–38 (1989) (allowing testimony "that the de-

Following *Shepard* and the text of Rule 803(3), a statement that "I am afraid" is admissible. This statement fits within the justification for the hearsay exception, namely, the declarant's "unique perspective into his own feelings and emotions."[131] Similarly, the statement that "I am afraid of D" is generally admissible.[132]

The case is different with respect to a statement that "I am afraid of D *because* he is a maniac*" or "I am afraid of D *because he threatened me*" or "I am afraid of D *because he is going to kill me.*"[133] Such statements are simply perceptions or beliefs a victim has of events, and their admission is not justified under the rationale for the state of mind exception. There is substantial authority holding that such statements of memory or belief are not admissible under Rule 803(3).[134] Thus, the

ceased had a plan to convince her husband that they were being evicted, and that she acted shortly before her death to further her plan" because it was offered "to show the existence of the deceased's plan to move out of the [military] base apartment and separate from her husband").

**131.** 3 Federal Rules of Evidence Manual, *supra*, at 1656.

**132.** *See, e.g., Martinez v. State*, Tex. Crim. App., 17 S.W.3d 677, 688 (2000) ("Veronica's statement that she was afraid of appellant was a statement of the declarant's then existing state of mind, and therefore fell within the Rule 803(3) hearsay exception."); *State v. O'Neal*, 87 Ohio St.3d 402, 721 N.E.2d 73, 84–85 (2000) ("[The victim's] statements that she was feeling stressed and was afraid of appellant were relevant to prove her intent to end the marriage. These statements were properly admitted as evidence under Evid. R. 803(3)...."); *State v. Brown*, Mo. Supr., 998 S.W.2d 531, 546 (1999) ("The state offered this testimony [that the victim was afraid of the defendant] to show [the victim's] state of mind regarding her fears about [the defendant] and not to show the truth of the matter being asserted."), *cert. denied*, 528 U.S. 979, 120 S.Ct. 431, 145 L.Ed.2d 337 (1999). *But see Com. v. Wilson*, 427 Mass. 336, 693 N.E.2d 158, 170 (1998) (finding that trial court erroneously admitted hearsay testimony recounting a murder victim's statements "that [the victim] was afraid of the defendant, and that [the victim] 'couldn't handle' the defendant"); *United States v. Brown*, 490 F.2d 758, 776 (1974) ("For example, the simple statement 'I am afraid' contains no extraneous factual matters; and, if the declarant's state of mind is at all relevant, there is very little conceivable prejudice to the defendant. However, the statement 'I am afraid of D (defendant)' is more dangerous.").

**133.** *See Brown*, 490 F.2d at 775–76 ("[I]n a trial for criminal assault, the statement 'I am afraid of D (defendant)' made by the victim might be very relevant on the issue of self-defense. However, the statement 'I am afraid of D—he beat me last week' is so close to the ultimate issue at hand that there is a greater danger that the jury will misuse the statement and assume some truth to the allegation of past conduct on the part of D.").

**134.** *See, e.g., State v. Fulminante*, 193 Ariz. 485, 975 P.2d 75, 88 (1999) ("But two of [the victim's] contested hearsay statements, 'He's going to kill me' and 'I'm afraid he's going to kill me,' directly report [the victim's] statement of belief about Defendant's future conduct and thus violate the rule.") (citations omitted); *State v. Phillips*, 194 W.Va. 569, 461 S.E.2d 75, 91 (1995) ("Even if the declarations were relevant to show the state of mind of the wife, the statements ... go much further and reveal details about extramarital affairs. The latter statement is not reflective of future intentions, but is a fact remembered and is specifically excluded from the exception."); *State v. Hawn*, 2d Dist., 138 Ohio App.3d 449, 741 N.E.2d 594, 601 (2000) (noting that in Ohio admissibility is limited to "testimony ... reflecting the state of mind of the victim, but not the reasons underlying that state of the mind") (citations omitted); *State v. Garcia*, 334 S.C. 71, 512 S.E.2d 507, 509 (1999) ("While their testimony presents circumstantial evidence of the decedent's fear of appellant and concern for her safety, the testimony improperly reveals the reason for her state of mind (i.e., that appellant had kicked and threatened to kill her).") (citation omitted); *United States v. Fontenot*, 9th Cir., 14 F.3d 1364, 1371 (distinguishing "I'm scared" from "I'm scared because [someone] threatened me"; holding that the latter is a statement of belief that is not admissible), *cert. denied*, 513 U.S. 966, 115 S.Ct. 431, 130

"statement of the declarant's then existing state of mind" would not include anything but the assertion that "I am afraid." The *reasons* why she was afraid cannot be characterized as assertions (*i.e.*, "statements") of her state of mind.[135]

The State argues that the hearsay evidence admitted against Capano nevertheless falls within the state of mind exception. The State also argues that, by stipulating to their admission before trial, Capano waived any hearsay objections with respect to Fahey's diary, the Capano-Fahey emails, and testimony by Kim Lynch-Horstmann. We address this fact, along with the State's argument that the trial court appropriately limited the jury's consideration of the evidence to "the state of mind of Miss Fahey at or about the time when the alleged incidents occurred," as part of the harmless error analysis below.

The State maintains that it did not offer the contested testimony to prove the "fact remembered or believed"—*i.e.*, that Capa-

no actually engaged in the conduct described or that Capano is a controlling, jealous person. Instead, the State argues that it offered the testimony to prove that Fahey *believed* that these things were true and, as a result, wanted to end her relationship with Capano. The State therefore argues that the testimony of Fahey's friends and psychotherapists does not fall within the definition of hearsay because the testimony was not offered to prove that the events and opinions described were actually true. Under the State's theory, to the extent that the proffered testimony is prejudicial, the trial court (as the court did in this case) must determine whether the testimony is admissible under the balancing test of D.R.E. 403.

Although one could plausibly interpret the state of mind exception to authorize the admission of testimony of memories or beliefs for some purpose other than proving the fact remembered or believed,[136] this interpretation places a difficult burden on the jury. In particular, the jury must confine its consideration of the declarant's

L.Ed.2d 343 (1994); *United States v. Liu*, 5th Cir., 960 F.2d 449, 452 (1992) ("Evidence of Liu's fear was admitted. Properly excluded were the alleged reasons for that fear."); *id.* ("If the reservation in the text of the rule is to have any effect, it must be understood to narrowly limit those admissible statements to declarations of condition—'I'm scared'—and not belief—I'm scared because Galkin threatened me.") (quoting *United States v. Cohen*, 5th Cir., 631 F.2d 1223, 1225 (1980)), *cert. denied*, 506 U.S. 957, 113 S.Ct. 418, 121 L.Ed.2d 341 (1992).

**135.** This interpretation of "statement" in Rule 803(3) finds support in the United States Supreme Court's narrow reading of this term in *Williamson v. United States*, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994). In that case, the Court held that a statement against penal interest was admissible under Rule 804(b)(3) but that the "narrative" or "collateral" portions of the statement were not. *See id.* at 599–600, 114 S.Ct. 2431. This holding was based partly on the definition of a "statement" as an "oral or written assertion," *see* Rule 801(a), as opposed to a "report or narrative."

**136.** *See State v. Alston*, 341 N.C. 198, 461 S.E.2d 687, 704 (1995) ("[A] murder victim's statements falling within the state of mind exception to the hearsay rule are highly relevant to show the status of the victim's relationship to the defendant.... Contrary to the defendant's assertions, we have long declined to follow *Brown*'s strict rule.") (citation omitted), *cert. denied*, 516 U.S. 1148, 116 S.Ct. 1021, 134 L.Ed.2d 100 (1996); *State v. Stager*, 329 N.C. 278, 406 S.E.2d 876, 895–97 (1991) (admitting taped statement by murder victim, including descriptions of specific incidents and threats, under state of mind exception); *State v. Jones*, 137 N.C.App. 221, 527 S.E.2d 700, 704–05 (2000) ("These statements, although entirely factual, in effect showed the decedent's state of mind when she uttered them and were therefore admissible under Rule 803(3).") (discussing *State v. Mixion*, 110 N.C.App. 138, 429 S.E.2d 363 (1993)), *review denied*, 352 N.C. 153, 544 S.E.2d 235 (2000); *see also State v. Phillips*, 194 W.Va. 569, 461 S.E.2d 75, 98 (1995) (Workman, J. dissenting) (suggesting that statements showing that the victim thought her husband was having affairs and that she intended to divorce him were not hearsay because they suggest defen-

memories and beliefs, including memories of potentially serious misconduct by the defendant, to the limited issue of a person's state of mind. Under these circumstances, it is difficult for the jury to make such an abstract distinction, even when properly defined by the trial court's limiting instructions.[137]

In practice, the broad reading of the state of mind exception proposed by the State relies heavily on the balancing test of Rule 403 to ensure that the defendant is not unfairly prejudiced by testimony describing the declarant's memories or beliefs. Thus, where the danger of unfair prejudice from the admission of these statements substantially outweighs the probative value of the statements, the trial court may exclude the statements under D.R.E. 403. This reliance on Rule 403 presents a potential problem because it replaces hearsay limitations with the more lenient Rule 403 prejudice balance. The hearsay rule is designed to exclude statements untested by cross-examination that are insufficiently reliable due to possible defects in the declarant's memory, perception or veracity. The Rule 403 analysis, on the other hand, assumes that these reliability concerns are overcome and focuses on balancing the effects of the statement on the jury.

▮ In view of the wide range of untested, and potentially unreliable, out-of-court statements that would be admissible under the State's broad interpretation of the state of mind exception, we conclude that Rule 803(3) authorizes the admission of hearsay statements by Fahey to her friends and psychotherapists[138] reflecting her fear of the defendant (that is, her state of mind), but not the memories or beliefs giving rise to that fear.

▮ Applying the above analysis to the present case, we conclude that Fahey's description of specific events involving Capano and her opinion of Capano reflect not on Fahey's "state of mind," but on her beliefs and memories of facts as she expressed them to her friends and psychotherapists.[139] For example, Jill Morrison testified that Fahey told her about being locked in a garage by Capano while they argued, an experience Fahey found "extremely frightening."[140] The narrative of this incident is not a state of mind—it is a

---

dant's motive to kill his wife, and it was irrelevant whether defendant was actually having affairs).

**137.** *Cf. Brown,* 490 F.2d at 777 ("[I]n extreme cases, where the relevance balance is clearly to be struck against the admission of the testimony, the limited utility of the special instruction has been repeatedly recognized by the courts.") (footnote omitted); *Shepard,* 290 U.S. at 103, 54 S.Ct. 22 (commenting on the efficacy of a limiting instruction, the Court stated that "The reverberating clang of those accusatory words would drown all weaker sounds"); *see also id.* at 106, 54 S.Ct. 22 ("The testimony now questioned faced backward and not forward. This at least it did in its most obvious implications.... Other tendency, if it had any, was a filament too fine to be disentangled by a jury.").

**138.** In Subsection C we deal with our separate, alternative holding under D.R.E. 803(4)

regarding the admissibility of Fahey's statements to her psychotherapists under the medical diagnosis or treatment exception.

**139.** *See Fulminante,* 975 P.2d at 85 ("[T]he statement must be limited to a declaration showing the state of mind and not include a description of the factual occurrence that engendered that state of mind."). Because we have concluded that the specific incidents that Fahey described to her friends and psychotherapists are not admissible under the state of mind exception, there is no need to address the limitations on the admissibility of bad act evidence established in D.R.E. 404 and in *Getz v. State,* Del. Supr., 538 A.2d 726, 734 (1988) or the prejudice balance under D.R.E. 403.

**140.** The state of mind exception authorizes the admission of a "statement of the declarant's *then existing* state of mind, emotion,

memory of an event—and does not fall under Rule 803(3) as we interpret that rule.[141] In contrast, Fahey's statements that she was upset, that she was afraid of Capano, or that she intended to break off her relationship with Capano are admissible as statements revealing Fahey's emotional or mental state.[142]

Accordingly, the evidence going solely to Fahey's state of mind was admissible. The portions of the testimony describing Fahey's beliefs or memories of facts were inadmissible.

## 2. Whether Statements Describing Fahey's Fear of Capano May be Presented in the State's Case-in-Chief

As discussed above, the statement "I fear Defendant" falls within the proper scope of Rule 803(3). Due to concerns over relevancy and prejudice, however, courts limit the admissibility of such statements by victims.[143] The concern is that a victim's statement that "I fear Defendant" leads to an inference that the defendant deserves to be feared.[144] Courts are wary of allowing

---

sensation or physical condition." D.R.E. 803(3) (emphasis added). To be admissible under Rule 803(3), the statement must reflect the declarant's state of mind *at the time that the statement is made*. Thus, a statement reflecting the declarant's memory of a past state of mind cannot meet this contemporaneity requirement. For example, Fahey's statement to Morrison that she was frightened during the garage incident is not admissible as a then existing state of mind, whereas Fahey's statements that she was upset with or afraid of Capano at the time of the statement is admissible under the exception.

**141.** The same analysis applies to Dr. Johnson's and Dr. Sullivan's testimony recounting Fahey's description of various incidents during the course of Fahey's relationship with Capano. For example, Dr. Sullivan testified that "apparently Mr. Capano got into the apartment and became very angry and he threatened to take away gifts, the air conditioner, things he felt he did not want to be present while she might be dating somebody else." Tr. of 11/2/98, at 44–45. Fahey's description of this event to Dr. Sullivan reflects Fahey's memory of the event, rather than her existing mental or emotional state at the time of the conversation.

**142.** For example, Jennifer Bartels-Houghton testified, regarding emails Capano sent: "She got upset and said that this man would not get the hint, that she did not want to be more than friends, and he was bothering her, sending her emails and asking her to go out to dinner." Dr. Kaye testified: "She was still fearful of him, was not convinced that he was ever going to let go, but in her own mind, she had wanted that to be over a long time ago."

Tr. of 10/27/98, at 33. These statements concerning the deterioration of their relationship are relevant to motive and intent. *See Gattis v. State*, Del. Supr., 637 A.2d 808, 818 (1994) ("In a prosecution for homicide arising out of a marital or romantic relationship, evidence of previous discord between the victim and the defendant is clearly material to issues of motive and intent."); *see also Donley*, 878 F.2d at 738 ("The government properly sought to persuade the jury to infer from her statements that she had such a plan and, in turn, to infer from that plan and the defendant's awareness of it that he had a motive for murder other than the one he claimed."); *People v. Fisher*, 449 Mich. 441, 537 N.W.2d 577, 582 (1995) ("[N]umerous prior cases have upheld the admissibility of evidence showing marital discord as a motive for murder, or as circumstantial evidence of premeditation and deliberation").

**143.** *See* 3 Federal Rules of Evidence Manual, *supra*, at 1660 ("[E]xclusion, if it is to occur, must be under Rule 403...."); 2 McCormick On Evidence § 276, at 230 (5th ed. 1999) ("If the statement is merely an expression of fear—i.e., 'I am afraid of D'—no hearsay problem is involved, since the statement falls within the hearsay exception for statements of mental or emotional condition. This does not, however, resolve the question of admissibility.").

**144.** *See Brown*, 490 F.2d at 776 ("It gives rise to the natural inference that there has been some past conduct on the part of the defendant to justify such a fear, *e.g.*, past beatings or threats, or even that the statement accurately reflects on defendant's state of mind

jurors to draw this inference because it may be based on subjective impressions but have great impact.[145]

In light of these concerns, courts have developed limitations on the admissibility of statements describing the victim's state of mind. *United States v. Brown*, the leading case on this issue, requires that the trial court must find a "substantial degree of relevance to a material issue" or a "manifest need for such evidence" before the court may admit statements describing the victim's fear of the defendant.[146] While not limiting admissibility to any predetermined set of facts, *Brown* observed that statements of the victim's mental state are generally admissible only to rebut the defendant's claim of self-defense, suicide, or accidental death.[147] The majority of courts have adopted this rebuttal requirement in one form or another.[148] The holding of the Superior Court in *State v. Porter* that a victim's statements of fear of the defendant could come in under 803(3) "only . . . in rebuttal after evidence of accident, self-defense, suicide or extreme emotional distress has been presented by the defense"

and intentions."); *Com. v. Qualls*, 425 Mass. 163, 680 N.E.2d 61, 65 (1997) ("The principal danger in admitting evidence of a homicide victim's fear of the defendant or desire to 'get' the defendant when there is no evidence of the defendant's awareness of the victim's state of mind is that the jury will consider the victim's statement of fear or intention, standing alone, as somehow reflecting on the defendant's state of mind rather than that of the victim.") (citing *Brown*, 490 F.2d at 766).

145. *See* 2 McCormick on Evidence, *supra*, § 276 at 231 ("However, the most likely inference that jurors may draw from the existence of fear, and often the only logical inference that could be drawn, is that some conduct of the defendant, probably mistreatment or threats, occurred and caused the fear. The possibility of over-persuasion, the prejudicial character of the evidence, and the relative weakness and speculative nature of the inference, all argue against admissibility as a matter of relevance.") (footnotes omitted).

146. *Brown*, 490 F.2d at 767, 774.

147. *See id.* at 767.

148. *See, e.g., State v. Parr*, 93 Wash.2d 95, 606 P.2d 263, 267 (1980); *State v. Christensen*, 129 Ariz. 32, 628 P.2d 580, 584 (1981) ("A victim's state of mind is only relevant when identity or the defense of accident, suicide or self-defense is raised."); *State v. Machado*, 111 N.J. 480, 545 A.2d 174, 178 (1988) ("[T]here are exceptions in [*State v.* ]*Downey*[, 206 N.J.Super. 382, 502 A.2d 1171 (1986)] relating to establishing that the decedent was not the aggressor, did not commit suicide and was not accidentally killed. . . ."); *State v. Baca*, 120 N.M. 383, 902 P.2d 65, 71 (1995) ("The state of mind of the victim of a crime commonly is a fact of consequence in issues of (1) self defense (rebutted by extrajudicial declarations of the victim's passive state of mind), (2) suicide (rebutted by statements inconsistent with a suicidal bent), and (3) accident (rebutted by victim's fear of placing self in way of such harm)."); *cf. Downs v. State*, Fla. Supr., 574 So.2d 1095, 1098 (1991) (finding that victim's statements indicating a fear of the defendant were inadmissible because the statements were not offered "to prove or explain any subsequent acts of relevance" by the victim); *People v. Borrelli*, Colo. App., 624 P.2d 900, 903 (1980) ("[B]etter-reasoned cases allow hearsay expressions of a victim's fear of a defendant only where the state of mind of the victim is clearly relevant to a material issue in the case."); *State v. Wauneka*, Utah Supr., 560 P.2d 1377, 1380 (1977) ("Pre-death hearsay statements of a victim in homicide cases are generally admissible when the defendant claims self-defense . . . [or] where the defense is that the death was accidental and that the victim was an aggressor."); *see also* 2 McCormick on Evidence, *supra*, § 267 at 232 ("Also, such statements [describing the victim's fear of the defendant] are admissible where the defense claims self-defense, suicide, or accidental death because . . . the decedent's fear helps to rebut aspects of the asserted defense.") (footnote omitted); 3 Federal Rules of Evidence Manual, *supra*, at 1660–61 (describing limitations on admission, noting that the paradigm use of a victim's statement of fear is to rebut a claim that the *victim* acted in a certain way).

is broadly in line with this prevailing view.[149]

In *State v. Wood*, the Arizona Supreme Court upheld admission of "statements made by [the victim] about her fear of Defendant and her desire to end their relationship."[150] The rationale for admissibility was as follows:

The statements about [the victim's] fear and desire to end the relationship helped explain Defendant's motive. The disputed trial issues were Defendant's *motive* and *mental state*—whether Defendant acted with premeditation or as a result of a sudden impulse. The prosecution theorized that Defendant was motivated by anger or spite engendered by [the victim's] termination of the relationship. [The victim's] statements were relevant because they showed her intent to end the relationship, which in turn pro-

vided a plausible motive for premeditated murder. In addition, [the victim's] statements were also relevant to refute Defendant's assertion that he and [the victim] had secretly maintained their relationship after July 4, 1989.[151]

It thus appears that *Wood* did not key admission solely to rebuttal of the defense case; rather, *Wood* recognizes the prosecution's need to present evidence that is material to the elements of its *prima facie* case.[152]

In a slightly different context, this Court has held that the State may introduce evidence of the defendant's prior bad acts in its case-in-chief only where the evidence is independently relevant to an issue or fact that the State must prove as part of its *prima facie* case.[153] Before admitting the contested evidence during the State's case-in-chief, the trial court must deter-

---

149. *State v. Porter*, Del. Super., 587 A.2d 188, 193 (1990). Alongside this Court's *Derrickson* requirements, which apply to state of mind hearsay generally, the Superior Court in *Porter* applied "additional admissibility requirements ... before hearsay evidence is to be admitted under D.R.E. 803(3) in a homicide prosecution." *Id.*

150. *State v. Wood*, Ariz. Supr., 180 Ariz. 53, 881 P.2d 1158, 1167 (1994), *cert. denied*, 515 U.S. 1147, 115 S.Ct. 2588, 132 L.Ed.2d 836 (1995).

151. *Id.* at 1167–68 (citations and footnotes omitted, emphasis in original). In *State v. Christensen*, Ariz. Supr., 129 Ariz. 32, 628 P.2d 580, 584 (1981), the Court had earlier held that "[a] victim's state of mind is only relevant when identity or the defense of accident, suicide or self-defense is raised." *Wood* distinguishes the prior holding in *Christensen* by noting that *Christensen* "hold[s] merely that evidence of the victim's fear of the defendant is not relevant to prove the defendant's conduct or identity.... In the present case, by contrast, Defendant's conduct and identity were undisputed." *Wood*, 881 P.2d at 1167 (citation omitted).

152. *See also Arizona v. Fulminante*, 193 Ariz. 485, 975 P.2d 75, 87–88 (1999) ("Even though Defendant did not claim at the second trial that he and [the victim] had a good

relationship, [the victim's] dislike and fear of her stepfather are relevant, although perhaps minimally, to the issue of *motive*, and admission of her statements of dislike and fear were permitted under the rule.") (emphasis added, footnote omitted) (citing *Wood*, 881 P.2d at 1167–68); *Stoll v. State*, Fla. Supr., 762 So.2d 870, 874 (2000) (noting that "the victim-declarant's state of mind may become an issue in the case" where it is relevant to an element of the crime in dispute or where it rebuts an argument of accident, self-defense, or suicide raised by the defendant); *but cf. State v. Phillips*, 194 W.Va. 569, 461 S.E.2d 75, 91 (1995) (noting that the defendant had not opened the door to the admission of a murdered wife's hearsay statement of her fear of her husband, the defendant, in the prosecution's case-in-chief because the defendant had not had an opportunity to present evidence that the marriage was a happy one).

153. *See Milligan v. State*, Del. Supr., 761 A.2d 6, 8 (2000) ("While the defense did acknowledge that 'late reporting' would be made an issue in its case and would be mentioned in its opening, 'late reporting' bore no reasonable relationship to an issue or ultimate fact to be proved in the State's case-in-chief."); *Cobb v. State*, Del. Supr., 765 A.2d 1252, 1254–55 (2001) (applying *Milligan*, 761 A.2d at 8); *see also Gattis*, 637 A.2d at 818 ("The

mine whether the evidence is sufficiently relevant to an element of the charged crime or whether the evidence must be presented in rebuttal after the defense raises an issue to which the evidence is relevant during its case-in-chief.

■ Following the cases discussed above, we conclude that a victim's statements of fear of the defendant are admissible (1) during the State's case-in-chief to prove the State's *prima facie* case or (2) during the State's rebuttal case to counter a defense theory that places the victim's own actions squarely at issue.[154]

■ Applying this rule to the present case, we find that testimony describing Fahey's state of mind was relevant to prove (1) that Fahey sought to end her romantic involvement with Capano and (2) that Capano, as the spurned lover, there-fore had a motive to kill her. Since this theory of admissibility is material to a disputed element of the State's *prima facie* case for first degree murder (that is, intent and/or premeditation), the State could properly present this evidence in its case-in-chief.[155] Thus, the trial court did not abuse its discretion by admitting during the State's case-in-chief hearsay evidence that was properly admitted under the state of mind exception.

3. Confrontation Clause Analysis of Hearsay Statements Admitted under the State of Mind Exception

■ The next question is whether the Confrontation Clause of the Sixth Amendment operates to bar admission of the hearsay statements by Fahey that are admissible under the state of mind exception.[156] The Confrontation Clause provides

court correctly ruled that evidence of prior bad acts directed to the victim could be presented only in rebuttal if the defendant testified concerning accident or lack of intent.").

154. We note that some cases appear to depart from the rebuttal requirement, although with varying degrees of clarity about the rationale for the departure. In *Clay v. Com.*, 33 Va.App. 96, 531 S.E.2d 623, 626–27 (2000) (*en banc*), *aff'd*, 262 Va. 253, 546 S.E.2d 728 (2001), the court allowed admission of a victim's statements of fear of the defendant ostensibly to rebut the defendant's story of an accident. Citing *Brown*, the *Clay* court held that the evidence of fear and deteriorating relationship was admissible because "logically, a deceased's fear of an individual accused of murder is inconsistent with a claim that the events in question culminating in the death were the result of 'pure chance.'" *Clay*, 531 S.E.2d at 628. As pointed out in the dissent, however, the accident story was simply that the gun "just went off," a story that does not implicate the victim's state of mind in the direct sense contemplated by *Brown*. *See id.* at 634 ("[N]o act or conduct of the decedent was at issue. Thus, the decedent's state of mind had no bearing on any issue to be decided by the jury.") (Benton, J. dissenting) (joined by Elder, J.). *See also State v. Garcia*, 334 S.C. 71, 512 S.E.2d 507, 508 (1999) (admitting evidence of victim's fear "because it tended to disprove appellant's contention the shooting was an accident; the victim's fear suggests appellant may have intended the shooting" although "Appellant offered no evidence at trial."); *State v. Alston*, 341 N.C. 198, 461 S.E.2d 687, 704 (1995) ("Contrary to the defendant's assertions, we have long declined to follow *Brown's* strict rule."), *cert. denied*, 516 U.S. 1148, 116 S.Ct. 1021, 134 L.Ed.2d 100 (1996).

155. *See Gattis*, 637 A.2d at 818 (holding that "evidence of previous [marital] discord between the victim and the defendant is clearly material to issues of motive and intent"); *Donley*, 878 F.2d at 737–38 (holding that evidence of the victim's plan was admissible to show that she acted in conformity with her plan) (citing *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892)); *see also United States v. Hartmann*, 7th Cir., 958 F.2d 774, 783 (1992) (finding no plain error in admission of victim's statements of fear of the defendant in order to support prosecution's theory of the case).

156. The hearsay testimony concerning Fahey's beliefs about Capano and her memories of specific incidents involving Capano is, as

defendants in criminal cases with the right to confront witnesses who testify against them.[157] Where hearsay statements by an unavailable declarant are admitted into evidence, the accused has no opportunity to test the veracity of those statements through cross-examination.[158] Before the State may present hearsay statements against the accused in a criminal prosecution, the State[159] must therefore establish (1) that the hearsay was admitted under a "firmly rooted" exception to the hearsay rule or (2) that the contested statements possess "particularized guarantees of trustworthiness 'such that adversarial testing would be expected to add little, if anything, to the statements' reliability.' "[160]

■ Where hearsay testimony is admitted pursuant to a "firmly rooted"

exception, it is not necessary to make a particularized assessment of the statement's reliability.[161] To determine whether an exception to the hearsay rule is "firmly rooted," the Court must find that the statements admissible under the exception are invariably trustworthy. This finding depends in part on the longevity and widespread acceptance of the hearsay exception by courts and legislatures.[162]

■ Based on the longstanding judicial precedent establishing the propriety of admitting statements under the state of mind exception,[163] this Court declared the state of mind exception, as defined in *Derrickson*, to be "firmly rooted" for purposes of the Confrontation Clause.[164] Following this established jurisprudence, we find that

---

noted above, inadmissible under the state of mind exception. We therefore assume that this evidence does not meet the requirements of the Confrontation Clause. We address in Subsection B whether the admission of this evidence was harmless beyond a reasonable doubt.

**157.** *See* U.S. Const. Amend. VI, cl. 3.

**158.** *See Maryland v. Craig*, 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) ("The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."); *see also Lilly v. Virginia*, 527 U.S. 116, 123–24, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (plurality opinion) (same).

**159.** *See Lilly*, 527 U.S. at 137, 119 S.Ct. 1887 (observing that the burden is on the government to establish the statement's reliability).

**160.** *Barrow v. State*, Del. Supr., 749 A.2d 1230, 1244 (2000) (quoting *Lilly*, 527 U.S. at 125, 119 S.Ct. 1887).

**161.** *See Bourjaily v. United States*, 483 U.S. 171, 183, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

**162.** *See Lilly*, 527 U.S. at 126, 119 S.Ct. 1887 ("[I]n light of 'longstanding judicial and legislative experience,' [the exception] 'rest[s] [on] such [a] solid foundatio[n] that admission of

virtually any evidence within [it] comports with the substance of the constitutional protection.' ") (quoting *Idaho v. Wright*, 497 U.S. 805, 817, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) and *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)) (internal quotation marks and citations omitted); *Bourjaily*, 483 U.S. at 183, 107 S.Ct. 2775.

**163.** This exception was first discussed by the United States Supreme Court in *Mutual Life Ins. Co. of New York v. Hillmon*, 145 U.S. 285, 295–97, 12 S.Ct. 909, 36 L.Ed. 706 (1892), and the exception first appeared in Delaware in 1923. Furthermore, the state of mind exception is recognized in at least forty-four states. *See Forrest v. State*, Del. Supr., 721 A.2d 1271, 1277 (1999).

**164.** *See Forrest*, 721 A.2d at 1277; *see also Derrickson v. State*, Del. Supr., 321 A.2d 497, 503 (1974) (observing that the state of mind exception is "a universally recognized exception to the hearsay rule"). Although the victim's statements of fear of the defendant may be admitted only if relevant to the State's *prima facie* case or if relevant to rebut an affirmative defense, this limitation is concerned primarily with controlling the risk of improper inferences about the defendant's character--a concern that is not relevant to Confrontation Clause analysis. In contrast, the *Derrickson* requirements are expressly designed to ensure that the statements are suffi-

D.R.E. 803(3) is a firmly rooted hearsay exception under the Confrontation Clause.[165] We therefore conclude that the admissible hearsay testimony concerning Fahey's emotional state is admissible under a firmly rooted hearsay exception and satisfies the requirements of the Confrontation Clause.

## B. Admission Under the State of Mind Exception of Fahey's Statements of Facts Remembered or Believed is Harmless Error

The hearsay testimony recounting Fahey's statements is found in the testimony of a number of witnesses. These include a psychiatrist and several psychologists[166] and also several of Fahey's friends.[167] In addition, Fahey's emails to Capano were read to the jury,[168] as were portions of Fahey's diary, which were read from the stand by Fahey's sister, Kathleen Fahey-Hosey.

As we have found, certain of the statements made by Fahey to her friends should not have been admitted un-

der the state of mind exception because they recounted facts remembered or believed. Similarly, analyzed under the state of mind exception of D.R.E. 803(3), certain of the statements made to the psychotherapists are inadmissible for the same reason. We conclude that, whether or not the statements to the psychotherapists are admissible under D.R.E. 803(4),[169] the admission of these statements, together with the inadmissible hearsay statements made to the friends, constitutes harmless error because these statements are cumulative of statements admitted under stipulation. The following harmless error analysis therefore assumes that the statements made to psychotherapists should not have been admitted to the extent they contain facts remembered or believed.[170]

Capano focuses on four categories of inadmissible evidence that were each presented through the testimony of one or more of the witnesses listed above: (1) the "gift incident" testimony that Fahey said Capano broke into her apartment at night and took back gifts that he had previously

ciently trustworthy to warrant admission against a defendant in a criminal case.

**165.** Even if Fahey's statements concerning her fear of Capano did not fall within a firmly rooted hearsay exception, we find that the statements admissible under Rule 803(3) possess such "particularized guarantees of trustworthiness" that their admission does not violate Capano's rights under the Confrontation Clause. *See Lilly*, 527 U.S. at 124–25, 119 S.Ct. 1887; *Wright*, 497 U.S. at 820–21, 110 S.Ct. 3139 (holding that testimony must be shown to be so trustworthy that "adversarial testimony would add little to its reliability"). Fahey's statements in her diary (stipulated as admissible) and her conversations with her psychotherapists and friends were made under circumstances that tended to establish that they were candid and made without a motive to fabricate. *See Wright*, 497 U.S. at 821–22, 110 S.Ct. 3139 (citing *State v. Robinson*, Ariz. Supr., 153 Ariz. 191, 735 P.2d 801, 811 (1987) and *State v. Kuone*, Kan. Supr., 243 Kan. 218, 757 P.2d 289, 292–93 (1988)).

**166.** Dr. Neil S. Kaye, M.D., Gary Johnson, Ph.D., and Michelle Sullivan, Ph.D.

**167.** Jill Morrison, Siobhan Sullivan, Jennifer Bartels-Houghton, Virginia Columbus, and Kimberly Lynch-Horstmann.

**168.** The most significant of these for the purposes of this appeal were read from the stand by Dr. Kaye.

**169.** As explained in Subsection C below, we have concluded that the statements to psychotherapists are admissible on a separate basis through the medical diagnosis or treatment exception of 803(4).

**170.** Under our alternative holding that the statements to psychotherapists are admissible, the remaining erroneously admitted hearsay testimony of the friends would clearly be negligible in comparison with the stipulated testimony and the psychotherapists' testimony relating the same information.

given her; (2) references to Capano "stalking" Fahey; (3) a discussion of Fahey's fear of being kidnapped by Capano; and (4) the "garage incident," in which Capano locked Fahey in a garage for several hours while they argued.[171]

We agree that, standing alone, the hearsay testimony about these factual incidents is a fact remembered or believed and is outside the Rule 803(3) exception. But, crucially, some of Fahey's hearsay statements were also presented through testimony to which Capano stipulated. Specifically, Capano stipulated to the admission of three sets of evidence: (1) Fahey's diary, (2) emails between Capano and Fahey, and (3) the testimony of Kim Lynch-Horstmann.[172] Of course, the admission of this evidence is not an issue in this appeal, but the *effect* of the admission of this evidence by stipulation is critical to our harmless error analysis.

 The issue is whether the erroneous admission of the four categories of evidence was harmless beyond a reason-

able doubt.[173] We must determine whether the State "has proved beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."[174] The State argues that the erroneously admitted evidence is similar to the evidence admitted pursuant to stipulation, and thus is not prejudicial. Capano argues that the four categories of evidence at issue add new and damaging detail and thus are not cumulative of the subject matter of the stipulated evidence.

Specifically, Capano argues that this evidence was "grossly prejudicial," that the State had a weak case based on circumstantial evidence, and that "to fill the void, the prosecution relied on Fahey's extrajudicial statements that Capano was stalking her and was violently jealous. . . ." Capano supports this view by contending that in closing argument the prosecutor emphasized the theme of Capano being "controlling and manipulative." Capano also argues that the statements were especially prejudicial because they came from a sympathetic victim.

**171.** *See* Tr. of Oral Argument, 6/13/01 at 3-7 ("[T]he evidence at issue in this matter falls into four principal categories.").

**172.** The parties do not dispute that this evidence was stipulated at trial. *See* Tr. of Oral Argument, 6/13/01 at 11; Appellant's Reply Supplemental Memorandum at 11.

**173.** *See Dowling v. United States*, 493 U.S. 342, 353–53, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (asserting that improper admission of evidence violates due process if it "violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions' ") (citations omitted); *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.") The erroneous admission of hearsay statements by an unavailable declarant against Capano clearly implicates his right to confront his accusers under the Confrontation

Clause. Therefore the constitutional harmless error standard applies. *See Barrow v. State*, Del. Supr., 749 A.2d 1230, 1245 (2000); *Nelson v. State*, Del. Supr., 628 A.2d 69, 77 (1993) ("Alternatively, when the evidentiary error is of a constitutional magnitude, the convictions may be sustained if the error is harmless beyond a reasonable doubt.") (citation and internal quotation omitted); *Smith v. State*, Del. Supr., 647 A.2d 1083, 1090–91 (1994) (same) (citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)); *see also id.* at 1091 ("Upon a finding that a defendant's constitutional rights were violated, a reviewing court must 'weigh the significance of the error against the strength of the untainted evidence of guilt to determine whether the error may have affected the judgment.' ") (quoting *Van Arsdall v. State*, Del. Supr., 524 A.2d 3, 11 (1987)).

**174.** *Jackson v. State*, Del. Supr., 643 A.2d 1360, 1377 (1994) (quoting *Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 1798, 100 L.Ed.2d 284 (1988)).

We have concluded that the admission of the testimony was harmless beyond a reasonable doubt because it is cumulative of the stipulated testimony and therefore had minimal prejudicial impact.[175] We begin by examining the substance of the stipulated testimony.[176]

In her last diary entry, Fahey called Capano a "controlling, manipulative, insecure, jealous maniac."[177] In another entry, Fahey described Capano as "cold" and "disinterested," stating that he "called and was nasty," that he "raised his voice at me" and was "furious with me."[178] Fahey wrote: "I was afraid he would fly off the handle again."[179] Lengthy stipulated testimony from Lynch-Horstmann added to this depiction of Capano. Through Lynch-Horstmann's testimony, the jury heard that Fahey viewed Capano as "angry" and "obsessive."[180] According to Lynch-Horstmann, Fahey "felt she had to escape. She was very aware that the obsessiveness of it was weighing very heavily on her shoulders. And sometimes she said I feel like I have to move out of the state to get away from him."[181]

Importantly, the stipulated testimony also described several specific incidents between Capano and Fahey, adding considerable detail to this picture of a "con-trolling, manipulative, insecure, jealous maniac." For instance, in an email message to Capano, Fahey wrote: "Tommy, you scared me this weekend, starting with Friday and all the calls you placed. It really freaks me out when you call every half hour...."[182] Lynch-Horstmann's testimony related numerous specific incidents centering on these themes. She testified:

There was an event in Delaware that Annie was very excited about going to with Michael called—I think it was the Grand Gala. And Tom had threatened her that he was going to be there, and she was very afraid that he was going to expose their relationship at this event.[183]

Other testimony given by Lynch-Horstmann focused on Capano's manipulation of Fahey and the volatility of their relationship. For example, she related that Fahey told her that Capano humiliated Fahey by talking about their affair to a priest at a church Fahey attended, causing her to stop attending that church.[184] Lynch-Horstmann also testified that according to Fahey, Capano would "attack [Fahey's] insecurities and refer to her as white trash" and tell her "that she should be lucky that he's even going out with her because of who he is and what he could buy and where she came from."[185] She

---

**175.** *See Dowling*, 493 U.S. at 353–53, 110 S.Ct. 668; *Chapman*, 386 U.S. at 24, 87 S.Ct. 824 (describing harmless error analysis for federal constitutional errors). *See United States v. Johnson*, 7th Cir., 127 F.3d 625, 631 (1997) ("Because of its limited (or nonexistent) prejudicial effect on the defendant, the admission of hearsay constitutes harmless error when it is cumulative to other testimony already presented.") (citing *United States v. Brown*, 7th Cir., 31 F.3d 484, 491 (1994)); *Keith v. State*, Del. Supr., No. 303, 2000, 2001 WL 433455, Berger, J. (April 25, 2001) (ORDER), Order at ¶ 6 ("The testimony was also cumulative of other, non-hearsay testimony, rendering any error harmless in any case.").

**176.** The diary, the emails, and the Lynch-Horstmann testimony.

**177.** Tr. of 10/28/98, at 155–56.

**178.** *Id.* at 152–54.

**179.** *Id.*

**180.** Tr. of 11/6/98, at 97.

**181.** *Id.* at 100.

**182.** Tr. of 10/27/98, at 115–16.

**183.** Tr. of 11/6/98, at 106–07.

**184.** *Id.*

**185.** *Id.* at 103.

testified that Capano was giving Fahey "a hard time" about staying at the shore in a house where other men would be staying. According to her testimony, Fahey "called me ... to say ... that Capano had just left and they had had a huge fight because he did not want her going to the shore.... [T]his fight ensued and she was too exhausted to make this trip to the shore."[186]

We must examine the non-stipulated, erroneously admitted hearsay testimony in light of this extensive stipulated testimony reflecting on themes of fear, harassment, obsession, and control. Turning to the first of the four categories of evidence not admitted pursuant to stipulation, Capano focuses on the prejudicial effect of what is known as "the gift incident," which Capano refers to as an "especially noteworthy" instance of prejudicial evidence. According to Dr. Johnson, Capano came "to [Fahey's] apartment quite late at night ... bolted the door shut and kept her inside for, my recollection was, three or four hours during which time he yelled at her, threatened to expose their relationship."[187] Capano then "took many of the gifts that he had given her out of the apartment and then eventually returned them."[188] Dr. Sullivan gave a similar account of this incident as reported to her by Fahey. She added that Fahey told her that she was too "frozen" to call for help, and that Capano "grabbed her arm and pushed her against the wall."[189] Jill Morrison, another of Fahey's friends, testified that one night "he came up the fire escape and they had a fight and he took back the gifts."[190]

This testimony is largely cumulative of the stipulated testimony described above. The incident itself was introduced by stipulation through Lynch-Horstmann's testimony. She testified that Capano "tried to remove all of the gifts that he had given Annie from her apartment because he didn't want another man watching the TV that he had given her, the clothes—seeing Annie wear the clothes that he had given her, so he removed a lot of those things from her apartment."[191] Thus the jury knew that he had come in and taken away the gifts he had given to her.

 Capano argues that the psychologist testimony regarding the gift incident is significantly more damaging than the stipulated testimony because it depicts Capano acting violently—breaking into the apartment, grabbing Fahey's arm and pushing her. This argument calls for a degree of parsing that is not realistic in view of the extensive amount of similar, stipulated testimony. The incident depicts Capano as controlling, angry, and ultimately menacing. As explained above, this is just what the jury had heard through Fahey's diary entries, the emails, and Lynch-Horstmann. The jury had heard that Fahey was literally "scared" of Capano—"afraid he would fly off the handle again"—and had also heard about several specific fights. Capano's argument that the "gift incident" testimony truly stands out from the numerous other accounts of his relationship with Fahey is not convincing.

The three other categories of evidence at issue also carry minimal risk of preju-

---

**186.** *Id.* at 92–93. Lynch-Horstmann also related another instance of fighting, one that occurred on a trip to an expensive resort at the end of their relationship, which was apparently a "disaster" because of the fighting. *Id.* at 212. We assume from the overall context of the record that these "fights" were verbal and not physical.

**187.** Tr. of 10/29/98, at 16.

**188.** *Id.*

**189.** Tr. of 10/29/98, at 45.

**190.** Tr. of 11/4/98, at 60–61.

**191.** Tr. of 11/6/98, at 97–98.

dice because they are cumulative of the stipulated testimony. The first of these is "stalking" testimony. This category includes the testimony of Siobhan Sullivan that Fahey said of Capano, "He's fucking stalking me."[192] It also includes testimony from Fahey's doctors. For example, Dr. Kaye testified that "if [Capano] was stalking her, sending her too many emails, parking his car in front of her home and she would notice it, not want him there, then you would expect to see ... flare-ups in the eating disorder."[193] Capano would show up unexpectedly, so that she would fear him "appearing at times where she wasn't ready to greet him in a public place."[194] He would also come "over to the house uninvited, wanting to get in, making a scene such that he was allowed in."[195]

▇▇▇ The stalking testimony, exemplified by the above excerpts, is also cumulative of the stipulated testimony. Apart from the *characterization* of Capano's actions, *i.e.*, apart from the use of the word "stalking" to describe them, this testimony simply paints the same picture of obsession that was testified to by Lynch-Horstmann. The following excerpt from her stipulated testimony suffices to make the point:

> He would e-mail her at work all the time, and they were kind of obsessive e-mails.... [Capano] [w]ould be upset that she wouldn't see him or wouldn't talk to him. At one point he threatened to commit suicide because he said he couldn't live without her. So there was a lot of pressure on Annie because he was saying—there was a lot of pressure on Annie. He was saying I left my wife so we could be together. So there was a lot about the e-mails."[196]

As noted above, Fahey's email to Capano also reflected this theme of obsession, stating, "Tommy, you scared me this weekend, starting with Friday and all the calls you placed. It really freaks me out when you call every half hour...."

▇▇▇ The next category of evidence Capano focuses on is Dr. Sullivan's statement that Fahey told her "she was very concerned about getting kidnapped" and she thought that it was Capano who might kidnap her.[197] Again, in light of the stipulated testimony, the vague and isolated discussion of kidnapping is essentially cumulative and harmless. Through Fahey's diary, the emails, and Lynch-Horstmann's testimony, the jury heard repeated testimony to the effect that Fahey was genuinely frightened of Capano. Moreover, this brief testimony appears to have been coaxed out of Fahey by Dr. Sullivan, who encouraged Fahey to muse about her fears, in a way that lessens the likelihood of prejudicial impact.[198]

---

192. Tr. of 11/4/98, at 161.

193. Tr. of 10/27/98, at 41.

194. Tr. of 11/2/98, at 24 (Dr. Sullivan).

195. Tr. of 10/29/98, at 32 (Dr. Sullivan).

196. Tr. of 11/6/98, at 98. Similarly, she testified:

> Well, it was right around that time, in September, I believe, that he did leave his wife, so he was very angry that she did not want to see him anymore at that point in time. So it was—she was struggling because he was very angry, and saying that he left his wife and now it was their time to be together, and he was pretty obsessive at that point.

*Id.* at 92–93. Capano's threatened appearance at the Grand Gala, discussed above, is of a similar nature.

197. Tr. of 10/29/98, at 36.

198. Dr. Sullivan testified:

> Q: [D]o you recall a time when she started to speak with you about a fear of violence from Mr. Capano at any time?
> Dr. Sullivan: What she did [say] was she [was] very concerned about getting kidnapped.
> Q: And what did she tell you about getting kidnapped?
> Dr. Sullivan: Well, she—she and her friend had been talking about this vaguely, and

The final category of evidence involves the "garage incident" testified to by Morrison:

"Yes, she told me of an incident where he had picked her up and took her back to his house into the garage and locked the doors and would not let her out of the garage while they argued and he made attempts to keep the relationship together. This was extremely frightening to Anne Marie because she had a fear of being locked in small dark places, and it was very upsetting for her."[199]

 Again, this testimony is akin to the stipulated testimony. Fahey's diary, the emails, and Lynch-Horstmann's testimony portrayed Capano as a "controlling, manipulative, insecure, jealous maniac." The garage incident simply portrays the type of harassing behavior that permeated the stipulated testimony, such as "call[ing] and leav[ing] maybe 15 messages on her answering machine in a two-hour period of time, [and telling her] that she had to talk to him, why wasn't she calling him back,

that he needed to talk to her."[200] The stipulated testimony also makes several significant and detailed references to "furious" and "exhaust[ing]" fighting.[201] The additional detail of Fahey being locked in the garage with Capano cannot have affected the outcome of Capano's trial. The garage incident, as well as the other evidence discussed above, is essentially cumulative and therefore harmless beyond a reasonable doubt.

Finally, we note that the limiting instructions issued by the trial court reduced the risk that any of this testimony would be a basis for inferring Capano's guilt.[202]

We conclude that the trial court erroneously admitted under the state of mind exception hearsay testimony from Fahey's psychotherapists and friends concerning specific incidents and beliefs described by Fahey. But, in view of the extensive and damaging hearsay evidence to which Capano stipulated at trial, we conclude that the erroneously admitted evidence was largely cumulative and that the trial court's error

---

she came into the office and said, so and so said, gosh, I could get kidnapped, what do you think, Michele? And I said, What is this about, and she said, Well, my friend thinks that somebody could kidnap me. And I said, Well, talk to me more about what this is about. I became extremely distressed and she said, Oh, I don't know, somebody could just take me away or something, and I said, Who would do this, and she said, Well, probably a third party. And I said, Well, what do you mean, that somebody would hire a third party? She said, Yeah. Who would do that? Mr. Capano. And I said, Well, is there anybody else that might do that, and she thought for a long while and said maybe a boyfriend of three or four years ago. *Id.* at 36–37.

199. Tr. of 11/4/98, at 62.

200. Tr. of 11/6/98, at 97–98 (Lynch-Horstmann).

201. Tr. of 10/28/98, at 152–54; Tr. of 11/6/98, at 92–93.

202. Following Dr. Kaye's testimony, the trial court instructed the jury that:

The purpose of this evidence is to examine the mental state, the emotional state of Anne Marie Fahey, and you are not—it in no way reflects as evidence of any actions or any state of mind on behalf of the defendant. This deals solely with Miss Fahey, not with Mr. Capano.

Tr. of 10/27/98, at 136. In connection with Jill Morrison's testimony, the court also instructed the jury that evidence of particular incidents involving harassing conduct:

is offered or may be considered by you solely for the purpose of determining the state of mind of Miss Fahey at or about the time when the alleged acts occurred. You may not consider the evidence as proof that the defendant is a bad person, and therefore, probably committed the offense with which he is charged.

Tr. of 11/4/98, at 23–24.

was harmless beyond a reasonable doubt.[203]

## C. Admissibility of Fahey's Statements to Her Psychotherapists Under D.R.E. 803(4)

We now turn to the issue concerning whether the medical diagnosis exception in D.R.E. 803(4) applies to statements made for purposes of psychotherapy—as distinct from statements made for purposes of diagnosing physical ailments. Specifically, Capano argues that the trial court erroneously admitted testimony from Fahey's psychotherapists recounting her statements to them during the course of Fahey's therapy. The State responds that the exception, by its terms, applies to statements made by a patient to licensed psychiatrists and psychologists during therapy.

■ As an alternative holding, we conclude that Fahey's statements to her psychotherapists are admissible independently under the medical diagnosis or treatment exception set forth in D.R.E. 803(4).[204]

### 1. Application of the Medical Diagnosis Exception

Rule 803(4) provides:

(4) Statements for purposes of medical diagnosis or treatment. Statements made for purposes of medical diagnosis or treatment and describing medi-

cal history, or past or present symptoms or sensations, or the inception or general character of the cause or external causes thereof insofar as reasonably pertinent to diagnosis or treatment.

Relying on the broad language of Rule 803(4), which neither specifies the type of person to whom a patient must make the statements nor explicitly restricts application of the exception to physical symptoms or ailments, the State argues that D.R.E. 803(4) applies to psychotherapists.

Capano argues, among other things, that such a broad reading of the exception renders meaningless the requirement that the statement be "reasonably pertinent to diagnosis or treatment" because nearly everything that a person has experienced, including statements of fault, is relevant to psychoanalysis. Capano also argues that in treating patients, psychotherapists do not depend on the "objective" truth of the statements made by the patients (that is, the correlation between the content of the statements and some notion of objective reality), or even on the sincerity with which the statements are made. To ensure that the medical diagnosis exception imposes a meaningful limitation on the types of hearsay statements that would be admissible at trial, Capano contends that the exception should apply only to statements relevant to the diagnosis and treatment of *physical* ailments.[205]

**203.** See *Dowling*, 493 U.S. at 353–53, 110 S.Ct. 668; *Chapman*, 386 U.S. at 24, 87 S.Ct. 824 (describing harmless error analysis for federal constitutional errors).

**204.** This holding is alternative in the sense that, even if we did not reach the question of admissibility under Rule 803(4), we have already concluded in Subsection B that the trial court's decision to admit Fahey's statements of memory or belief under Rule 803(3) was harmless error.

**205.** See, e.g., *State v. Zimmerman*, 121 Idaho 971, 829 P.2d 861, 864 (1992) ("A psychologist does not provide 'medical' treatment as

contemplated by the rule."); *People v. LaLone*, 432 Mich. 103, 437 N.W.2d 611, 612–13 (1989) (holding that psychotherapists' testimony does not fall within medical diagnosis exception because "statements made in the course of the treatment of psychological disorders may not always be as reliable as those made in the course of the treatment of physical disorders" and because psychological ailments are difficult to verify); *State v. Barone*, Tenn. Supr., 852 S.W.2d 216, 220 (1993) (same); *Hall v. State*, Miss. Supr., 539 So.2d 1338, 1342 n. 8 (1989) (refusing to extend exception "beyond the diagnosis and treatment of matters medical") (superseded by

The State counters that statements made during therapy are likely to be highly reliable because patients have a strong motivation to be truthful in communicating with psychotherapists to ensure an accurate diagnosis and appropriate treatment. To the extent that unfairly prejudicial testimony may become admissible under a broad reading of the exception, the State maintains that such testimony may be excluded under the Rule 403 balancing test.

This argument presents us with an issue of first impression. We have concluded that the better-reasoned view is that statements to either a psychiatrist (a medical doctor specializing and certified in psychodiagnosis or psychotherapy) and a psychologist (a trained and certified professional—not a medical doctor—who specializes in psychodiagnosis or psychotherapy) *may* be admissible under D.R.E. 803(4).

We do not declare a general view that such statements will always—or even usually—be admissible. But if a firm foundation with respect to the qualifications of a psychotherapist and the proper professional circumstances is established, statements made to that professional by a patient voluntarily submitting to diagnosis or undergoing mental health treatment may, in the discretion of the trial court, be

admissible in a given case. While in some cases statements of the patient made to the professional in the course of psychodiagnosis or psychotherapy may be unreliable, inappropriately far-ranging, or unduly prejudicial, they are not necessarily so.

To establish the appropriate foundation, the proponent must show that the statements satisfy the two-part reliability test first developed in *United States v. Iron Shell*.[206] First, the declarant's motive in making the statement must be consistent with the purpose of promoting treatment, and the declarant must be aware that the diagnosis and treatment of her ailment depend on the accuracy of her statements.[207] Second, doctors must reasonably rely on this sort of information in diagnosis or treatment.[208] Finally, the trial judge must conduct a proper D.R.E. 403 analysis and determine that the probative value is not substantially outweighed by the danger of unfair prejudice.

These safeguards must be employed by the trial judge to ensure that admission of psychotherapist testimony is consistent with the rationale underlying the medical diagnosis exception: "[A] person seeking medical treatment is unlikely to lie to a doctor she wants to treat her, since it is in her best interest to tell the truth."[209] Limiting hearsay testimony in

---

amendment to Mississippi Rule 803(4) as noted in *Hall v. State*, Miss. Supr., 611 So.2d 915, 921–22 (1993)).

**206.** 8th Cir., 633 F.2d 77, 83–84 (1980) (applying F.R.E. 803(4) to admit doctor's testimony concerning the victim's statements in a child rape case); *see also United States v. Renville*, 8th Cir., 779 F.2d 430, 436 (1985).

**207.** *See Iron Shell*, 633 F.2d at 83–84 ("[The exception] relies upon the patient's strong motive to tell the truth because diagnosis or treatment will depend in part upon what the patient says.").

**208.** *See id.* (citing F.R.E. 703).

**209.** *Ring v. Erickson*, 8th Cir., 983 F.2d 818, 820 (1993); *see also State v. Robinson*, 153 Ariz. 191, 735 P.2d 801, 809 (1987) (admitting testimony of psychologist under *Iron Shell* test); *State v. Altgilbers*, App., 109 N.M. 453, 786 P.2d 680, 686 (1990) (same); *Felix v. State*, 109 Nev. 151, 849 P.2d 220, 249–50 (1993) ("In proffering statements made to psychiatrists or psychologists for the purpose of medical treatment or diagnosis, the proponent of the evidence must show, directly or indirectly, and the trial court must satisfy itself, that the patient understood the need to speak truthfully and that the statements were reasonably necessary for the treatment or diagnosis of the patient.").

this manner also assures that psychotherapists' testimony about their patients is not used to circumvent the rule against hearsay.[210]

█ Thus, where the patient's statements and the circumstances demonstrate reliable guarantees of trustworthiness we find no supportable reason why there should be a blanket exclusion of statements made to psychotherapists as compared to the general acceptance of statements made to doctors or medical paraprofessionals for physical ailments.[211]

In this case, we find that the trial judge properly exercised his discretion under circumstances consistent with our holding. The qualifications of Dr. Neil Kaye, M.D., Dr. Michelle Sullivan, and Dr. Gary Johnson, the psychotherapists, were established. The professional circumstances of Fahey's diagnosis or treatment were ap-propriate: There is no evidence that Fahey had an improper motive in seeking help from the psychotherapists or that she believed that the success of her treatment was unrelated to the accuracy of her statements.

In addition, Dr. Kaye testified that, in diagnosing and treating patients, psychotherapists necessarily rely on the patients' statements about their relationships in treating their psychological ailments.[212] Although Capano asserts that Fahey's ailments themselves (such as depression, anxiety, compulsive obsessive disorder, and anorexia) undermine the truthfulness of her statements in therapy, Capano fails to show how these disorders might have actually affected her ability to represent accurately her thoughts and feelings.[213] Similarly, Capano argues that Fahey often failed to disclose the full details of her life to her therapists. But Capano provides no

---

**210.** Capano suggests that admission of hearsay testimony from psychologists will permit psychologists to testify with impunity in place of their patients. This fear is misplaced for three reasons: (1) to be admissible, the testimony must be relevant and not unfairly prejudicial under D.R.E. 401, 402, and 403; (2) the testimony must relate to the psychological treatment and must satisfy the two-part reliability test; and (3) opposing counsel may cross-examine the psychotherapists on the purpose of the diagnosis (that is, whether the goal of the diagnosis was treatment or preparation for litigation).

**211.** *See, e.g., United States v. Newman,* 7th Cir., 965 F.2d 206, 210 (1992) ("The rationale [of F.R.E. 803(4)] applies as forcefully to a clinical psychologist as to a physician, and warrants us in reading 'medical' broadly."); *Morgan v. Foretich,* 4th Cir., 846 F.2d 941, 949 n. 17 (1988) (same); *State v. Nelson,* 138 Wis.2d 418, 406 N.W.2d 385, 390 (1987) (same); *United States v. Balfany,* 8th Cir., 965 F.2d 575, (1992) ("[S]tatements about abuse . . . made by a child to a trained social worker or psychologist pursuant to diagnosis or treatment for emotional or psychological injuries are admissible under Rule 803(4)."); *State v. Hildreth,* Iowa Supr., 582 N.W.2d 167, 169 (1998) ("We agree that statements made to a social worker in connection with diagnosis or treatment of emotional trauma may fall within the purview of rule 803(4) if the social worker is sufficiently qualified by training and experience to provide that diagnosis and treatment."); *cf. State v. Cephas,* Del. Supr., 637 A.2d 20, 25 (1994) (holding that job-related mental injuries are equally compensable as physical injuries under the Delaware Workmens' Compensation Act; stating, "[a]lthough the cause and existence of a mental infirmity may be more difficult to establish than its physical counterpart, a clearly proven mental injury should be accorded equal treatment under the Act").

**212.** Tr. of 10/27/98, at 29.

**213.** In some cases, a patient's lies are as helpful to her treatment as her truthful statements. *See People v. LaLone,* 432 Mich. 103, 437 N.W.2d 611, 612–13 (1989); 3 Federal Rules of Evidence Manual, *supra,* at 1666 ("But while a doctor relies only on reliable information to treat a patient for physical ailments, a psychiatrist relies on all information, truthful and untruthful, to treat the patient."). There is no evidence that this concern applies to the present case.

626

reason to question the reliability of the statements and disclosures that Fahey did make during the course of her therapy.

Fahey had a motive to be truthful and candid. There is no reasonable basis, therefore, to conclude that her statements were contrived or so far-ranging as to be irrelevant to her treatment or otherwise problematic. Moreover, the trial judge conducted a proper D.R.E. 403 balancing test and concluded that the probative value of the psychotherapists' testimony was not substantially outweighed by the danger of unfair prejudice.[214]

■ Finally, it should be noted that the D.R.E. 803(4) exception for medical diagnosis or treatment does not contain the same limitation as the state of mind exception under D.R.E. 803(3) regarding a fact remembered or believed. Accordingly, to the extent that the psychotherapists' testimony regarding Fahey's statements included facts remembered or believed, they are not barred under D.R.E. 803(4). Therefore, they are either admissible under this alternative basis or constitute harmless error under the analysis previously set forth in this Opinion.

## 2. Confrontation Clause Analysis of Statements Admitted Under the Medical Diagnosis Exception

■ Although the medical diagnosis or treatment exception of D.R.E. 803(4) has been recognized in its generic form as "firmly rooted" for purposes of the Confrontation Clause,[215] the exception has not historically been extended to psychotherapists, in Delaware. Capano therefore argues that the medical diagnosis exception is not "firmly rooted" as applied to psychotherapists. But we need not reach that issue because the alternative ground of "particularized guarantees of trustworthiness" under the Confrontation Clause jurisprudence is applicable here.

As noted above, the plurality opinion in *Lilly* holds that the Confrontation Clause may be satisfied if the proponent of the evidence carries its burden of showing that the contested statements possess "'particularized guarantees of trustworthiness' such that adversarial testing would be expected to add little, if anything, to the statement's reliability."[216] Reliance on this prong of the Confrontation Clause requires a showing that the "declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility."[217]

**214.** Tr. of 10/26/98, at 24–29; 11/2/98 at 5, 181.

**215.** *See White v. Illinois*, 502 U.S. 346, 112 S.Ct. 736, 743 n. 8, 116 L.Ed.2d 848 (1992) (medical diagnosis exception); *Forrest v. State*, Del. Supr., 721 A.2d 1271, 1274 (1999) (state of mind exception).

**216.** *Lilly*, 527 U.S. at 125, 119 S.Ct. 1887. This inquiry is known as the "residual trustworthiness test." *Id.* at 136, 119 S.Ct. 1887. *Compare* D.R.E. 803(24) (authorizing admission of a statement not specifically covered by the enumerated exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines its materiality, that it is more probative than certain other evidence, that the interests of justice are best served by admitting the evidence, and the proponent gives advance notice.). We need not address the specific applicability of D.R.E. 803(24) to this case.

**217.** *Wright*, 497 U.S. at 820, 110 S.Ct. 3139; *see also id.* at 820, 110 S.Ct. 3139 (holding that a determination that a statement possesses "particularized guarantees of trustworthiness" requires an examination of the circumstances "that surround the making of the statement and that render the declarant particularly worthy of belief."). Courts have significant leeway in determining the factors that provide the indicia of reliability necessary for hearsay testimony to satisfy the Confrontation Clause. *See id.*, Essentially, the State must demonstrate that the statements are as reliable as those admitted pursuant to a "firmly rooted" exception. *See id.* at 821, 110 S.Ct. 3139.

In this regard, we believe that it is particularly important that the statements satisfy the general requirements for admissibility established in *Derrickson.* *Derrickson,* which applies to the state of mind exception, requires "that the statement(s): i) must be relevant and material; ii) must relate to an existing state of mind when made; iii) must be made in a natural manner; iv) must be made under circumstances dispelling suspicion; and v) must contain no suggestion of sinister motives."[218]

In the present case, Fahey made the statements to her psychotherapists in a natural manner during therapy sessions and—at least for the most part—did not make the statements in response to questioning. In addition, there is nothing to indicate that Fahey made the statements under suspicious circumstances or in a manner suggesting that she had sinister motives. Rather, it appears that Fahey was expressing her concerns and fears regarding her relationship with Capano to those persons in whom she regularly confided. This conclusion finds further support in the "spontaneity and consistent repetition" of the statements.[219] Fahey made nearly identical statements concerning her intentions and her emotional state to a number of her psychotherapists and friends. In short, the nature of Fahey's statements, the manner in which they were communicated, and the persons to whom the statements were directed collectively establish that Fahey was speaking candidly. We therefore conclude that the admissible hearsay testimony presented by Fahey's psychotherapists possesses "indicia of reliability" and "guarantees of trustworthiness" sufficient to satisfy the Confrontation Clause. Thus the D.R.E. 803(4) exception as applied here satisfies the Confrontation Clause.

Finally, our decision to affirm the trial judge's decision in admitting the hearsay evidence is independently supported under the state of mind exception of D.R.E. 803(3) and the harmless error analysis, whether or not the psychotherapists' testimony is also independently admissible under D.R.E. 804(3). These conclusions apply both for Delaware evidentiary law purposes and for purposes of the federal Confrontation Clause analysis.

### V. Lesser Included Offenses

Capano requested that the trial judge instruct the jury on the following lesser included offenses to the charge of first degree murder: second degree murder, manslaughter, and criminally negligent homicide.[220] This request was made on two grounds. First, that there was evidence refuting the State's theory of intentional killing; and second, that Capano's testimony that Fahey was shot accidentally would support a verdict based on reckless or negligent homicide. The trial court denied the request, stating that "the State's theory produces some evidence of intent, but there isn't any evidence of recklessness or negligence in this particular case."[221] Addressing Capano's accident defense, the trial court further stated that it also failed to provide a basis for a theory of reckless or negligent killing by Capano.[222]

---

**218.** *Forrest,* 721 A.2d at 1276.

**219.** The United States Supreme Court has observed that "spontaneity and consistent repetition" and a "lack of motive to fabricate" are appropriate factors to consider in determining whether a statement possesses "particularized guarantees of trustworthiness." *See id.* at 821–22, 110 S.Ct. 3139 (citing *State*

*v. Robinson,* 153 Ariz. 191, 735 P.2d 801, 811 (1987) and *State v. Kuone,* 243 Kan. 218, 757 P.2d 289, 292–93 (1988)).

**220.** Tr. of 1/11/99, at 201.

**221.** Tr. of 1/11/99, at 207.

**222.** *Id.*

Murder in the second degree is defined as "recklessly caus[ing] the death of another person under circumstances which manifest a cruel, wicked and depraved indifference to human life."[223] Manslaughter is defined as "recklessly caus[ing] the death of another person."[224] A person is also guilty of manslaughter when the person "intentionally causes the death of another person under circumstances which do not constitute murder because the person acts under the influence of extreme emotional disturbance."[225] Criminally negligent homicide is defined as causing, "with criminal negligence, . . . the death of another person."[226]

 In reviewing Capano's claim that he was entitled to a jury instruction on any of these lesser included offenses, the statute and the case law require that we determine whether "there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense."[227] We review *de novo* Capano's claim that there was a rational basis for the requested instructions.[228] We have concluded that there is no rational basis in the evidence to support a charge on any of the lesser included offenses advanced by Capano.

### A. Contentions of the Parties

 Capano's argument in support of the first ground (that he was entitled to an instruction on the lesser included offenses because there was evidence tending to refute an intentional killing) is that "[a] jury, looking at *all* the evidence, could have decided that Capano and Fahey went out to dinner on Thursday night, June 27th, just as they usually did, and that, later that night, a sudden and spontaneous incident, for example, an argument that raged out of control, resulted in Fahey's death, but that her death was not intended and certainly not planned." The premise of this argument is that there was some evidence of an "argument that raged out of control," suggesting a spontaneous crime of passion, recklessness or negligence. We find no support in the record for this premise.

Capano's argument rests on two related contentions. First, he contends that the accident defense he presented through his testimony does not preclude an instruction on lesser included offenses, even though it is totally inconsistent with the theory that Fahey died after an argument with Capano. Second, Capano argues that there is a rational basis for any or all three of the lesser included offenses because the jury can "reject or accept all or part of a witness' testimony, or all or part of the State's theory of the case, or all or part of the defense case." Under this reasoning, the jury is free to fill in the "gaps" in the State's case without any evidence in order to construct a speculative scenario of reckless or negligent homicide. The State argues that by "limiting his defense to MacIntyre's accident, Capano ruled out any argument that he killed Fahey either accidentally or otherwise." Although we do not agree entirely with the State's argument, we have concluded that Capano's testimony and the elements of the lesser included offenses are mutually exclusive. Also, there

---

**223.** 11 *Del. C.* § 635; *see also* 11 *Del. C.* § 231(c)(defining recklessness).

**224.** 11 *Del. C.* § 632(1).

**225.** 11 *Del. C.* § 632(3).

**226.** 11 *Del. C.* § 631; *see also* 11 *Del. C.* § 2321(d) (defining criminal negligence).

**227.** *Zebroski v. State,* Del. Supr., 715 A.2d 75, 82 (1998) (quoting 11 *Del. C.* § 206(c)).

**228.** *See id.* at 82; *cf. Zimmerman v. State,* Del. Supr., 628 A.2d 62, 66–67 (1993) (applying *de novo* review to Superior Court's denial of requested instruction on "claim of right" defense to theft or extortion).

is no evidence in this record to furnish a rational basis for the elements of the lesser included offenses.

## B. No Preclusion

As noted, the Delaware statute[229] expressly provides that the trial court is "not obligated to charge the jury with respect to an included offense unless there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense." In cases where a jury could rationally disregard a defendant's exculpatory testimony, that testimony does not preclude the conviction of an included offense. We have concluded that in this case, the jury could rationally disregard all of Capano's testimony that Fahey was shot as a result of Capano's efforts to grab the gun from MacIntyre's hands.[230] Therefore, Capano's exculpatory testimony cannot be the *sole* basis for precluding lesser included offenses.

This reasoning is supported by our holding in *Miller v. State*.[231] In *Miller*, the defendant was charged with arson in the first degree for allegedly setting his former landlord's residence on fire. The State called two witnesses, each of whom testified that they observed the defendant entering the house through a back window and exiting minutes later. Each witness also testified that he saw smoke coming from the house shortly thereafter. In addi-

tion, the State called the former landlord, who testified that he had recently evicted the defendant from the residence.[232]

The defense offered three witnesses: the defendant's mother, the defendant's girlfriend, and the defendant. Each testified that the defendant was "at his mother's house at the time of the alleged arson and burglary."[233] "The thrust of the defense was that the defendant was elsewhere."[234] The issue on appeal was whether, notwithstanding the defendant's exculpatory alibi defense, the defendant was entitled to a jury instruction that he could be acquitted of first degree arson and convicted of the lesser included offense of arson in the second degree.[235]

Citing Section 206(c), we held in *Miller* that the defendant's exculpatory defense did not preclude a charge on arson in the second degree, and that based on the evidence the charge should have been given.[236] *Miller* stands for the proposition that a jury can convict of a lesser included even when the defendant's testimony, if believed by the jury, would result in acquittal.

More recently, in *Webb v. State*, we cited *Miller* for the proposition that the rational basis "standard applies even where the defendant denies any involvement in the charged offense."[237] But, in *Miller*, unlike the case before us, there was some evi-

---

229. 11 *Del. C.* § 206(c).

230. Tr. of 12/21/98, at 191.

231. Del. Supr., 426 A.2d 842 (1981).

232. *See id.* at 843.

233. *Id.*

234. *Id.* at 845.

235. The distinction between the two "depend[ed]" on the [statutory] aggravating ele-

ment of whether the defendant knew of circumstances which rendered the presence of another person not an accomplice (in the building) a reasonable possibility." *Id.*

236. *See id.* The rational basis in the evidence for an instruction on second degree arson was that the defendant had not lived in the building for over a month.

237. *Webb v. State*, Del. Supr., 663 A.2d 452, 462 (1995). We held that Webb was not entitled to a lesser included offense instruction because there was no rational basis in the evidence for such a charge. *See id.* at 463.

dence from which a rational juror could infer the elements of the lesser included offenses.

In support of its preclusion argument, the State cites the following language from *Manchester v. State*:[238]

> In applying Section 206(c), this Court has held that where the defense is complete innocence to a charge of first degree murder, there can be only two choices for the jury: guilty of first degree murder or innocent. *Dutton v. State*, Del. Supr., 452 A.2d 127, 146 (1982); *Bailey v. State*, Del. Supr., 521 A.2d 1069, 1093-94 (1987).

▆▆▆▆ We do not read *Manchester* or the cases it cites as adopting a rule of *automatic* preclusion where the defense is complete innocence. As we observed in *Manchester*, "there was no rational basis in the evidence for a charge on a lesser-included offense."[239] Similarly, in *Dutton* and *Bailey* we held that the denial of a lesser included instruction was not error because "there is nothing in the record which would support a jury finding under the particular instruction ... sought."[240] These cases rely on fact-sensitive analysis and do not stand for a rule of automatic preclusion when the evidence—apart from the exculpatory version of events offered by the defendant—would support conviction of an included offense.[241]

## C. The Evidence Here Does Not Support a Lesser Included Offense Charge

We now address Capano's contention that based on the evidence put forward by the State there is a rational basis for acquittal of first degree murder and conviction of the lesser included offenses. The State's theory of the case was that Capano planned and intentionally killed Fahey. Capano argues that even if the State did not put forward "affirmative" evidence of recklessness or negligence, the "evidence purportedly reflecting intent was de minimis at best, and what little evidence there was, was equally consistent with" the lesser included offenses enumerated above. Capano argues that the jury "can reject or accept all or part of a witness's testimony, or all or part of the State's theory of the case, or all or part of the defense case." This is correct in the abstract, but it begs the question whether there is some basis in the record for inferring from the gaps in the State's case some evidence to support the elements of any of the lesser included offenses.

The State argues that no evidence was presented of recklessness or criminal negligence, and that "the jury was not free to infer a state of mind from nonexistent evidence." Our independent review of the evidence at trial confirms the accuracy of the State's view. There is no such evidence. To permit the jury to find the elements of the lesser included offenses on

---

**238.** Del. Supr., No. 134, 1986, 1987 WL 44962, Holland, J. (Oct. 19, 1987) (ORDER).

**239.** *Id.*

**240.** *Bailey*, 521 A.2d at 1069, 1093; *see also Dutton*, 452 A.2d at 146 (finding no support in the record for requested lesser included offense instruction).

**241.** When the defendant's testimony *corroborates* an element of the offense charged, however, it may preclude conviction of a lesser included offense. *See Ross v. State*, Del. Supr.,

482 A.2d 727, 735 (1984) (holding that a jury could not find manslaughter based in part on fact that the defendant's "own testimony conclusively establishes an intentional killing"); *Ward v. State*, Del. Supr., 575 A.2d 1156, 1158 (1990) ("In this case, however, there is no basis for concluding that Ward was guilty only of a lesser offense. To accept Ward's position, we would have to conclude that *all testimony presented at trial was false*.") (emphasis added).

this record would permit unguided speculation by the jury.

We hold that the evidence produced at trial does not provide a rational basis for "a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense."[242] If the jury rejected the State's planning evidence, concluding, for example, that the cooler and gun purchases were unrelated to Fahey, it could have returned a verdict acquitting the defendant. But, conviction on any other theory would require pure speculation by the jury concerning the manner of Fahey's death. Allowing a conviction on the basis of speculation would be inconsistent with the statute and our prior case law requiring a "rational basis" standard.

The possibility that Capano killed Fahey by an act that was reckless, criminally negligent, or under the influence of extreme emotional disturbance is based entirely on speculation. Although there is evidence of the disposal of Fahey's body, the parties concede that apart from the accident defense offered in Capano's testimony, there is no evidence concerning the *manner* of Fahey's death. Her body was not recovered and neither was any murder weapon. Putting aside Capano's accident defense, no one gave eyewitness testimony bearing on the circumstances under which Fahey died.[243] If the State's planning evidence and Capano's accident defense are rejected, it is *possible* that Capano killed Fahey in some kind of jealous rage, or some other reckless or negligent act. But these possibilities are only speculative. They are not supported by any rational basis in the evidence.

 Capano contends that a jury could have decided that Capano killed Fahey after "an argument that raged out of control," a theory that seems to suggest that Capano acted under the influence of extreme emotional disturbance and is guilty of manslaughter. This possibility is said by the defense to be supported by evidence concerning the troubled romantic relationship between Capano and Fahey. Even assuming evidentiary support for this theory, the applicable Delaware statute places the burden on the defendant to prove that he acted "under the influence of extreme emotional distress" and "that there is a reasonable excuse or explanation for the existence of the extreme emotional distress."[244] Because none of Capano's defense was directed at satisfying the burden he must carry under Section 641, the jury could not have found "extreme emotional disturbance" as a mitigating circumstance.[245]

242. *Zebroski v. State*, Del. Supr., 715 A.2d 75, 82 (1998) (quoting 11 *Del. C.* § 206(c)).

243. Small spots of blood, later determined to be Fahey's, were found in Capano's great room. Tr. of 12/1/98, at 234. Gerry Capano testified that he helped Capano dispose of a bloodstained sofa. Tr. of 11/9/98, at 54–56. This is evidence that Fahey died after sustaining injuries that caused her to bleed, but does not provide any basis for a theory of reckless or negligent killing.

244. 11 *Del. C.* § 641 provides that:

The fact that the accused intentionally caused the death of another person under the influence of extreme emotional distress is a mitigating circumstance, reducing the crime of murder in the first degree as defined by § 636 of this title to the crime of manslaughter as defined by § 632 of this title. The fact that the accused acted under the influence of extreme emotional distress must be proved by a preponderance of the evidence. The accused must further prove by a preponderance of the evidence that there is a reasonable explanation or excuse for the existence of the extreme emotional distress. The reasonableness of the explanation or excuse shall be determined from the viewpoint of a reasonable person in the accused's situation under the circumstances as the accused believed them to be.

245. *See Moore v. State*, Del. Supr., 456 A.2d 1223 (1983)

Capano cites the 1994 Connecticut case of *State v. Sivri*[246] to support his argument that, because the State did not show how Fahey died, the jury could infer reckless or criminally negligent acts. In *Sivri* the .evidence showed that the victim died in the defendant's home after sustaining a bloody injury, and that the defendant attempted to conceal the death and flee the country.[247] Reviewing the conviction of first degree murder, the *Sivri* Court held that, although the evidence would support a finding of intent to kill, it would "permit the jury to infer that there was also a possibility that 'there was a sudden or spontaneous incident ... resulting in the unintended death'...."[248] Noting that "the evidence of intent to kill was not overwhelming," the *Sivri C*ourt held that the "proof on intent ... was sufficiently in dispute" to warrant instruction on lesser included offenses.[249]

*Sivri* is distinguishable from this case. First, in this case, unlike the situation in *Sivri*, there is evidence of planning. The *Sivri C*ourt itself distinguished another Connecticut case where "evidence of prior planning and preparation"—rental of a woodchipper to dispose of the body—made the "defendant's claim of a 'sudden confrontation ... too speculative to put the issue of intent sufficiently in dispute.' "[250] Second, this Court's precedent suggests that we would not follow *Sivri* on its facts and allow the jury the same freedom to speculate based on gaps in the State's evidence.[251]

### D. Accident Testimony Not a Basis for Lesser Includeds

■ The second ground on which Capano argues that he was entitled to a jury instruction on lesser included offenses is that based on his testimony alone there is a rational basis in the evidence for finding recklessness or criminal negligence. Capano testified that "Debby shot Anne Marie."[252] He testified that MacIntyre came into the great room of Capano's house where Fahey and Capano were sitting, surprising them both. MacIntyre was enraged, apparently because of Fahey's presence, and was crying and yelling. Then she threatened to kill herself.[253] According to Capano, "the left arm was coming up and I thought, oh my God, she's going to shoot herself. And so I reached out with my right hand to grab her left hand to pull the gun away from herself. And as I did that, a shot went off."[254]

246. Conn. Supr., 231 Conn. 115, 646 A.2d 169 (1994).

247. The evidence in *Sivri* was that the victim had gone to the defendant's home to give him a professional massage and was never seen again. Her body was not recovered. The police found that blood had been spilled on the defendant's carpet equal to "one fourth to one fifth of the blood in the body of a woman of medium build." Blood was also found in defendant's car. Finally, the State presented consciousness of guilt evidence consisting of defendant's flight to Turkey and attempts to conceal the body and the bloodstains. *See id.* at 172–77 (summarizing facts).

248. *Id.* at 182.

249. *Id.*

250. *Id.* (citing *State v. Crafts*, 226 Conn. 237, 627 A.2d 877, 886 (1993)). Crafts' argument, rejected by the Connecticut Supreme Court, that he was entitled to a lesser included offense instruction "rel[ied] on the fact that the State's evidence of intent was entirely circumstantial." *Crafts*, 627 A.2d at 885.

251. *See, e.g., Dutton v. State*, Del. Supr., 452 A.2d 127 (1982) (holding that instruction on lesser included offense is not required on facts similar to those in *Sivri*).

252. Tr. of 12/21/98, at 189.

253. *Id.* at 188–91.

254. *Id.* at 191. Based on this testimony, the trial court instructed the jury that it must acquit Capano "if the evidence as to accident creates a reasonable doubt as to the defendant's guilt." Tr. of 1/13/99, at 237–38.

This evidence does not support an instruction on a lesser included offense. This Court has held that an accident defense is incompatible with recklessness or criminal negligence.[255] Therefore, Capano's account of how Fahey died does not support recklessness or criminal negligence. Capano testified that he prevented MacIntyre from killing herself. Most important, according to Capano's testimony, MacIntyre fired the gun. Capano's testimony was that his role was simply to grab her hand as she lifted the gun up. These facts do not establish any criminal culpability. We are not persuaded by Capano's argument that a jury could find that he acted recklessly or negligently by "grabbing the arm of a hysterical woman threatening suicide and brandishing a gun."

This would be an entirely different case if Capano had testified in a manner consistent with a homicide committed in a jealous rage, or by recklessness, or by an act of criminal negligence. But he did not so testify. His testimony was confined to an accident scenario that involved no crime on his part. To permit Capano now to prevail on an argument that the jury could completely have disregarded both the State's evidence and Capano's testimony and to speculate on a scenario that has no evidentiary support whatsoever would fly in the face of clearly established Delaware statutory and case law.

### E. No Due Process Violation

Capano argues that the refusal to instruct on lesser included offenses violated Capano's due process rights. Relying principally on the 1980 United States Supreme Court decision in *Beck v. Alabama*, and Delaware authority as well, Capano argues that because he is a defendant in a capital case he has a constitutional right to a lesser included offense instruction in this case.[256]

Capano's argument fails because the right to a lesser included offense instruction depends on there being a rational evidentiary basis for that instruction. *Beck* is consistent with that rule. And its facts were significantly different from the facts before us.

*Beck* struck down Alabama's *statutory prohibition* on giving a lesser included offense instruction. In *Beck*, the Alabama statute provided that as to capital offenses:

> If the jury finds the defendant guilty, it shall fix the punishment at death when the defendant is charged by indictment with any of the following offenses and with aggravation, which must also be averred in the indictment, and which offenses so charged with said aggravation *shall not include any lesser offenses.*[257]

No such prohibition is at issue in this case. The relevant Delaware statute simply

---

**255.** *See Smith v. State*, No. 38, 1996, 1996 WL 539851, Veasey, C.J. (September 19, 1996) (ORDER), Order at ¶ 13 ("[I]f an act is done recklessly, it cannot be due to an accident."); *Hall v. State*, Del. Supr., 431 A.2d 1258, 1260 (1981) (observing that defendant's accident defense was the "antithesis of the acts and states of mind which characterize the various degrees of homicide").

**256.** *Beck v. Alabama*, 447 U.S. 625, 627, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) (holding that a death sentence may not "constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a ver-

dict."); *Chao v. State*, Del. Supr., 604 A.2d 1351, 1359 (1992) (explaining the particular concern of *Beck* that without the "procedural safeguard" of a lesser included charge, jurors may convict in order to punish because they "have determined that a serious crime was committed ... although not necessarily ... the crime with which the defendant was charged").

**257.** *Beck*, 447 U.S. at 629, 100 S.Ct. 2382 (quoting Alabama Code § 13–11–2(a) (1975)) (emphasis supplied). The Court noted that the "last phrase of this subsection has been consistently construed to preclude any lesser included offense instructions in capital cases." *Id.* In *Beck*, the State conceded that a lesser

states that the trial judge "is not obligated" to charge on lesser included offenses unless the rational basis test is met.[258]

In *Hopper v. Evans*[259], the United States Supreme Court stated:

> *Beck* held that due process requires that a lesser included offense instruction be given when the evidence warrants such an instruction. But due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction.[260]

*Hopper* explicitly upheld Alabama's requirement that there be a "reasonable theory from the evidence" to support a lesser included offense, and held that none was required on the facts of that capital case.[261]

We have concluded that in this case there is no "rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense."[262] Neither Delaware law nor the Due Process Clause requires the lesser included instructions requested by Capano. Nothing in *Beck* or its progeny supports Capano's argument.

## VI. Admission of Evidence of Capano's Character and Prior Misconduct

Capano argues that the trial court improperly admitted evidence of his character during its case-in-chief and during his cross-examination. In particular, he contends that the trial court should have excluded the following evidence under D.R.E. 404: (1) Debbie MacIntyre's testimony that she purchased a handgun for Capano;[263] (2) Tom Shopa's testimony that Capano, while in jail, asked Shopa if he would sleep with MacIntyre;[264] and (3) the State's cross-examination of Capano concerning a racist email that Capano sent to another lawyer,[265] specific instances of "indiscreet" marital infidelity,[266] and Capano's net worth.[267]

We review the trial court's admission of evidence of other bad acts under D.R.E. 404 to determine whether the trial court abused its discretion.[268] In contrast, we review *de novo* a trial court's determination under Rule 404 that "bad act" evidence is relevant to prove something other than the defendant's propensities or that the evidence is related to a "pertinent trait."[269]

included offense instruction would have been given "absent the statutory prohibition." *Id.* at 630, 100 S.Ct. 2382.

**258.** *See* 11 *Del. C.* § 206 ("The court is not obligated to charge the jury with respect to an included offense unless there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense.").

**259.** 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982).

**260.** *Id.* at 611, 102 S.Ct. 2049 (emphasis added).

**261.** *Id.* at 611–12, 102 S.Ct. 2049. *Hopper* also noted the federal rule that a lesser included offense instruction should be given "if the evidence would permit a jury rationally to find [a defendant] guilty of the lesser offense

and acquit him of the greater." *Id.* at 612, 102 S.Ct. 2049. (citation omitted).

**262.** 11 *Del. C.* § 206(c).

**263.** Tr. of 11/18/98, at 72–91.

**264.** Tr. of 12/1/98, at 58–63.

**265.** Tr. of 1/4/99, at 30–32.

**266.** Tr. of 1/4/99, at 39, 43–46.

**267.** Tr. of 1/4/99, at 46–47.

**268.** *See Allen v. State*, Del. Supr., 644 A.2d 982, 985 (1994).

**269.** *See Steigler v. State*, Del. Supr., 277 A.2d 662, 668 (1971), *vacated on other grounds*, 408 U.S. 939, 92 S.Ct. 2872, 33 L.Ed.2d 760 (1972) (reviewing *de novo* relevance of evidence admitted under Rule 404(b)).

## A. MacIntyre's Gun Purchase

■ On direct examination, MacIntyre testified that, on two occasions, Capano asked her to purchase a gun for him and that she eventually did so in May 1996.[270] On appeal, Capano argues that MacIntyre's testimony about the gun purchase is inadmissible under the rule articulated by this Court in *Farmer v. State*.[271] More specifically, he contends that this testimony is inadmissible because: (1) there is no evidence that the gun was involved in Fahey's death and (2) the jury may improperly infer that possession of a gun indicates a disposition to use it.[272] The State responds that the suspicious nature of the purchase is probative evidence that Capano planned to murder Fahey. The trial court agreed with the State and permitted MacIntyre to testify on this issue.[273]

In *Farmer*, the Court held that a gun found in the defendant's house was inadmissible because the State had no evidence connecting that gun or that type of gun to the shooting with which the defendant was charged.[274] The *Farmer* Court recognized that the admission of a gun into evidence may be unfairly prejudicial to the defendant where admission of the gun serves only to support an inference that the defendant had a gun available to him at the time of the shooting.[275]

In contrast, the State's case against Capano of a planned homicide depends on evidence that he "was assembling the wherewithal to commit a homicide."[276] And the suspicious nature of his use of MacIntyre to purchase the gun for him is probative evidence of this planning. Although neither side produced evidence indicating that the gun purchased by MacIntyre was involved in Fahey's death, MacIntyre's gun purchase for Capano is nevertheless independently relevant to prove that he had the gun purchased as part of a plan to murder Fahey and that he sought to cover his tracks by ensuring that he was not the registered owner of the gun.

■ The issue, of course, is whether the jury will infer from this transaction that Capano is a bad person because he purchased a gun illegally or that Capano possessed a gun and therefore used it to murder Fahey. In *Getz v. State*,[277] this Court established six requirements for the admission of evidence of a defendant's prior bad acts. The evidence of prior bad acts must be: (1) material to an ultimate issue; (2) admissible under D.R.E. 404(b); (3) proved by clear and convincing evidence; (4) not too remote from the crime charged; (5) not unfairly prejudicial under D.R.E 403; and (6) accompanied by a limiting instruction.

■ Because MacIntyre's transaction is probative evidence of planning, the dispute centers on the last two *Getz* elements.[278] The first question is whether the danger of unfair prejudice "substantially outweighs" the probative value of the evidence under D.R.E. 403. Although there is a danger of improper jury inferences from Capano's possession of a gun, we find that

---

270. Tr. of 11/18/98, at 72–91.

271. Del. Supr., 698 A.2d 946, 948-49 (1997).

272. *See Farmer*, 698 A.2d at 949.

273. Tr. of 10/28/98 Teleconference, at 8–9.

274. *See Farmer*, 698 A.2d at 949.

275. *See id.*

276. Tr. of 10/28/98 Teleconference, at 9.

277. 538 A.2d 726, 734 (1988).

278. The State's asserted purpose for presenting this testimony is expressly authorized by D.R.E. 404(b): "Evidence of other crimes, wrongs, or acts ... may, however, be admissible [to prove] ... *preparation, plan....*" (emphasis added).

this risk does not substantially outweigh the probative value of the evidence—particularly in view of the discretion accorded the trial court to decide these issues.[279]

▮ Under the final *Getz* prong, the parties agree that the trial court failed to give a limiting instruction for MacIntyre's testimony. The State suggests, however, that Capano agreed at trial that no such instruction was necessary. The office conference discussions on this point are not crystal clear, but it appears that defense counsel wanted to wait until MacIntyre testified before proposing a limiting instruction.[280] Defense counsel did not repeat its request later, apparently because counsel thought that an instruction was not necessary.[281] Under these circumstances, we conclude that the trial court's decision to admit MacIntyre's testimony without an instruction did not constitute an abuse of discretion under *Getz*.

### B. Shopa's Conversation with Capano

Tom Shopa, who was a close friend of Capano, testified on direct examination that Capano asked him to have a "physical relationship" with Debbie MacIntyre.[282] Capano argues that this testimony is irrelevant and improper character evidence under D.R.E. 404 because it serves only to support an inference that Capano is a bad person. The State contends that Capano's attempt to induce Shopa to sleep with MacIntyre is evidence that Capano sought to "exert continuing control over MacIntyre from prison."

▮ The primary issue surrounding Shopa's testimony is whether the testimony is material to an ultimate issue or whether it bears only on Capano's character.[283] MacIntyre testified that she initially lied to investigators, at Capano's request, about her purchase of a gun for him.[284] Because Capano challenged this testimony on cross-examination,[285] the extent of his control over MacIntyre became a material issue in this case. Shopa's testimony does not prove directly that Capano actually exerted an influence on MacIntyre, but a jury could reasonably infer from the testimony that Capano attempted to control

---

**279.** *See Allen v. State*, Del. Supr., 644 A.2d 982, 985 (1994).

**280.** Tr. of 11/18/98 Office Conference, at 7–10.

**281.** Tr. of 1/7/99 Office Conference, at 21 ("Mr. Maurer: I don't think we need a repeated instruction on the purpose for which the gun was put into evidence. I think that sort—that whole dynamic has been changed by the way the case developed. We gave that instruction initially.").

**282.** Tr. of 12/1/98, at 62–63. Shopa's testimony proceeded as follows:
Q. Did he [Capano] say anything else in regards to Debby MacIntyre to you?
A. He said he was very, if you will—He felt that she was needy, and he wanted me to take care of her, to kind of be there, to help her, to be strong for her, and—and—and also to—to have—have a physical relationship with her, to sleep with her.

Q. And what did you say to him in response to this request, if you will, to have a physical relationship with her?
A. I said no. I refused to. And I was shocked and very upset by that. I didn't express it at that time, but reflecting on it that night, I was very upset about that.
Q. Now at any point did Deborah MacIntyre ask you to have a physical relationship?
A. No.

**283.** At trial, defense counsel objected to Shopa's testimony on the ground that it was irrelevant because it does not tend to prove that Capano exercised control over MacIntyre. Tr. of 12/1/98 Office Conference, at 7–8.

**284.** Tr. of 11/18/98, at 164–65, 172. MacIntyre also testified that Capano requested that she tell investigators that Capano had purchased the cooler for his brother. Tr. of 11/18/98, at 173–74.

**285.** Tr. of 11/19/98, at 189–192, 212–225.

MacIntyre by controlling her personal relationships. We conclude that Shopa's testimony was material to MacIntyre's explanation of events and therefore did not constitute improper character evidence.

██ Although the testimony does not present Capano in a favorable light, the probative value of the evidence is not substantially outweighed by the risk that the jury will infer from the evidence that he is a bad person.[286] As a result, the trial court did not abuse its discretion in admitting Shopa's account of his conversation with Capano.

### C. Cross-Examination of Capano

Capano also contends that the State improperly cross-examined him about (1) a message he sent to a colleague that included racist remarks, (2) specific instances of sexual misconduct, and (3) his net worth. The State's cross-examination questions on these topics, Capano argues, were not relevant and were unfairly prejudicial because they encouraged the jury to make negative inferences about his character under D.R.E. 404(b). The State contends that D.R.E. 404(a)[287] authorizes these lines of

questioning because Capano's direct examination testimony placed relevant character traits in dispute.

██ Rule 404(a)(1) expressly permits the prosecution to use evidence of bad character traits exhibited by the accused to rebut "evidence of a pertinent trait offered by an accused." This rule, in conjunction with Rule 405(a),[288] extends to the State's use of Capano's prior bad acts to impeach his character evidence. The question therefore becomes whether the three challenged character traits are "pertinent" to this case within the meaning of Rule 404(a).

██ We emphasize at the outset that the trial judge necessarily has "wide discretion" in ruling on the permissible use of bad acts as impeachment evidence during cross-examination.[289] Nevertheless, to be "pertinent" within the meaning of Rule 404(a), the cross-examination questions must meet one of three conditions. The prior bad acts must either: (1) indicate that a character witness lacks sufficient knowledge of the defendant to render an opinion about the defendant's character;[290] (2) indicate that the defendant is lying about a fact that is relevant to the case;[291] or (3)

**286.** *See* D.R.E. 403.

**287.** D.R.E. 404(a) provides: "Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except: (1) Character of accused. Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same."

**288.** D.R.E. 405(a) permits the impeachment of admissible character evidence: "On cross examination, inquiry is allowable into relevant specific instances of conduct."

**289.** *See Steigler v. State*, Del. Supr., 277 A.2d 662, 668 (1971), *vacated on other grounds*, 408 U.S. 939, 92 S.Ct. 2872, 33 L.Ed.2d 760 (1972).

**290.** *See, e.g., Michelson v. United States*, 335 U.S. 469, 479, 69 S.Ct. 213, 93 L.Ed. 168 (1948) (permitting the prosecution to question

character witnesses about the basis of their testimony about the defendant's character and reputation); *United States v. Russo*, 110 F.3d 948, 952 (1997) (permitting prosecution to question character witness about their knowledge of the charges against the defendant).

**291.** *See, e.g., Casalvera v. State*, Del. Supr., 410 A.2d 1369, 1373–74 (1980) (permitting the State to question defendant about unemployment benefits collected in Delaware while defendant was working in New Jersey "to impeach his assertion that he only returned to Delaware out of his concern for the victim"); *Britt v. State*, Del. Supr., 402 A.2d 808, 809 (1979) (permitting State to question defendant about fight with friend 12 hours before arrest to impeach defendant's testimony that he later returned to his friend's home "with a peaceful intent and unarmed").

indicate that the defendant lied about a specific fact.[292]

In the present case, only the third category applies to the disputed questions because the State sought to impeach Capano's testimony on topics that are not directly relevant to the State's first degree murder case. As the Second Circuit observed in *United States v. Beno*,[293] the State may refute a defendant's lies about specific facts (whether relevant or irrelevant to the case as a whole) because the defendant "should not be allowed to profit by a gratuitously offered misstatement." The court also observed that the rules governing the State's impeachment of the defendant's character evidence do not "suggest[ ] that once a defendant has offered irrelevant and incompetent evidence on certain specific facts, the prosecution is immediately entitled to explore without restraint and at great length any specific occurrence which might tend to create an abhorrent image of the defendant."[294]

■ Applying this analysis to the present case, Capano testified during direct examination that he "wasn't prejudiced"[295] and that he was "discreet" in his romantic affairs.[296] The State responded to Capano's testimony that he was not "prejudiced" by questioning him about an email he sent to a colleague that described a person as a "dot head" who "smelled funny."[297] To

challenge Capano's assertion that he was "discreet," the State questioned Capano on cross-examination about three specific incidents in which he engaged in sexual conduct that was not discreet.[298]

The trial court permitted these questions because Capano had volunteered information about specific, positive character traits, and the State was entitled to rebut his testimony.[299] We agree with the trial court that Capano was not entitled to "profit by a gratuitously offered misstatement" about his positive character traits. Although the State may not use isolated remarks as a means to engage in a lengthy examination of a defendant's past conduct, the State's questioning in the present case described only four specific incidents and was limited to rebutting the specific traits described during direct examination. As a result, we conclude that the State's cross-examination of Capano about his racist remarks and his extramarital affairs was sufficiently brief and targeted to fall within the proper scope of impeachment.

■ During direct examination, Capano repeatedly asserted that he accepted less pay working in the public sector than he would have received. if he had worked for a private law firm.[300] In response, the State presented evidence during its cross-examination indicating that Capano's net worth in 1993 exceeded five million dollars.[301] Although the State's cross-examina-

**292.** *See, e.g., McAllister v. State*, Del. Supr., No. 88, 1992, 1993 WL 278170, Veasey, C.J., (July 15, 1993) (ORDER), Order at ¶ 8, (permitting State to question defendant about prior convictions when he testified that he had only been convicted of five previous crimes because his testimony was "demonstrably false character evidence"); *cf. United States v. Beno*, 2d Cir., 324 F.2d 582, 588 (1963) (stating the rule but finding that the impeachment was improper).

**293.** 2d Cir., 324 F.2d 582, 588 (1963).

**294.** *Id.*

**295.** Tr. of 12/21/98, at 14.

**296.** Tr. of 12/17/98, at 34.

**297.** Tr. of 1/4/99, at 32.

**298.** Tr. of 1/4/99, at 43–46.

**299.** Tr. of 1/4/99, at 31, 43.

**300.** Tr. of 12/16/98, at 24–25, 26–27, 30–32, 34.

**301.** Tr. of 1/4/99, at 47.

tion was not intended to prove that his testimony was false, the State's questions undermined the apparent purpose of Capano's testimony, *i.e.,* to show that he has a good character because he sacrificed something by accepting reduced pay in the public sector. The State's cross-examination indicated that this pay cut did not require a significant sacrifice by Capano because he was independently wealthy. Although courts generally forbid the admission of the defendant's net worth for consideration by the jury,[302] the trial court did not abuse its broad discretion by permitting the State to cross-examine Capano on this topic because he described during direct examination the financial sacrifices he made to work in the public sector.[303]

### D. Due Process

■ Capano also presents an argument that the admission of the disputed character evidence violated his right to a fair trial under the Due Process Clause. Because we have concluded that the contested evidence was admissible and relevant

under Rule 404, the admission of this evidence does not constitute a violation of the Due Process Clause.[304]

## VII. Denial of Motion for Recusal

In May 1999, while this Court had jurisdiction of this appeal, but the matter had been remanded for the trial judge to decide Capano's motion for a new trial, Capano made two requests that Judge William Swain Lee recuse himself in view of Judge Lee's possible candidacy for governor and various newspaper articles highlighting his role in the Capano trial. Judge Lee denied these requests by letters to the parties, stating that his "ability to impartially address [the pending motions] has not been affected by the trial's impact on other aspects of [his] life." On August 20, 1999, a formal motion for recusal was filed. Judge Lee denied the recusal motion on August 24, 1999. The next day, he issued his opinion denying the motion for a new trial.

After several extensions of time, Capano's brief in the appeal of his conviction·

---

**302.** *See People v. Hogan,* 31 Cal.3d 815, 183 Cal.Rptr. 817, 647 P.2d 93, 116 (1982), *overruled on other grounds by People v. Cooper,* 53 Cal.3d 771, 281 Cal.Rptr. 90, 809 P.2d 865 (1991) ("Generally, evidence of the wealth or poverty of a defendant is not admissible...."); *Northwestern Univ. v. Crisp,* 211 Ga. 636, 88 S.E.2d 26, 31 (1955) (same).

**303.** We also note that the challenged cross-examination questions present a less serious problem than the sort of questions that this Court has found to be reversible error in the past. *See, e.g., Gregory v. State,* Del. Supr., 616 A.2d 1198, 1203 (1992) (finding trial court committed reversible error in admitting cross-examination of defendant on prior crimes without conducting a D.R.E. 403 balancing and without determining if the crimes indicated dishonesty); *Aiken v. State,* Del. Supr., No. 244, 1993, 1994 WL 330014, Walsh, J. (June 29, 1994) (ORDER), Order at ¶¶ 7–8, (finding reversible error in decision to admit evidence of two prior incidents of violence against persons other than victim).

**304.** *See Dowling v. United States,* 493 U.S. 342, 353-53, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (asserting that improper admission of evidence violates due process if it "violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions'") (citations omitted); *see also Dunnigan v. Keane,* 2d Cir., 137 F.3d 117, 125 (1998) (holding that evidence must be "sufficiently material to provide the basis for conviction" to violate the Due Process Clause). This case is thus distinguishable from *Zebroski v. State,* Del. Supr., 715 A.2d 75, 79 (1998) (noting that the "introduction by the prosecution of racial material in a criminal proceeding violates the Due Process Clauses of both the United States and Delaware Constitutions in cases where the purpose for such introduction is to establish a defendant's abstract belief and/or to create bias against the defendant") (citing *Dawson v. Delaware,* 503 U.S. 159, 166–67, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992)).

and sentencing was filed with this Court on February 4, 2000. Just before that filing, Capano filed a motion in this Court for a limited remand of the proceedings to enlarge the record on appeal in connection with the recusal issue. We denied this motion in an opinion dated March 17, 2000.[305] Instead of interrupting Capano's appeal by staying briefing on the merits in order to conduct an evidentiary hearing that might become an "open-ended fishing expedition,"[306] we directed Capano to file a supplemental brief on the recusal issue together with his other briefing. As we stated:

> The supplemental briefing should address discrete instances of judicial discretion by Judge Lee, the exercise of which may have (a) been motivated by political ambitions; and (b) influenced the outcome of the trial to Capano's prejudice. Assuming that the briefing demonstrates an appropriate issue or issues for factual inquiry, a remand on discrete issues may be necessary. If a remand becomes necessary, we will address these issues in the context of all other issues on appeal. On the other hand, we may never have to reach the issues raised by the motion, depending on the outcome of other aspects of the appeal.[307]

We now consider Capano's argument in the context of his appeal from his conviction and sentence.

### A. Capano's Contentions

Capano contends that Judge Lee's ambition to run in the 2000 gubernatorial contest created "the appearance, and, quite probably, the reality that because of political ambition, Judge Lee tilted in favor of both conviction and the death penalty because they were the politically popular outcomes in this widely publicized case."[308] Capano argues that based on the record submitted to this Court, consisting mainly of newspaper articles quoting Judge Lee, it was error for him to deny the motion for recusal, and that we should reverse the conviction and death sentence. Alternatively, Capano continues to argue for a limited remand to conduct a hearing into the factual basis of his argument.

■ It is necessary to examine the record on which rests Capano's argument and his earlier recusal motion. On May 5, 1999, after sentencing but while a motion for new trial was pending, a news article was published in the Wilmington News Journal under the headline, "Judge William Swain Lee May Run for Governor."[309] In addition, Capano cites a newspaper report containing statements allegedly made by Judge Lee indicating that Republicans had approached him during Capano's trial to encourage him to consider running for governor.[310]

In suggesting that Judge Lee's political ambitions create a conflict of interest, Ca-

**305.** *Capano v. State*, Del. Supr., 758 A.2d 499 (2000). This opinion sets forth the procedural history of the recusal requests and the formal recusal motion made by Capano. For the sake of brevity, this procedural history is not repeated here.

**306.** *Id.* at 502.

**307.** *Id.* at 504–05. Capano did not file a separate brief on the recusal issue, choosing instead to include this issue in an Amended Appellant's Opening Brief. In addition, Capano filed a supplemental appendix in support of his recusal argument.

**308.** Judge Lee did, in fact, resign his judgeship and retired to seek the Republican Party's nomination for governor, eventually losing the nomination in a close Republican primary.

**309.** *See* Nancy Charron, *Judge William Swain Lee may run for governor*, Wilmington News Journal, May 5, 1999, at B1. The article discussed Judge Lee's background and made reference to the Capano case. This revelation appears to have been the impetus for Capano to make his first request to Judge Lee to recuse himself.

**310.** Todd Spangler, *Lee Who Heard Capano Case, Weighs Run for Governor*, Del. State

pano places particular emphasis on statements by Judge Lee in which he acknowledges the role that the Capano trial played in encouraging his candidacy. One newspaper article reports that in a speech given during Judge Lee's later campaign for the Republican nomination, he credited the Capano case and the guilty verdict for his popularity, saying that if Capano had been acquitted, the Judge would have been seen "as just another judge who failed to see that the system did its job."[311] Another newspaper article reports Lee making similar comments on another occasion.[312] Capano argues that, given the link—belatedly acknowledged by Judge Lee himself—between the Judge's political interests and a completed trial resulting in a guilty verdict, Judge Lee cannot have been impartial when he ruled on the recusal motion and the motion for new trial.

### B. Denial of Recusal Not an Abuse of Discretion

■ Canon 3C(1) of the Delaware Judges' Code of Judicial Conduct provides: "a judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned." When faced with a claim of bias or conflict of interest, the judge must follow a two-part analysis:

> First, he must, as a matter of subjective belief, be satisfied that he can proceed to hear the cause free of bias or prejudice concerning that party. Second, even if

the judge believes that he has no bias, situations may arise where, actual bias aside, there is the appearance of bias sufficient to cause doubt as to the judge's impartiality.[313]

■ On appeal of the trial judge's recusal decision, the reviewing court must determine: (i) whether, as a matter of subjective belief, the judge was satisfied that he or she could proceed to hear the case free of bias or prejudice concerning a party; and (ii) whether objectively there is an appearance of personal bias.[314] We must be satisfied that the trial judge engaged in the subjective test and will review the merits of the objective test.[315] The standard of review is abuse of discretion.[316]

■ We are satisfied that Judge Lee's decision not to recuse himself was a proper exercise of discretion. In response to Capano's first request that he recuse himself, Judge Lee determined that his "ability to impartially address [pending] issues has not been affected by the trial's impact on other aspects of my life." Judge Lee maintained this position in subsequently denying a second recusal request and a later motion for recusal. These responses fulfill the first part of the *Los* analysis described above. Accordingly, we turn to whether there is an objective appearance of bias in this case.

The highly publicized nature of the Capano trial brought all the participants into the public spotlight, a fact that Judge Lee

News, May 6, 1999. Statements in newspaper articles are hearsay, and in most cases their accuracy cannot be assumed. *See Capano v. State*, 758 A.2d 499, 505 (2000) (Hartnett, J., dissenting); Richard E. Flamm, Judicial Disqualification 168 (1996) (noting that as a general rule media reports are considered incompetent sources on which to base a disqualification motion).

**311.** Sandy Bauers, *Trial run: From judge's bench to state capital?*, Philadelphia Inquirer, Feb. 20, 2000, at B1.

**312.** Tom Eldred, *Lee admits to Capano Blunder in Delaware*, (visited Feb. 15, 2000) <http://www.newszap.com/021500b.html>.

**313.** *Los v. Los*, Del. Supr., 595 A.2d 381, 384–85 (1991).

**314.** *See Jackson v. State*, Del. Supr., 684 A.2d 745, 752-53 (1996) (citing *Los v. Los*, 595 A.2d at 384).

**315.** *See id.*

**316.** *See id.*

obviously realized. We see no basis, however, to extrapolate the reality or the appearance that Judge Lee was unable to act impartially in all matters pertaining to the guilt and sentencing phase. There is nothing in the record to suggest that political ambitions of Judge Lee affected his ability to preside impartially over the entire proceedings in this case. Moreover, as noted in our opinion of March 17, 2000, we directed the parties to identify and discuss "discrete instances of judicial discretion by Judge Lee, the exercise of which may have (a) been motivated by political ambitions; and (b) influenced the outcome of the trial to Capano's prejudice."[317] In our view Capano has not satisfied this burden. Thus, Judge Lee's refusal to recuse himself, "supported by his subjective belief that he could be impartial"[318] was not an abuse of discretion.

We find that Judge Lee did not violate the provisions of Canon 7 of the Delaware Judges' Code of Judicial Conduct. Canon 7A(2) states that a judge "should not ... make speeches for a political organization or candidate or publicly endorse or oppose a candidate for public office." Canon 7A(3) prohibits judges from several forms of participation in political organizations, including "attend[ing] political gatherings."[319] Canon 7C states that "a judge should not engage in any other political activity except on behalf of measures to improve the law, the legal system or the administration of justice."

The Delaware Court on the Judiciary has observed that "a judge should not have to resign merely to learn whether he has a realistic chance of election...."[320] Any exploratory activity, however, must be done "in a manner consistent with the Delaware Judges' Code of Judicial Conduct."[321]

Assuming that during Capano's trial or sentencing, Judge Lee had private conversations with one or more Republican leaders concerning a possible candidacy, such conversations did not violate his obligations under Canon 7. Likewise, assuming that Judge Lee was considering a possible candidacy, there is no evidence that he did so improperly under Canon 7. The Code of Judicial Conduct does not require judges to resign immediately upon conceiving of the possibility of running for office.[322] Nor does it disqualify judges who have been assigned to sensitive or well-publicized cases from seeking political office.[323] Capano's argument that Judge Lee acted improperly in this case

---

317. *Capano v. State*, Del. Supr., 758 A.2d 499, 504 (2000).

318. *Los*, 595 A.2d at 385.

319. *See In re Barrett*, Del. Ct. Jud., 593 A.2d 529, 533–34 (1991) (finding a violation of Canon 7A(3)).

320. *In re Buckson*, Del. Ct. Jud., 610 A.2d 203, 222 (1992).

321. *Id.*

322. In Delaware judges are appointed by the Governor and confirmed by majority vote in the Senate. Del. Const., art. IV, § 3. In states that elect judges however, it is common for judges to hear cases and conduct trials while up for reelection. Absent extreme circumstances, a judge's candidacy has not been held to require disqualification. *See, e.g., Adkins v. State*, 600 So.2d 1054, 1061–63 (1990) (holding that it was proper for judge not to recuse himself from capital case even though "he was at the time campaigning for a seat on the circuit court" because defendant had not shown clear evidence of bias). *See Brown v. Doe*, 2d Cir., 2 F.3d 1236, 1248–49 (1993) ("To reverse [the] conviction, this Court would have to rule in effect that no judge who is elected may preside in sensational cases. We reject such a rule as incompatible with federalism.").

323. Judge Lee was the Resident Judge of Sussex County. His home was two hours distant from the courthouse in Wilmington, New Castle County, where the defendant resided. Judge Lee was assigned to the case by the

because he entertained political ambitions has no basis in this record or Capano's proffer on remand.

## VIII. Investigation of Allegations of Juror Misconduct

 Capano raises two issues on appeal concerning the trial court's resolution of allegations of juror misconduct. First, he contends that the trial court abused its discretion by failing to investigate a dismissed juror's allegations that the remaining jurors had conspired to have the complaining juror removed because his view of the case differed from their view.[324] Second, he contends that the trial court abused its discretion by refusing to dismiss a juror who participated in a conversation about the case with a juror from another trial and who initiated a conversation with Fahey's sister before the penalty phase of this trial began.

 A trial court's determinations on the "mode and depth of investigative hearings into allegations of juror misconduct" and on the remedy for such misconduct are reviewed on appeal to determine whether the court abused its discretion.[325]

### A. Juror No. 5

During the trial, the court received two letters from the jury foreperson alleging (1) that Juror No. 5 had expressed his opinions on the case to at least two other jurors and (2) that Juror No. 5 indicated that he had already reached a decision in the case.[326] In response to these allegations, the court interviewed Juror No. 5 in the presence of counsel.[327] The trial judge informed the juror of the allegations and identified the complaining jurors.[328] The juror asserted that he had not expressed any opinions to other jurors and that he did not know why the jurors had made the allegations.[329] Nevertheless, with the agreement of all counsel, the court dismissed the juror.

After the trial was completed, Juror No. 5 approached two of Capano's lawyers and suggested that the other jurors had conspired to remove him from the jury because he was inclined to acquit Capano.[330] Based in part on these allegations, Capano moved for a new trial. The trial court again interviewed Juror No. 5 and concluded that the juror's testimony was not credible.[331] The trial judge declined to in-

President Judge. He was a logical choice for the assignment because he was a veteran trial judge, and the fact that he was not a resident of New Castle County enhanced his objectivity, although conducting this ten-week trial necessitated extensive travel for the trial judge at significant personal inconvenience.

324. The State argues that Capano did not present this issue to the trial court and therefore waived the issue on appeal. *See* Supr. Ct. R. 8. Although Capano did not demand further investigation at the time of the juror's dismissal, he did properly raise the issue when Juror No. 5 later alleged misconduct by the other jurors. The trial court had the opportunity to consider the allegations in ruling on Capano's motion for a new trial. As a result, Capano did not waive the issue and we review the record for an abuse of discretion.

325. *Massey v. State*, Del. Supr., 541 A.2d 1254, 1257 (1988) (citations omitted).

326. Tr. of 12/30/98 Office Conference, at 2–3.

327. Tr. of 12/30/98 Office Conference, at 10–12.

328. Tr. of 12/30/98 Office Conference, at 10–12.

329. Tr. of 12/30/98 Office Conference, at 10–11.

330. Tr. of 7/8/99 Interview with Juror No. 5, at 10–12. The juror also wrote a letter to the court expressing his disappointment that he had been dismissed, but the court apparently lost the letter and failed to inform counsel of the receipt or contents of the letter. Tr. of 6/22/99 Office Conference, at 18.

331. *See State v. Capano*, Del. Super., C.A. No. N97–11–0720, 1999 WL 743679 at *9–10. Lee, J. (July 25, 1999) (Mem. Op.).

vestigate the matter further and denied Capano's motion for a new trial.[332]

 The trial court has broad discretion to determine the extent to which allegations of juror misconduct warrant further investigation.[333] This policy has particular force where the defendant wishes to impeach the jury's verdict with evidence of misconduct.[334]

 In the present case, the trial court elected not to investigate further the allegation that members of the jury conspired to have Juror No. 5 removed because he was inclined to acquit Capano. In reaching this decision, the trial judge acted within his broad discretion because he found no credible evidence to suggest that the allegations warranted further investigation. The post-trial testimony of Juror No. 5 was the only evidence of misconduct by other jurors.[335] Moreover, the trial court had a sufficient basis on which to conclude that this testimony was not credible: (1) The juror did not mention the alleged conspiracy during his initial interview with the court or in his 1999 letter to the court and (2) the juror misrepresented the content of his first interview with the trial judge.[336] Although allegations of improper pressure by other jurors are undoubtedly serious,[337] the trial court did not abuse its discretion in declining to conduct a further investigation into the post-trial allegations of Juror No. 5.[338]

## B. Juror No. 4

Juror No. 4 was involved in two separate incidents that raise some questions about her impartiality. First, this juror had a conversation concerning the Capano case with a juror serving on another trial. During an interview with the trial judge, Juror No. 4 revealed the general tenor, if not the precise contents, of the conversation.[339] Based on this interview, the trial judge

332. *See id.* at *10.

333. *See Massey v. State*, Del. Supr., 541 A.2d 1254, 1257 (1988).

334. *See id.* at 1256 (citing D.R.E. 606(b)).

335. Capano also contends that Juror No. 3, who was dismissed because she had been arrested for drug possession during the trial, suggested that jurors had determined Capano's guilt before the end of the trial. This type of allegation, however, does not automatically warrant further investigation. *See Lovett v. State*, Del. Supr., 516 A.2d 455, 474–75 (1986) (holding that speculation about pressure on the jury to return a guilty verdict and "third hand allegations" that the jury considered facts not in evidence do not require further inquiry into the jury's verdict).

336. *See Capano*, 1999 WL 743679 at * 9–10.

337. *See McCloskey v. State*, Del. Supr., 457 A.2d 332, 338–39 (1983) (holding that animosity between jurors and trial court's private interview with foreperson raised presumption of improper pressure on jurors).

338. *Cf. Sheeran v. State*, Del. Supr., 526 A.2d 886, 897 (1987) ("[T]he effect of the alleged actions of other jurors upon the mind or emotions of the juror who wrote to the trial court, is precisely the kind of intra-jury influence that the prohibition in D.R.E. 606(b) was designed to protect from inquiry.... We find the trial judge did not abuse his discretion in refusing to hold an evidentiary hearing as to the allegations set forth in the juror's letter or in refusing to grant a new trial."). Capano argues that the holding in *Fisher v. State*, Del. Supr., 690 A.2d 917, 918 (1996), supports his position that the trial court is obligated to conduct an in-depth investigation of allegations of serious juror misconduct. In *Fisher*, the Court remanded to the trial court for a hearing on possible racial bias among jurors after the trial court "denied summarily" the defendant's motion for a new trial. *Fisher* presents a different situation than the present case because the Capano trial court did not deny Capano's motion for a new trial "summarily." Although the judge did not conduct a juror-by-juror investigation, the judge did not dismiss the allegations out-of-hand. On the contrary, the trial court interviewed the lone complaining juror and concluded that the juror's testimony lacked credibility.

339. Tr. of 10/28/98 Interview with Juror No. 4, at 13–14. The juror testified as follows: The first day I get on the bus, everybody's talking about Capano this, and all that, and

concluded that the conversation was "innocent" and did not prejudice Capano.[340]

Second, Juror No. 4 initiated a conversation with Fahey's sister, Kathleen Fahey-Hosey, at a local gym after the guilt phase and just before the penalty phase of the trial began. Juror No. 4 told Fahey-Hosey that she was "really sorry about all this" and that the jury had "prayed for her family" after it came to a decision in the guilt phase.[341] There is no evidence that Fahey's sister made any statement to the juror on the merits of the case. When the court interviewed her, the juror also suggested that she may have already reached a decision on sentencing.[342]

 As an initial matter, it would appear that Capano did not object to the retention of Juror No. 4 after the disclosure of her conversations with the other juror or after her contact with Fahey's sister. Although it is unclear from the record when the trial judge revealed that Juror No. 4 discussed Capano's trial with the other juror, Capano waived his objection to the retention of Juror No. 4 by failing to present the issue to the trial court.[343]

 In any event, Capano's claims with respect to Juror No. 4 fail because Capano does not present any evidence that the juror's conversations actually prejudiced his case. To impeach a jury verdict because of juror misconduct, "a defendant must establish actual prejudice unless defendant can show that the circumstances surrounding the misconduct were so egregious and inherently prejudicial as to support a presumption of prejudice to defendant."[344] Moreover, indications that a juror has made up her mind on an issue before the end of the trial—despite repeated admonitions from the trial judge not to do so—do not generally require dismissal of the juror.[345]

---

I was just quiet. An they were talking about—and I assumed they were jurors, too, but I wasn't going to say nothing until I went in and I knew.
And they were talking about the case and they said to me—and the woman said to me, "Are you a juror," and I said, "No," because I didn't—I didn't mean—I mean I didn't know who was listening and I just said no.

340. Tr. of 10/28/98 Interview with Juror No. 4, at 18.

341. Tr. of 1/26/99 Interview with Juror No. 4, at 5–6. At this point Juror No. 4 testified:

I walked over to the Stairmaster. I got on and I started to go and I looked over and I'm standing right next to her [Kathleen Fahey Hosey] and I just—I mean we know each other, I've been looking at her for four months, and I just said hi and she said hello. And I just said I'm really sorry about all this and I said hopefully it will be over soon, and, you know, and then she told me she was putting her son into IHM school, and I told her that the night that we finally came to our decision, we prayed for her family and that was it. And I mean it was

just kind of small talk. It wasn't—I mean she never said anything to me about what she wanted or anything like that. It was nothing. It was nothing like that at all. It was just—I mean I wasn't going to ignore the woman. . . .
I've never even—and she says, "Do you live around here," and I said, "Yeah, you know, my family's from north Wilmington. And she says, "Oh, are you the school teacher," and I said, "No, I'm the social worker" and I said I work at Mary Campbell Center. And she said "Oh, I'm a physical therapist" and that was—I mean, I said, "Oh, we have a physical therapy department where we work, I wonder if you know Pat Kramer."

342. Tr. of 1/26/99 Interview with Juror No. 4, at 9.

343. See Supr. Ct. R. 8.

344. Massey v. State, Del. Supr., 541 A.2d 1254, 1255 (1988).

345. See Styler v. State, Del. Supr., 417 A.2d 948, 953 (1980) (finding that trial judge could properly conclude that statements by two jurors before the end of the trial indicating that

In the present case, there is no evidence that Juror No. 4's conversation with the other juror was prejudicial to Capano. Based on the testimony of Juror No. 4 and on the disclosure by the other juror, the trial court could properly conclude that Juror No. 4 did not overhear information about the Capano case during her conversation with the other juror.[346] The trial court could therefore properly retain Juror No. 4 after her contact with the other juror because there was no risk that the juror would base her deliberations on facts outside the evidence adduced in court.[347]

▮▮▮▮▮ Similarly, although Juror No. 4's conversation with Fahey's sister was completely inappropriate during the course of the Capano trial, it did not indicate an improper bias in favor of Fahey's family. The conversation was relatively brief and did not concern the facts of the case or the jury's verdict.[348] Evidently, the trial court and defense counsel were satisfied with the account, and they agreed to permit Juror No. 4 to remain on the jury for the penalty phase, thus waiving the claim now presented.[349]

▮▮▮ Finally, Juror No. 4's comment that "I feel like I've already come to my decision on [sentencing]" was not sufficiently prejudicial to warrant dismissal because she merely indicated an inclination in one (unspecified) direction. Although jurors are consistently admonished not to reach a decision on any issue before the parties have presented all of the evidence, the trial court has discretion to permit a

juror to remain as long as the juror does not "express[ ] a firm conclusion that the man was guilty regardless of anything."[350] Juror No. 4, by contrast, agreed that she could "still discuss the aggravating and mitigating circumstances and be open to being convinced by other people who are on the jury."[351] Because Juror No. 4 did not express "a firm conclusion" with respect to Capano's sentence, the trial court did not abuse its discretion by permitting the juror to participate in the penalty phase of Capano's trial.

The trial court could properly find that the incidents described above did not actually prejudice Capano and that they did not taint the jury's verdict. As a result, we conclude that the trial court did not abuse its discretion by declining to pursue further investigations or by refusing to grant Capano's motion for a new trial on the basis of this misconduct.

The courts of this State, and the courts of many other states, go to great pains to insulate jurors from any contact even remotely related to a pending case. Indeed, it is customary practice in Delaware for jurors to wear juror identification badges during a case. It is regrettable from an institutional perspective that these juror mishaps occurred in this case. Although contact between a juror and the victim's family is improper and should not be permitted, there is no indication that the conversation was prejudicial to Capano in this case. We trust, however, that the Superior Court has instituted adequate measures

they thought that the defendant was guilty was "loose talk" and did not reflect a bias against defendant).

**346.** Tr. of 10/28/98 Interview with Juror No. 4, at 18.

**347.** *Cf. Lovett v. State*, Del. Supr., 516 A.2d 455, 474–75 (1986) (holding that "third hand allegations" that the jury considered facts outside evidence do not require a new trial).

**348.** Tr. of 1/26/99 Interview with Juror No. 4, at 5–7. *See* excerpted testimony *supra* note 341.

**349.** Tr. of 1/26/99 Interview with Juror No. 4, at 13–14.

**350.** *Styler,* 417 A.2d at 953.

**351.** Tr. of 1/26/99 Interview with Juror No. 4, at 9.

and instructions to ensure that such problems will not occur in other cases in the future.

### IX. Questions Concerning Post-Arrest Silence—No Plain Error

Capano argues that questioning during cross-examination concerning his silence at his bail hearing violated his due process rights. Because no objection was raised at trial, we review this claim for plain error.[352] We conclude that the questions complained of were proper.

Capano was arrested on November 17, 1997 for the murder of Fahey. He was indicted on December 12, 1997. A five-day proof positive hearing was held commencing on February 2, 1998, and bail was denied. Trial commenced on October 6, 1998.

In January and February 1998, while Capano was incarcerated awaiting trial, MacIntyre was in contact with investigators. She had testified before the grand jury in September 1996 and was possibly going to be required to appear as a witness at the bail hearing and the proof positive hearing. On January 28, 1998, MacIntyre attended an interview with law enforcement officials and stated under oath that she had thrown away the gun that she had purchased for Capano. This was the same testimony she had previously given before the grand jury.[353] According to MacIntyre, whose testimony at trial was

that Capano took and kept the gun,[354] it was at this January 28th interview that she decided not to continue giving a false story to the government.[355] On February 27, 1998, following negotiations between her lawyers and the government, MacIntyre signed an agreement with the State. This agreement protected her from prosecution for prior false statements in exchange for cooperation with the government investigation.[356]

During this period, Capano and MacIntyre exchanged letters. The content of this extensive correspondence was examined in great detail through MacIntyre's and Capano's testimony, including Capano's direct testimony. The admission of these letters is not an issue on appeal. These letters contain "advice" from Capano about how MacIntyre should handle herself with respect to the investigation. He told her, for example, that she was not in danger of being prosecuted for perjury, and that she should hire new lawyers for herself.[357] The jury could reasonably infer from these letters that Capano was attempting to dissuade MacIntyre from cooperating with the government, and to manipulate her testimony.[358]

On direct examination, Capano's counsel read through a number of the letters, asking Capano what they meant. This testimony was clearly intended to bolster the claim that Capano was "protecting" MacIntyre by not revealing her role in Fahey's death.[359]

---

352. See Wainwright v. State, Del. Supr., 504 A.2d 1096, 1100 (1986). In a sidebar conference, the State said that "Pre-arrest silence we can use to impeach, and I think the other thing is if you put the letters in that are post-arrest I think you raise the post-arrest issue." A fair reading of the transcript is that Capano's attorneys agreed with that statement.

353. Tr. of 11/18/98, at 181–92; Tr. of 11/19/98, at 51.

354. Tr. of 11/18/98, at 91–94.

355. Tr. of 11/19/98, at 220–21.

356. Id. at 54.

357. Tr. of 11/19/98, at 61–76.

358. Tr. of 11/18/98 at 207–22; Tr. of 11/19/98, at 29–30; Tr. of 12/29/98, at 30–32.

359. Tr. of 12/29/98, at 34, 53 ("I promised Debby that I would protect her. I was very deeply in love with Debby. I knew what had happened was an accident. And I felt some, you know, obvious sense of responsibility, because if I had been truthful, you know, if I had been kinder on the phone ... nothing

■ In this context, the questioning of Capano regarding his post-arrest silence were proper means of impeachment. These questions and answers are part of the following exchange on cross-examination:

Q: And then February 27, 1998, after you are arrested, Debbie MacIntyre signs a cooperation agreement with the Government, right?

A: Yes, she does. I didn't hear the date you said.

Q: February 27, 1998?

A: Yeah, I don't know if that's the date she signed. I know that's the date she went in. For all I know she had signed it the day before.

Q: You kept quiet at the bail hearing which preceded this, right? There was a bail hearing in February to decide whether you would stay in jail. You never said she did it, right?

A: I never testified.

Q: But you never said it through any means. You never told your attorneys, you never did anything?

A: No, I was true to my word. I was protecting her.

Q: You were protecting her. February 27th she signs a cooperation agreement with the State?

A: Yes.

Q: And you're in jail?

A: Yes.

Q: You have—according to your testimony, it's been horrible conditions that you've endured in jail, right?

A: Very terrible.[360]

■ The third and fourth questions in this exchange relate to Capano's post-arrest silence. In *Doyle v. Ohio*,[361] the United States Supreme Court held that "use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." The prohibition on questioning regarding post-arrest silence extends beyond a defendant's exercise of his right to silence at the time of arrest to include pre-trial silence generally.[362] The rationale of *Doyle* is that it is "fundamentally unfair" to use a defendant's silence for impeachment after giving *Miranda* warnings assuring the defendant, "at least implicitly, that his silence will not be used against him . . . ."[363]

The questioning excerpted above does not run afoul of *Doyle* because it did not "impeach the exculpatory story."[364] The State used Capano's silence to impeach him on a discrete issue that Capano himself had raised in order to convince the jury of the veracity of his accident defense. That discrete issue is the meaning of his letters to MacIntyre and what they could tell the jury about his conduct in January and February 1998. This testimony raised

---

like this would have ever happened. If I had taken the damn gun away from her at some point and just confiscated it from her house.") (testimony of Tom Capano).

**360.** Tr. of 1/4/99, at 102–03.

**361.** 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976)

**362.** *See Brecht v. Abrahamson*, 507 U.S. 619, 628–29, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) ("On the other hand, the State's reference to petitioner's silence after that point in

time, or more generally with petitioner's failure to come forward with his version of events *at any time before trial* . . . crossed the *Doyle* line.") (emphasis added); *Hassine v. Zimmerman*, 3d Cir., 160 F.3d 941, 947 (1998) (finding *Doyle* violation where questions went to general pre-trial silence).

**363.** *Fletcher v. Weir*, 455 U.S. 603, 606, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) (quoting *Anderson v. Charles*, 447 U.S. 404, 407–08, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980)).

**364.** *Doyle*, 426 U.S. at 619, 96 S.Ct. 2240.

a subsidiary issue relative to the alleged accident that occurred on Thursday, June 27, 1996.

As stated above, Capano used his own direct examination to explain the letters, answering such questions as, "Now, what did you mean by protecting someone completely?"[365] In his direct testimony he methodically referenced the letters as they related to his "state of mind" in January and February 1998.[366] Therefore the State was entitled to use his silence to raise the inference that the specific "state of mind" he claimed to have—i.e., a protective one toward MacIntyre—was not credible.[367] Therefore, we find no error.

 Finally, even assuming that there was a *Doyle* violation, permitting the isolated questioning is not plain error. Capano's *pre-arrest* silence following Fahey's death, and his persistent efforts to conceal her death and hide his involvement, were central issues before the jury. As Capano testified, he remained silent about MacIntyre's involvement at great cost to his family and his career, even as his "world was collapsing."[368] Capano's effort at trial was to convince the jury that this was because he loved MacIntyre and would not betray her. Even without the questioning complained of, the jury had to confront the stark fact that Capano remained silent before his arrest despite extraordinary pressures, all in order to "protect" MacIntyre.[369] It is thus inconceivable that two isolated references to Capano's failure to speak at a bail hearing caused any prejudice.

### X. No Brady Violation

Capano argues that the trial judge was required to disclose to the defense certain sealed documents relating to Gerry Capano's drug usage. The trial judge held an *in camera* review. After that review, the trial court determined that this material was *Brady* material because it constituted impeachment evidence with respect to Gerry, in that it contained "information on specific episodes when Gerard purchased and used drugs."[370] The trial court further found that "the material is cumulative evidence of facts in evidence and of which the defense already knows: Gerard purchased and used a large quantity of drugs on a regular basis."[371] Based on this finding,

---

365. Tr. of 12/29/98, at 54; *see also, e.g., id.* at 58.

366. Tr. of 12/29/98, at 34.

367. *Cf. Anderson v. Charles*, 447 U.S. 404, 408, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980) (holding that *"Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements"); *United States v. Reveles*, 5th Cir., 190 F.3d 678, 685 (1999) ("When a defendant attempts to convince a jury that he was of a cooperative spirit, *Doyle* does not tie the hands of prosecutors who attempt to rebut this presentation by pointing to a lack of cooperation.").

368. Tr. of 1/4/99, at 102.

369. *Id.*

370. *State v. Capano*, Del. Super., No. 97–11–0720, 1998 WL 729756, at * 1, Lee, J., (Sept.

17, 1998) (ORDER) (citing *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment") and *Giglio v. United States*, 405 U.S. 150, 153–54, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (holding that the obligation to disclose under *Brady* applies to matters relevant to the credibility of a witness)); *see also Jackson v. State*, Del. Supr., 770 A.2d 506, 515–17 (2001) (discussing and applying *Brady*).

371. *Id.* In this appeal we have also examined *in camera* the same material examined by the trial judge, and we come to the same conclusion.

and taking into account that the documents were sealed to protect an informant, the trial court excluded the information contained in the documents.

■■■■■■■ Capano's claim of a *Brady* violation is without merit. We review for abuse of discretion the decision of the trial court.[372] In this case, Gerry Capano was cross-examined at length and in detail about his history of drug use.[373] Other witnesses gave testimony about Gerry's drug use, including Dr. Tavani, who testified that it affected Gerry's ability to perceive reality. The additional fact that Gerry was testifying pursuant to a plea agreement, and thereby avoiding prosecution on drug-related charges, was also before the jury.[374] Therefore, it was not an abuse of discretion for the trial judge to exclude this evidence on the basis that it was cumulative. Because the evidence is cumulative, Capano cannot show "a *Brady* violation ... by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."[375]

## XI. Propriety of Questions During Cross-Examination of Capano

Capano argues that the State asked improper questions while cross-examining him. First, he argues that the State asked him questions that the prosecutor knew were likely to cause him to invoke his claim of lawyer-client privilege.[376] Second, he argues that the State asked "so-called 'were they lying' questions" that unfairly placed him in the position of having to argue that other witnesses had lied. We find no merit to either of these arguments.

■■■■■■ As to the first category of claimed error, Capano concedes that no objection was raised at trial and that therefore this Court must apply plain error review.[377] On cross-examination, the State tried to demonstrate Capano's manipulation and control of Debbie MacIntyre. To that end, the State sought to establish that, while incarcerated, Capano asked MacIntyre to fire her own lawyers and hire a lawyer named Jack Willard recommended by Capano.[378]

Apparently Willard had represented Capano at some point. It was in this connection that Capano was asked whether Wil-

---

**372.** *See Snowden v. State,* Del. Supr., 672 A.2d 1017, 1024 n. 6 (1996) ("A trial court's denial of access to the defense, following an *in camera* inspection, is reviewed for abuse of discretion and has generally been affirmed on appeal."); *Lilly v. State,* Del. Supr., 649 A.2d 1055, 1059 (1994).

**373.** Tr. of 11/9/98, at 143–86.

**374.** *Id.* at 5; Tr. of 11/10/98, at 4, 91.

**375.** *Kyles v. Whitley,* 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

**376.** Capano argues that these questions were improper under Rule 512 of the Delaware Uniform Rules of Evidence. Rule 512 provides that:

(a) The claim of a privilege, whether in the present proceeding or on a prior occasion,

is not a proper subject of comment by judge or counsel. No inference may be drawn therefrom.

(b) In jury cases, proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege without knowledge of the jury.

(c) Upon request, any party against whom the jury might draw an adverse inference from a claim of privilege is entitled to an instruction that no inference may be drawn therefrom.

**377.** *See Wainwright v. State,* Del. Supr., 504 A.2d 1096, 1100 (1986). Relief is warranted when "the error complained of [is] so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process." *Id.*

**378.** Tr. of 1/4/99, at 4–10.

lard had asserted lawyer-client privilege on Capano's behalf. Capano repeatedly insisted that Willard had not been his attorney at the time Capano tried to get MacIntyre to hire him. The State was merely attempting to rebut Capano on this point by showing that Willard had in fact invoked lawyer-client privilege on behalf of Capano. No adverse inference was drawn from these questions.[379] In this context the questions were not improper because they were intended to explore the Capano-Willard relationship.

■■■ Capano also complains of another group of questions in which the prosecutor asked Capano whether he had lied to his lawyers.[380] As Capano concedes, these questions related to false information that he fed his lawyers for public dissemination following Fahey's disappearance while her fate was still unknown. For example, Capano caused his lawyers to issue a press release describing Capano as "devastated" by her disappearance and "hop[ing] she will be found safe."[381] Capano was asked whether these statements were, in effect,

"lies" he told to his attorneys. They did not require him to invoke lawyer-client privilege since they related to information that Capano told his lawyers for the purpose of making the information public.[382] Therefore they were not improper.

Capano next complains of certain questions he refers to as "were they lying questions." Such questions may be problematic for the reason that opinions about who is lying and who is not invade the province of the jury[383] or for the reason that it is "misleading and unfair to make it appear that an acquittal requires the conclusion that [a witness] is lying."[384] Some courts, however, have found that "were they lying" questions are not always improper.[385]

■■■ Delaware has not adopted a general prohibition on the type of questions at issue here, and we decline to do so now.[386] In this case the questions were not improper and do not warrant a new trial. For instance, Gerry's neighbor Jeffrey Stape testified that he saw Capano parked outside of Gerry's home on the morning of

379. *See* D.R.E. 512(a).

380. Tr. of 1/4/99, at 166–83.

381. *Id.* at 181.

382. D.R.E. 502(b) (limiting privilege to confidential communications).

383. *See United States v. Boyd*, D.C. Cir., 54 F.3d 868, 871 (1995) ("It is therefore error for a prosecutor to induce a witness to testify that another witness, and in particular a government agent, has lied on the stand.").

384. *State v. Casteneda-Perez*, 61 Wash.App. 354, 810 P.2d 74, 78–79 (1991).

385. *See, e.g., People v. Overlee*, 236 A.D.2d 133, 666 N.Y.S.2d 572, 577 (1997) (explaining that where witnesses contradict each other, and the contradiction is not attributable to mistake, a credibility contest results and it is proper advocacy for a cross-examiner to highlight it).

386. We have disapproved of assertions made by the prosecution in closing argument relating to witness credibility, especially when they imply that in order to acquit the defendant the jury would have to find that another witness had lied under oath. *See Fensterer v. State*, Del. Supr., 509 A.2d 1106, 1112 (1986) (holding that comments made by the prosecutor in closing argument were "improper and unacceptable" because they implied that "in order to acquit the defendant ... the jury would have to find that the officers lied under oath"). *Cf. Hughes v. State*, Del. Supr., 437 A.2d 559, 571 (1981) ("In our opinion, 'liar' is an epithet to be used sparingly in argument to the jury."); *id.* at 570–71 (holding that it was improper for prosecutor to label defendant's "pre-trial out-of-court statements as 'lies,'" and that such characterizations must not be made unless "(a) that is a legitimate inference which may be drawn from the evidence, and (b) the prosecutor relates his argument to specific evidence which tends to show that the testimony or statement is a lie.").

Friday, June 28, 1996, the day that Fahey's body was disposed of at sea. Capano was asked whether Stape had been "mistaken" when he testified that Capano glanced quickly away when Stape spotted him parked in front of Gerry's home the day after the alleged murder.[387] This question was about perception more than credibility, and in any event related to a minor fact. There was certainly nothing improper about this question.

Capano was asked whether he had ever told either Fahey or Kim Lynch-Horstmann (a friend of Fahey) that one of his daughters needed brain surgery. Capano said that he had not. The prosecutor then said: "Kim Horstmann is confused. Anne Marie Fahey is lying to her psychiatrist. And you are to be believed?"[388] This question, however, came after Capano had just testified that the State's contention was a "lie" and that Lynch-Horstmann was "confused."[389] In addition, we note that the question did not force Capano to comment directly on Fahey's credibility; rather, Capano asserted in his answer that Fahey's psychiatrist was not believable when she recorded the information. Therefore this questioning was not improper.

Finally, Capano was asked whether his brother Joseph was lying under oath when he stated that he had asked Capano, "Why didn't you do something about the extortion?"[390] Capano answered by saying "it's possible that he made a mistake,"[391] a response that demonstrates the harmlessness of the question. Finally, we note that

throughout the trial Capano himself labeled other witnesses as liars, asserting, for example, that both MacIntyre and Gerry had no credibility. For the foregoing reasons, the trial court's allowing the questions complained of on appeal was not error and does not warrant a new trial.

### XII. Personal Opinions of Witnesses as to Capano's Guilt

On direct examination, Brian Fahey, the victim's brother, testified that the Fahey family had filed a civil suit against Capano because they "believed at the time that Tom Capano murdered my sister."[392] He also said that Capano "was responsible for causing my family a great deal of pain, for killing my sister . . . ."[393] Nicholas Perillo, a convicted felon who asserted that Capano had asked him to find someone to burglarize MacIntyre's home, read into evidence his statement to prosecutors that "Jesus, I think the bastard killed her."[394] Capano did not object to these statements at trial. On appeal, he contends that admission of these personal opinions as to Capano's guilt was plain error.

■■■ Neither of these statements jeopardized Capano's right to a fair trial. It is apparent from Brian Fahey's testimony that he had no personal knowledge of what had happened to his sister, Anne Marie. Perillo was a convict, and by virtue of his testimony he was a "jailhouse snitch," to use the State's phrase. These opinions do not invite the kind of deference that risks depriving Capano of the right to have the jury make the ultimate determination of his guilt or innocence.[395] Therefore, even

387. Tr. of 12/29/98, at 85–86.

388. Tr. of 12/30/98, at 165–66.

389. *See Webb v. State,* Del. Supr., 663 A.2d 452, 463 (1995) (distinguishing the type of comment found improper under *Fensterer* from statements made by prosecutor in response to defendant's own suggestion that a witness was lying).

390. Tr. of 12/29/98, at 239.

391. *Id.* at 240.

392. Tr. of 10/26/98, at 105.

393. *Id.*

394. Tr. of 11/24/98, at 46.

395. *Cf. Powell v. State,* Del. Supr., 527 A.2d 276, 279 (1987) (finding plain error where an *expert* witness impugned the credibility of the

assuming that admission of these statements would have been error in the context in which they were admitted if there had been a timely objection by Capano's counsel, Capano was not, in fact, prejudiced and their admission was not plain error.

### XIII. Capano's Absence from Office Conferences

 Capano contends that he was denied his right to be present at all stages of the trial because he was absent from the daily office conferences at which counsel presented evidentiary and other legal matters to the trial judge for decision. Because Capano failed to raise an objection at trial concerning his absence from office conferences, the plain error standard of review applies.[396] As a result, the issue is deemed waived unless the error is "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[397]

 A defendant in a criminal case has a right to be present at trial based on the Sixth Amendment right to confront one's accusers and the common law "privilege of presence" during trial.[398] In Delaware, this right has been enshrined in Superior Court Criminal Rule 43.[399] As

Superior Court Criminal Rule 43 indicates, however, the right to be present at trial has definite boundaries.[400] For present purposes, we need note only that Rule 43(c)(3) explicitly states that a defendant's presence is not required "[a]t a conference or argument upon a question of law." Similarly, in *United States v. Smith*,[401] the Third Circuit defined the scope of a defendant's right to be present at proceedings related to trial:

> Due process mandates that a criminal defendant have an opportunity to attend any proceeding where his presence has a 'relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.' A defendant's presence is a condition of due process, however, only 'to the extent that a fair and just hearing would be thwarted by his absence.'[402]

Because Rule 43 does not require the defendant's presence at office conferences concerning legal issues and because there is no basis to conclude that Capano's absence "thwarted" the fairness of his trial, we find that Capano's absence from the conferences did not violate his Sixth Amendment rights.

 Furthermore, because Capano does not allege that he was absent

---

defendant, thereby invading the province of the jury, and where the expert's particular testimony was "crucial" and a "substantial evidentiary factor" in the prosecution's case).

**396.** *See* Supr. Ct. R. 8. Capano argues that this issue is subject to *de novo* review on appeal. As we describe below, Capano's claim fails under either standard of review.

**397.** *Wainwright v. State*, Del. Supr., 504 A.2d 1096, 1100 (1986) (citing *Dutton v. State*, Del. Supr., 452 A.2d 127, 146 (1982)).

**398.** *Shaw v. State*, Del. Supr., 282 A.2d 608, 609 (1971).

**399.** Rule 43(a) provides: *"Presence Required. The defendant shall be present at the arraign-*

ment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule."

**400.** *See, e.g.*, Super. Ct. Crim. R. 43(b)–(c) (describing situations in which the defendant's presence or continued presence is not required).

**401.** 3d Cir, 186 F.3d 290 (1999).

**402.** *Id.* at 296 (internal citations and quotation marks omitted) (quoting *United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985); citing Fed.R.Crim.P. 43(a) ("defendant shall be present ... at every stage of the trial")).

during the "traditional and formal confrontation stage of the trial," he must show that he suffered some prejudice as a result of his absence.[403] Capano has shown no such prejudice. Although Capano was notified of the office conferences,[404] he presents no explanation for his failure to attend them. As a consequence, we conclude that Capano's absence from the conferences was voluntary. Apart from a general suggestion that Capano could have "contributed" to the conferences, there is no argument that his presence would have affected the outcome of the trial or that he was otherwise prejudiced.

We conclude that Capano's absence from the office conferences did not violate his constitutional rights and that Capano cannot show that he suffered prejudice as a result of his absence from the conferences.

### XIV. Admission of Adultery Evidence During Impeachment

Capano contends that the trial court permitted the State to impeach defense witnesses' testimony with evidence of marital infidelity but did not permit the defense to impeach the testimony of a prosecution witness with evidence of infidelity. For example, Capano argues that the trial court did not permit the defense to cross-examine a prosecution witness about his extramarital affairs as a means to undermine an inference that Capano arranged for the witness to sleep with Deborah MacIntyre.[405] In contrast, the court permitted the defense to cross-examine Gerry Capano about his extramarital affairs to undermine his credibility,[406] and the court permitted the State to cross-examine Tom Capano about incidents involving marital infidelity to rebut Tom's assertion that he was "discreet."[407] Decisions on admissibility are reviewed under an abuse of discretion standard.[408]

■■■■ Capano's argument that the trial court ruled inconsistently on these issues fails for two reasons. First, the trial court did not prevent defense counsel from questioning State's witness Keith Brady about extramarital affairs. To the contrary, the court permitted defense counsel to ask Brady "whether or not you have been involved in other adulterous relationships and how many" in order to impeach Brady's credibility.[409] The court did, however, limit the extent to which the defense could describe the *details* of these affairs because such details were not relevant to Brady's credibility.[410]

Second, although the court limited the cross-examination of Brady by prohibiting

---

**403.** *Bass v. State*, Del. Supr., No. 368, 1988, 1989 WL 47282, Horsey, J. (April 5, 1989) (ORDER) (citing *Dutton v. State*, Del. Supr., 452 A.2d 127 (1982)) (distinguishing situations in which a defendant's absence is *per se* reversible error from those situations in which a defendant's absence is reversible error only where the defendant can show prejudice).

**404.** The trial judge announced on the first day of the trial (and on a variety of other occasions) that "on a daily basis. I'm going to be meeting with counsel at 9:30 in my chambers." Tr. of 10/26/98, at 152–53.

**405.** Tr. of 11/18/98, at 3–4.

**406.** Tr. of 11/9/98 Office Conference, at 3–4.

**407.** Tr. of 1/4/99, at 43.

**408.** *See Floudiotis v. State*, Del. Supr., 726 A.2d 1196, 1202 (1999). Although the State argues that the plain error standard of review applies to this issue because Capano did not raise the "inconsistency" argument below, we find that Capano preserved this issue for appeal by challenging the admission of the contested impeachment evidence at trial. Tr. of 1/4/99, at 41–43. As we describe below, however, Capano's claim fails under either standard.

**409.** Tr. of 11/16/98, at 30–31.

**410.** Tr. of 11/16/98, at 30–31.

the disclosure of the details of his extra-marital affairs, this limitation does not conflict with the court's later ruling that the State could cross-examine Capano concerning specific instances of marital infidelity. Applying D.R.E. 404(a)(1), the trial court permitted the State to discuss particular sexual encounters to impeach Capano's direct examination testimony that he was "discreet" in conducting his extramarital affairs.[411] In exercising his discretion, the trial judge could properly conclude that the impeachment of the credibility of a witness by reference to extramarital affairs does not require disclosure of the details of those affairs, whereas the impeachment of Capano's specific assertion that he was "discreet" does require the limited disclosure of such details.

We therefore conclude that the trial court neither erred nor ruled inconsistently on these issues.

### XV. Plain Error—Limits on Allocution

#### A. Introduction

■■■■ Under the Delaware death penalty statute, where the defendant pleads not guilty in a capital case and does not waive trial by jury, there must be a trial to determine guilt. If the jury in the guilt phase unanimously renders a verdict of guilty of first degree murder, the same trial judge and jury will then turn to the separate penalty phase hearing. At the penalty phase, evidence is presented relating to mitigating and aggravating circumstances.[412] At the conclusion of the hearing, the jury will report to the trial judge whether the evidence shows beyond a reasonable doubt the existence of at least one statutory aggravating circumstance (e.g., premeditation and the result of substantial planning) and whether, by a preponderance of the evidence, the aggravating circumstances outweigh the mitigating circumstances. The jury report carries with it the final tally by number of affirmative and negative votes cast by the jury on each question.[413]

■■■ Significantly, the statute also provides that the defendant has the right personally to address the jury in summation in addition to having counsel address the jury in summation on the defendant's behalf:

At the hearing the Court shall permit argument by the State, the defendant and/or the defendant's counsel, on the punishment to be imposed. Such argument shall consist of opening statements by each, unless waived, opening summation by the State, rebuttal summation by the defendant and/or the defendant's counsel and closing summation by the State.[414]

This statutory provision is complementary to the requirement of the Rules of Criminal Procedure of the Superior Court:

Before imposing sentence, the court shall . . .

(C) Address the defendant personally and determine if the defendant wishes to make a statement and to present any information in mitigation of the sentence.[415]

---

411. Tr. of 1/4/99, at 43.

412. 11 *Del. C.* § 4209(c)(1).

413. 11 *Del. C.* § 4209(c)(3). As the jury was instructed, its answers to these two questions were, in effect, a recommendation for either the death penalty or life imprisonment. *See Manley v. State,* Del. Supr., 709 A.2d 643, 647 n. 2 (1998).

414. 11 *Del. C.* § 4209(c)(2).

415. Super Ct. Crim. R. 32(a)(1)(C). *Compare* Federal Rules of Criminal Procedure 32(c)(3)(C) ("Before imposing sentence, the court must . . . address the defendant personally and determine whether the defendant wishes to make a statement and to present any information in mitigation of the sentence.").

 These statutory and rule provisions are, on their face, broad and openended in establishing the framework of the right of allocution belonging to a defendant facing the death penalty personally to address the jury and/or the judge before the determination of the penalty. It is important to focus on the fact that the right of allocution does not involve sworn testimony by the defendant nor does it subject the defendant to cross-examination. Black's Law Dictionary defines allocution as follows:

> allocution ... 1. A trial judge's formal address to a convicted defendant, asking him or her to speak in mitigation of the sentence to be imposed. ● This address is required under Fed. R. Crim. P. 32(c)(3)(C). 2. An unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending sentence. ● This statement is not subject to cross-examination.[416]

 Under Delaware law, the function of the jury in the penalty phase is solely advisory. It is the judge who has the ultimate responsibility to impose either a death sentence or a sentence of life impris-

onment without benefit of probation or parole or any other reduction. But the judge must consider and give substantial weight to the recommendation of the jury before imposing sentence.[417] The jury's recommendation is significant, and therefore the conduct of the penalty phase hearing must be conducted fairly. Accordingly, the nature and scope of the right of the defendant personally to address the jury in allocution is one we have recently addressed[418] and one we must now apply to this case.

### B. Capano's Exercise of His Right to Allocution

Capano elected his right of allocution January 28, 1999, the last day of his penalty phase hearing. On that day, Capano intended to allocute by reading a prepared statement from the witness stand. Before he began, Capano's counsel informed the trial judge that they had instructed Capano about the law of allocution.[419] Capano's counsel, however, informed the court that Capano had not told them the substance of his allocution.[420] Before Capano began, the trial judge imposed limitations, *without objection,* on the substance of allocution. Outside of the jury's presence, the trial judge explained to Capano that his allocution was limited as follows:

---

**416.** Black's Law Dictionary 75 (7th ed. 1999).

**417.** 11 *Del. C.* § 4209(d). In this case, the jury was advised that the trial judge would give its recommendation "great weight." As we have stated, the jury plays an "important role" in the process, *Shelton v. State,* Del. Supr., 652 A.2d 1, 5 (1995), acting "in an advisory capacity as the 'conscience of the community.'" *Wright v. State,* Del. Supr., 633 A.2d 329, 335 (1993) (quoting *State v. Cohen,* Del. Supr., 604 A.2d 846, 856 (1992)). The "trial judge is vested with ultimate sentencing authority," and "may completely reject the recommendation of the jury." *Lawrie v. State,* Del. Supr., 643 A.2d 1336, 1346 (1994) (citations omitted). Delaware's death penalty statute pro-

vides that the jury must report its "final vote" on "[w]hether the evidence shows beyond a reasonable doubt the existence of at least 1 aggravating circumstance...." 11 *Del. C.* § 4209(c)(3). The trial court, "after considering the recommendation of the jury," must find "beyond a reasonable doubt at least 1 statutory aggravating circumstance." *Id.* § 4209(d)(1).

**418.** *Shelton v. State,* Del. Supr., 744 A.2d 465, 488–503 (2000); *cert. denied,* 530 U.S. 1218, 120 S.Ct. 2225, 147 L.Ed.2d 256 (2000).

**419.** Tr. of 1/28/99, at 42.

**420.** *Id.* at 11–12.

Allocution is extended only to acceptable expressions of remorse, pleas for leniency, statements about his own good person and plans or hopes for the future. It is not to dispute the evidence or the verdict, to attack the investigation or the prosecutors. These limits are to be strictly enforced. And if in fact they are violated, I will terminate the allocution. . . ."[421]

No objection was raised by Capano or his counsel to these limitations. In fact, as noted, these ground rules had already been explained to Capano by his attorneys.[422]

Before Capano began to exercise his right of allocution, the trial court related these limitations to the jury, explaining that "a man who is facing the possibility of capital punishment has the right to address his jurors, his judge, not to dispute the facts of the case or to comment on matters related to the trial, but to deal with those areas that are appropriate for you to consider in determining the questions that lie ahead of you."[423]

Capano began his allocution by saying, "I'm not allowed to talk about the evidence, and the next thing I was going to say was about the evidence, so I won't."[424] Again, at a later point in his testimony, he said with reference to a matter concerning his daughters, "I'm not allowed to talk about that evidence . . . ."[425] Finally, at the end of allocution, he said, "There are a couple of other things that I wanted to say but better check and make sure they don't violate any rules. Maybe just one other."[426]

*Capano* gave a lengthy allocution covering a number of subjects.[427] He alluded to his accident defense, saying, for example, that his actions on the night of June 27 were those of a "panicked man," and were a result of "very cowardly decisions which I think when I was on the stand before I basically already said that much."[428]

Capano did in fact make some references to the evidence, in spite of the court's limitation. In addition, he discussed his family life, explained his background and personal qualities to the jury, and described his relationship with Fahey, among other things. Thus he had a substantial opportunity to receive the intended benefits of allocution.

Capano raises on this appeal for the first time for plain error review not only the trial judge's limits on discussing the evidence but also the trial court's reaction when Capano entered into a discussion of certain evidence. For example, Capano was discussing his pride in his daughters, and then veered into a discussion of what he viewed as harassment of his daughters, presumably by State officials. He told the jury that "my kids were harassed. They were lied to and . . . ." At this point the trial judge interrupted Capano as follows:

> The Court: We're done. Please take Mr. Capano out of the courtroom.
>
> The Defendant: Can I take it back, Your Honor?
>
> The Court: No.

The trial judge immediately relented, however, stating in the presence of the jury:

---

**421.** *Id.* at 42–43.

**422.** *Id.* at 42.

**423.** *Id.* at 43–44.

**424.** *Id.* at 45.

**425.** *Id.* at 58.

**426.** *Id.* at 64.

**427.** The State's undisputed estimate is that he spoke in allocution for about 45 minutes. In fact, his allocution is spread over twenty pages of the penalty hearing transcript.

**428.** Tr. of 1/28/99, at 48, 49.

I will let him continue. Sort of blown my rules apart here and I'll instruct the jury on that, but the next time you make such a blatant attack on the rules that you're forced operate under I will remove you. There won't be taking back anything. You will not be present for the rest of the trial.[429]

Later, when Capano began discussing his relationship with Fahey, the trial court interrupted, saying:

Mr. Capano, if you have any remarks that deal with expressions of remorse, pleas for leniency, plans or hopes for the future, or statements about your own good person, some of which you have already made, please make them now. I will not tolerate any deviance from these conditions.[430]

When Capano left the stand, the trial court delivered the following instruction to the jury:

Members of the jury, as I indicated before Mr. Capano started his allocution, it's limited to a very narrow framework, specifically the defendant is not permitted to rebut any facts or to deny his guilt or to voice an expression that contradicts the evidentiary facts that you heard in the trial. It is solely for the purpose of acceptable expressions of remorse, pleas for leniency, statements about his own good person, and for his plans and hopes for the future. To the extent that Mr. Capano spoke to those valid areas, you should consider it his testimony. To the extent that he violated the terms of the allocution, which he was specifically informed of prior to taking the stand, you should consider that in any way you deem appropriate.[431]

The trial judge did not explain what he meant by the term "consider that in any way you deem appropriate."

Then, in the presence of the jury, the trial judge asked the prosecution "if the State [has] anything [it] wish[ed] to present in view of the deviation from the purposes of allocution." Following a sidebar conference during which the State pressed for an instruction regarding Capano's suggestion that he had been stopped from testifying about certain matters, the Court stated the following to the jury:

The purpose of the sidebar was for me to reflect on certain statements that were made by Mr. Capano which may have been misleading. Mr. Capano elected the right of allocution, which means that he could take the stand and, within the limitations which I indicated to you, could speak and not be subject to cross examination. There was nothing to permit him or to—excuse me—there was nothing to keep him from taking the stand and testifying on broader issues in the penalty phase; however, had he done that, he would have subjected himself to cross examination. So when he indicated that there were things that he could not talk about, he was right because allocution is very limited, but had a different form been chosen, those limitations would not have been the same.[432]

### C. The Sentencing Decision

The jury returned its recommendations on January 28, 1999.[433] Eleven of the 12 jurors found the existence of the statutory aggravating circumstance that "the murder was premeditated and the result of substantial planning," while one juror did

429. *Id.* at 59–60. Capano ended his allocution by saying "I'm sorry if I broke the rules." *Id.* at 65.

430. *Id.* at 62–63.

431. *Id.* at 66.

432. *Id.* at 68–69.

433. *See State v. Capano*, Del. Super., No. IN97–11–0720. Lee., J. (March 16, 1999) (Mem. Op.), Mem. Op. at 1.

not. The jury found that the aggravating circumstances outweighed the mitigating ones, and recommended by a vote of 10 to 2 that the death penalty be imposed. The trial court sentenced Capano to death on March 16, 1999, based on its finding that the State proved beyond a reasonable doubt the statutory aggravating circumstance that Capano had premeditated and substantially planned Fahey's murder.[434] The trial court also found that the State had proved by substantial and reliable evidence the existence of six non-statutory aggravating circumstances, and that the aggravating circumstances outweighed the five mitigating circumstances that also existed.[435]

One of the nonstatutory aggravating circumstances found by the trial court was the defendant's "disdain for authority."[436] The trial court stated that "it also is noteworthy that defendant breached many rules the Court imposed during these proceedings. The Court, directly, and through counsel, on numerous occasions set forth rules to defendant which it expected him to follow, and defendant consistently violated those rules. He openly defies authority."[437] In remarks accompanying the handing down of the sentence, the trial court noted that in spite of the limits of allocution, Capano had "specifically refused to ask for mercy, showed no remorse, and continued his attack on the decision of the jury [and] the disloyalty of those who testified against him . . . ."[438]

### D. Capano's Contentions

Capano argues that his death sentence should be set aside because the trial judge improperly limited the scope of his allocution during the penalty phase of his trial.

He argues that he was impermissibly restricted to "expressions of remorse, pleas for leniency, statements about [his] own good character and person and plans and hopes for the future." In addition, Capano contends that the trial judge erred by interrupting him during his allocution and admonishing him in front of the jury for exceeding the scope of the allocution and by commenting to the jury that they could view Capano's exceeding the scope of the allocution "in any way . . . appropriate." Finally, Capano argues that the trial judge erred during sentencing by considering the fact that Capano violated his ruling on the scope of the allocution as a factor in imposing the death sentence.

 Capano contends that this Court's standard and scope of review should be de novo. Despite his failure to object, Capano asserts that his resistance to the judge's attempt to limit his right to allocution calls for a less deferential standard of review than plain error. Regardless of the standard, Capano contends that this Court should review his claim because the right to allocution is "arguably a 'substantial right' of a capital defendant."[439] The State contends the standard and scope of review is plain error. We agree that plain error is the standard and scope of review.

 The issue we consider is whether the trial judge committed plain error in his limitations on Capano's allocution, in the judge's reactions to Capano's attempts to discuss evidence, made in the jury's presence, and in the judge's direct statements to the jury. The State conceded at oral argument in this Court that the trial judge's limitations on allocution were

**434.** *Id.* at 16.

**435.** *Id.* at 21.

**436.** *Id.* at 8.

**437.** *Id.* at 11.

**438.** Tr. of 5/16/99, at 7.

**439.** *See Shelton v. State,* Del. Supr., 744 A.2d 465, 497 n. 142 (2000).

erroneously restricted and that the court's comments "probably did" affect the jury's attitude toward Capano.[440] Nevertheless, it was proper for the jury to consider any violations of courtroom rules as a nonstatutory aggravating factor in its recommendation.[441] The issue that concerns us here is the likely effect on the jury of the trial judge's reactions to those "violations."

We are mindful of the trial judge's "duty to act instantly to control disrespectful or obstructionist tactics in the courtroom."[442] A trial judge has "broad latitude" to take measures to "preserve order and appropriate conduct in judicial proceedings."[443] In this case, the trial judge's remarks at sentencing and the sentencing opinion reflect that he found Capano to be a continually disruptive and unruly presence.[444]

The trial judge has a unique vantage point, and we do not undertake to second-guess his assessment. We further recognize that the challenge of managing a difficult litigant is magnified in the context of a lengthy capital trial subject to intense public scrutiny.[445] The trial in this case began on October 6, 1998 and ended on January 17, 1999, a period of nearly three months. The trial judge firmly and ably maintained control over these most difficult proceedings and moved the trial forward expeditiously.

Our task is to assess the likely effect of the trial judge's statements on the fairness and integrity of Capano's penalty phase. Our review of the record convinces us that the totality of the trial judge's handling of the allocution did not unfairly prejudice Capano.

### E. The Shelton Jurisprudence

On June 25, 1999, while Capano's direct appeal to this Court was pending, we released an opinion in *Shelton v. State*.[446] In *Shelton*, the defendant was instructed by the trial judge that he could not use his allocution to "talk about the facts surrounding the murder."[447] The trial court instead limited Shelton's allocution to "asking the sentencing authority . . . to give you mercy, spare your life in this case, and sentence you to life." Shelton acquiesced in that limitation because he did not want to discuss the facts in any event. Speaking briefly in allocution, Shelton did not discuss any evidence.[448] Shelton was sentenced to death for first degree murder and his death sentence was affirmed by this Court on direct appeal.[449]

---

**440.** Tr. of October 24, 2000 Oral Argument in the Supreme Court, at 30.

**441.** *See* 11 *Del. C.* § 4209(c).

**442.** *Smith v. State*, Del. Supr., 560 A.2d 1004, 1009 (1989).

**443.** *Id.* at 1008, 1009; *see also State v. Bennefield*, Del. Supr, 567 A.2d 863, 864 (1989) (discussing trial court's obligation to ensure that final arguments are not improper); *Dutton v. State*, Del. Supr., 452 A.2d 127, 140 (1982) (finding no error in trial judge's response to what he viewed as a breach of required professional etiquette).

**444.** *See supra* note 437.

**445.** *See* Managing Notorious Trials 17 (National Center For State Courts) (2d. ed. 1998) (stating that "the existence of media and public interest in notorious cases intensifies the difficulty" of "maintaining the appearance of impartiality, ensuring a fair trial, and maintaining control of the courtroom").

**446.** Del. Supr., 744 A.2d 465 (2000), *cert. denied*, 530 U.S. 1218, 120 S.Ct. 2225, 147 L.Ed.2d 256 (2000). A motion for reargument was filed and denied by this Court. In connection with the denial of the motion, we released a revised opinion. *See Shelton v. State*, Del. Supr., 744 A.2d 465 (Jan. 5, 2000).

**447.** *Id.* at 490.

**448.** *Id.*

**449.** *Outten v. State*, Del. Supr., 650 A.2d 1291 (1994), *cert. denied*, 515 U.S. 1145, 115 S.Ct. 2585, 132 L.Ed.2d 834 (1995).

In his motion for post-conviction relief, Shelton argued for the first time that the trial court had infringed his right to present mitigating evidence to the jury in allocution. Shelton argued that this right was guaranteed under Superior Court Criminal Rule 32 as well as the Eighth and Fourteenth Amendments of the United States Constitution. According to Shelton, his counsel had rendered ineffective assistance by failing to object to the limitations placed on his allocution.[450]

Despite Shelton's clear assent to the limits placed on allocution, we reached the merits of his claim under a plain error standard of review.[451] We concluded that the limitations placed on Shelton's allocution did not reflect the full scope of allocution under Delaware law.[452] We defined the scope of allocution as follows:

> [T]here is no blanket rule that would preclude a defendant who wished to do so from discussing or arguing in allocution facts already in evidence either in the guilt phase or the penalty phase.
>
> * * *
>
> In our view, Superior Court Criminal Rule 32(a)(1)(C) and 11 *Del. C.* § 4209(c)(2) provide a *defendant in the penalty phase of a capital case the opportunity to argue in allocution from the facts already in evidence in the guilt phase or the penalty phase why those facts should not result in the death penalty.* This is true whether the argument

is to assert diminished responsibility, reduced culpability in comparison to other defendants, mistaken identity, mistake by the jury in finding guilt or any other reason.[453]

Thus, the *Shelton* holding allows a defendant to discuss in allocution facts already in evidence, but requires that the defendant be "sworn and subject to cross-examination" before making a "statement of new evidence."[454] We indicated that this limitation on the presentation of new evidence achieved a balance of the important purposes served by allocution, considerations of fairness toward the defendant as well as the State and the truth-seeking function of the jury.[455]

In *Shelton*, we explained the purposes served by allocution:

> Presently, allocution serves two purposes: "First, it reflects our commonly-held belief that our civilization should afford every defendant an opportunity to ask for mercy. Second, it permits a defendant to impress a jury with his or her feelings of remorse." Put another way, allocution is necessary because it affords "an opportunity for the jury to learn about the 'whole person'" and "it bespeaks our common humanity that a defendant not be sentenced to death by a jury 'which has never heard the sound of his voice.'"[456]

---

**450.** *Shelton*, 744 A.2d at 488.

**451.** In *Shelton*, the scope of allocution was an issue of "first impression." *Id.* at 497 n. 142. Therefore, although the defendant had acquiesced in the limitations placed on his allocution, the Court decided to "waive the waiver rule." *Id.*

**452.** *Shelton* addressed the common law right of allocution based on Delaware Superior Court Criminal Rule 32 and 11 *Del. C.* § 4209(c)(2). *Shelton*, 744 A.2d at 495. We declined to address whether the federal con-

stitution "provide[s] a right of a capital defendant to make before the jury an unsworn statement that is not subject to cross examination." *Id.*

**453.** *Id.* at 496, 498 (emphasis supplied).

**454.** *Id.* at 496.

**455.** *Id.*

**456.** *Shelton*, 744 A.2d at 492 (citations omitted).

The importance of allowing a defendant to discuss evidence in his allocution must be measured in light of these purposes. In some cases, such as the *Shelton* case itself, the defendant may have no wish to refer to the facts of the crime for which he was found guilty. In other cases, however, discussing the evidence presented at trial may be a crucial part of the defendant's plea for mercy.

Although this evidence may have been before the jury in the guilt phase, the purpose of allocution is for the defendant to be heard under procedures that allow him to speak directly to the jury. In fact, the Delaware death penalty statute expressly permits the defendant as well as his counsel to present "argument" and "summation,"[457] and the Superior Court Rule permits the defendant to present "any information in mitigation."[458] In *Shelton*, we quoted with approval Justice Frankfurter's observation that "[t]he most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself."[459] This policy is a key factor in analyzing the right of allocution and its application to this case.

The issue in *Shelton* was first raised in a post-conviction proceeding in that case. The question at that stage of the proceedings was whether Shelton was entitled to a new penalty hearing because of the alleged ineffective assistance of counsel in failing either to object to the overbroad and erroneous limits the trial court had placed on

his allocution or to raise the issue on direct appeal. We held that he was not entitled to a new penalty hearing because "he was unable to show that that he was prejudiced" by the erroneous limitations.[460] This was because Shelton's "considered strategy"[461] was to avoid discussing in allocution the facts of the case. Not only had he made no proffer of what facts he would argue in allocution if allowed, his wish *not* to discuss the facts surrounding the murder had been made unusually clear through extensive colloquy among the judge, Shelton and counsel.[462]

Shelton's strategy was carried out in his actual allocution, during which Shelton did not discuss the facts or express remorse. Twice he stated in his allocution that he was not pleading for his life. Therefore, the limits placed on allocution and trial counsel's failure to object to those limits became a moot point that resulted in harmless error, and thus were not grounds for overturning the sentence.

### F. Plain Error Review in This Case

Capano argues that the limits placed on his allocution were error in light of *Shelton*. Neither Capano nor his counsel objected to the limits placed on his allocution. Under plain error review,[463] the Court will grant relief only if the error complained of is "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process." To es-

---

**457.** 11 *Del. C.* § 4209(c)(2).

**458.** Super. Ct. Crim. R. 32(a)(1)(C).

**459.** *Shelton,* 744 A.2d at 492 (quoting *Green v. United States,* 365 U.S. 301, 304, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961)); *see also id.* at 515 (Hartnett and Berger, Justices, dissenting).

**460.** *Id.* at 499.

**461.** *Id.* at 498.

**462.** *See id.* at 497–98 ("We are faced with a very unusual case where the record reveals as plain as glass that the defendant consciously decided, after methodical questioning by the trial judge and statements on the record by his counsel, that he was not going to present mitigating circumstances.").

**463.** *Wainwright v. State,* Del. Supr., 504 A.2d 1096, 1100 (1986) (citations omitted).

tablish plain error, Capano has the burden of showing actual prejudice.[464]

As noted above, *Shelton* was not decided until after Capano was sentenced. Nevertheless, the State concedes that the limitations placed on Capano's right of allocution were too restrictive in light of *Shelton*.[465] Although it thus concedes error, the State argues that the trial judge's limits on allocution were not plain error in this case. First, the State seems to contend that *Shelton* should not be applied because it was decided after Capano was sentenced. The rationale of the State's argument is that because the scope of the right of allocution was unclear before *Shelton* was decided, and was an issue of first impression in *Shelton*, the error in this case cannot have been "plain"—*i.e.*, obvious.

 This argument misconceives the nature of plain error review. Plain errors must be "apparent on the face of the record."[466] As suggested by this language, the issue is whether the error is apparent from the vantage point of the *appellate court* in reviewing the trial record, not whether it was apparent to the *trial* court in light of then-existing law.[467] In this case, it is apparent, and conceded by the State, that the limitations imposed on the right of allocution accorded Capano are inconsis-

tent with the right of allocution established in *Shelton*.

The trial judge in the case before us was, of course, unaware when he imposed limits on Capano's allocution of what we were later to decide in *Shelton*. His error, therefore, was understandable. Accordingly, the fact that *Shelton* was decided after Capano's penalty hearing is not itself a bar to a finding of plain error, but that analysis requires a showing of unfairness and substantial prejudice to Capano.

The State also contends that there is no plain error because this Court has not definitively declared allocution a "substantial right." *Shelton* held that on the facts of that case the defendant had not shown that he was prejudiced by the limits placed on his allocution. Shelton was carrying out his own strategy—however misguided that strategy might have been—not to discuss the facts of the case as developed in the guilt phase.

We held in *Shelton* that "it does not follow, however, that a trial judge's setting of parameters on allocution similar to this one [in Shelton's case] would not be reversible error in a proper case where objection to the limitation was preserved, where there was plain error, or where

---

**464.** *See Stevenson v. State,* Del. Supr., 709 A.2d 619, 633 (1998).

**465.** See Tr. of 10/24/00 Oral Argument in the Supreme Court, at 29.

**466.** *Wainwright,* 504 A.2d at 1100; *see also Johnson v. United States,* 520 U.S. 461, 117 S.Ct. 1544, 1548, 137 L.Ed.2d 718 (1997) (noting that to be "plain" an error must be "clear" or "obvious.") (quoting *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993)).

**467.** *See Johnson,* 117 S.Ct. at 1549 (holding that "it is enough that an error be 'plain' at the time of appellate consideration," even when "the law at the time of trial was settled and clearly contrary to the law at the time of appeal"). As the Seventh Circuit has ex-

plained, a primary reason for the requirement of 'plainness' is that the appellate court on direct appeal is ill positioned to review contested issues of fact or undeveloped issues of law. *See United States v. Caputo,* 7th Cir., 978 F.2d 972, 975 (1992) ("An error is not plain in the sense of egregious if isn't even clear that it was an error, and if that isn't clear the appellate court is likely to encounter difficulty in determining that an error occurred at all.") In this case, the legal error is perfectly clear in light of current law. *Cf. Shea v. Louisiana,* 470 U.S. 51, 105 S.Ct. 1065, 1070, 84 L.Ed.2d 38 (1985) (holding that "principled decision-making and fairness to similarly situated petitioners require application of a new rule to all cases pending on direct review.")

there was a showing of ineffective assistance of counsel and resulting prejudice to the defendant."[468] We also noted—although determination of the point was not necessary to the decision in *Shelton* —that the right to allocution "is arguably a substantial right of a capital defendant."[469]

We also held that whether the right of allocution is a *substantial* right in a given case, it is not a *constitutional* right under the state or federal constitution. This Court stated in *Shelton* that the right to allocution "is not a right granted by either the federal or state constitutions, [but rather] . . . a right that is grounded solely on the Superior Court Criminal Rule, the Delaware death penalty statute and Delaware decisional law."[470]

In the context of plain error review, the defendant must show that the error affected substantial rights.[471] Under the federal plain error rule, the phrase "affecting substantial rights" means "in most cases . . . that the error must have been prejudicial: It must have affected the outcome of the [trial] court proceedings."[472] To say that a right is not substantial may be merely another way of saying that the defendant cannot have been prejudiced by an erroneous abridgment of that right. We need not engage in an abstract analysis of whether allocution is a "substantial right." Rather, consistent with this Court's plain error jurisprudence, we must decide whether the error that occurred in this case prejudiced Capano when viewed in the total context of

the record relating to the allocution issue.[473]

## G. *The Issue Whether Capano Was Unduly Prejudiced*

■■■ Capano argues that his death sentence should be reversed because the trial judge improperly imposed restrictions on his allocution and because he "paid an enormous price for the trial judge's error" during the penalty phase. Capano contends that his allocution "deteriorated into an ongoing battle between [him] and the trial judge." The record shows that this is not the case.

There are at least three important distinctions from *Shelton* that are relevant to our evaluation of this case in light of the *Shelton* jurisprudence.

(1) Capano had already told his story to this jury in extensive direct testimony and cross-examination in the guilt phase, whereas Shelton did not testify in his guilt phase. This, in and of itself, is not dispositive, but it is a factor that plays into our plain error review of how far the trial judge must permit the defendant to go in allocution in rehashing and arguing the effect of admitted evidence.

(2) The main purpose of allocution is to permit a defendant to present in his own "halting eloquence" his remorse, personal life or diminished culpability (relative to other perpetrators) to a jury that may not have "heard the sound of his voice."[474] That policy may have applied to *Shelton*

---

**468.** *Shelton,* 744 A.2d at 498.

**469.** *Id.* at 497 n. 142.

**470.** Id. at 495.

**471.** *See* Super. Ct. Crim. R. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

**472.** *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 1778, 123 L.Ed.2d 508 (1993).

**473.** *See Stevenson v. State,* Del. Supr., 709 A.2d 619, 633 (1998).

**474.** *Shelton v. State,* Del. Supr., 744 A.2d 465, 515 n. 258 (2000) (Hartnett and Berger, JJ., dissenting) (citing *Green v. United States,* 365 U.S. 301, 304, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961)); *Shelton,* 744 A.2d at 492 n. 118 (citing *State v. Zola,* 112 N.J. 384, 548 A.2d 1022, 1046 (1988) (citations omitted)).

(but for his express waiver). Capano, on the other hand, was a trained lawyer with trial experience.

▬▬▬ (3) Judicial control of the proceedings was clearly at issue here and not in *Shelton.* Shelton himself was an unsophisticated defendant who was confused but nonetheless clearly and expressly waived his allocution right to argue the facts. Capano, on the other hand, was a trained lawyer. Apparently, the trial judge thought Capano was attempting to manipulate the system and needed to be reined in. Although the trial judge may have been harsh in rebuking him in the presence of the jury,[475] we must evaluate the colloquies that took place during the penalty phase in the context of Capano's performance during the entire three-month trial, including his testimony in the guilt phase and his allocution in the penalty phase.

The State argues that here, as in *Shelton,* the limitations had no effect on Capano's allocution. According to the State: (a)

Capano did manage to discuss *some* evidence in his lengthy allocution in disregard of the limitations imposed by trial court; and (b) Capano's tactics and comportment during both trial and allocution may well have alienated the jury and foreclosed an argument that he was prejudiced by limits placed on allocution.[476] The State also argues that the trial court's attempts to control Capano and enforce the limitations on allocution were appropriate efforts to deal with Capano's transgressions and maintain control of the proceedings.[477]

▬▬▬ Capano contends that the trial judge's rebukes of him for violating the erroneous limits on his allocution substantially prejudiced him. Specifically, he argues that the ongoing dispute between Capano and the trial judge risked conveying to the jury that the trial judge felt personal animus toward Capano. In the circumstances, he contends that this atmosphere would likely have affected the jury's deliberations.[478] This is a capital case that re-

---

**475.** Capano calls his allocution an "unmitigated disaster," saying that it "deteriorated into an ongoing battle between Capano and the trial judge," during which Capano was "fiercely denigrated by the trial judge in front of the jury for what is now conceded to have been judicial error."

**476.** *See* Tr. of 10/24/00 Oral Argument in the Supreme Court, at 31–32:

> Mr. Wharton: [I]t really strains the ability [sic] to believe that Mr. Capano did not really have an opportunity to say everything he wanted to say, whether it be in allocution or whether it be in his trial testimony. He testified for some eight days. He allocuted for some 45-50 minutes on a wide range of subjects.
>
> * * *
>
> And his attempts to further belittle individuals in the courtroom would not play well with the jury. So really, the argument becomes, well, if only Mr. Capano could have talked longer and said more, he could have saved his life.
>
> In fact, the exact opposite is true. The more he talked, the worse it became for him.

**477.** *See Smith v. State,* Del. Supr., 560 A.2d 1004, 1009 (1989) (stating that trial judges "should be mindful of their duty to act instantly to control disrespectful or obstructionist tactics in the courtroom").

**478.** *See, e.g., Childress v. State,* Del. Supr., 721 A.2d 929, 932 n. 11 (1998) ("A Trial Judge has a duty to avoid any language or any conduct that would lead the jury to suspect that the judge is favorable to one party to the trial.") (citations and internal quotations omitted); *Callahan v. Cardinal Glennon Hosp.,* Mo. Supr., 863 S.W.2d 852, 867 (1993) (*en banc*) (noting that "a judge exerts great influence over the jury"); *Jefferson–El v. State,* 330 Md. 99, 622 A.2d 737, 741 (1993) (noting that a judge's "opinion or manifestations thereof usually will significantly impact the jury's verdict"); *Starr v. United States,* 153 U.S. 614, 14 S.Ct. 919, 923, 38 L.Ed. 841 (1894) ("It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling.").

sulted in a death sentence, based in part at least, on the jury's recommendation. Death cases are different from other cases and require heightened sensitivity to the finality of the punishment and scrupulously fair process in the penalty phase.[479] Notwithstanding these concerns, we find that the trial judge did not commit plain error.

We focus on four important factors that lead us to conclude, in these circumstances, that the trial court applied a rational, although erroneous, standard when it instructed Capano on the limitations on the scope of his allocution and informed the jury that it had done so.

 First, *Shelton* does not mean that there is an almost limitless boundary to the right of allocution. During the penalty phase, to the extent that a defendant seeks to present new matters of relevance that go beyond the record in the guilt phase, thus exceeding the limited parameters permitted in allocution, the defendant must testify under oath and be subjected to cross-examination.

Second, the trial judge was endeavoring to help the jury focus on "those areas that are appropriate for you to consider in determining the questions that lie ahead of you."[480] The questions for determination by the jury at the penalty phase do not include a re-examination of their decision that, beyond a reasonable doubt, Capano had intentionally murdered Anne Marie Fahey.

Third, Capano not only failed to make a proffer, as he should have, regarding the scope of his intended allocution, but also he refused to inform his own counsel—who otherwise may have had the responsibility to do so as officers of the court. His counsel had informed the trial judge that while Capano wished to exercise his right to allocution, "I have no idea what he is going to say. He won't tell me."[481] Capano's own maneuvering raised a red flag to the trial judge that trouble loomed ahead.

Fourth, Capano did discuss facts that had been admitted in evidence in the guilt phase. We believe that when facts relate to a capital defendant's attempt to display remorse, to minimize the circumstances that relate to aggravation, to diminish degrees of culpability relative to other perpetrators (not applicable here, of course), or to establish a basis for mercy, those facts admitted into evidence at the guilt phase can be drawn upon to support the jury's focus on "the questions that lie ahead."

The trial judge, in our view, appropriately attempted to establish rational guideposts in light of the anticipated uncertainty. He attempted, as an experienced trial judge managing a difficult case and an unpredictable defendant, to keep the defendant and the jury properly focused on the objective of the penalty phase.

Throughout Capano's allocution, and despite the limitations set by the trial judge, Capano referred to the facts of the case.[482] In so doing, he consistently deflected re-

**479.** *See Barrow v. State,* Del. Supr., 749 A.2d 1230, 1249 (2000) ("The imposition of the death penalty requires scrupulous adherence to the constitutional standards that authorize its use."). Also, as Justice O'Connor has stated:

Because sentences of death are "qualitatively different" from prison sentences, this Court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guar-

antee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake.
*Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 878, 71 L.Ed.2d 1 (1982) (O'Connor, J., concurring) (citation omitted).

**480.** Tr. of 1/28/99, at 43–44.

**481.** *Id.* at 11.

**482.** *See* Tr. of 1/28/99, at 44–65.

sponsibility for Fahey's death. He demonstrated disdain for expressing remorse, eschewed a plea for leniency, and spoke little of his good character and person or his plans and hopes for the future. His discussion in his allocution of the facts adduced at the guilt phase was not used to advance the purpose of allocution at all.

Capano is not a typical defendant, nor is he an unsophisticated defendant. He is a sophisticated lawyer, trained and experienced in the law and the public domain. He consciously avoided making a proffer of his remarks, refused to tell his counsel of his plans, heard *and* accepted the trial judge's rulings *without objection* and then intentionally and purposefully violated the parameters of the rulings he accepted.

In his sentencing decision, the trial judge found that "[t]he evidence showed defendant is manipulative, controlling, vindictive. His need for control over those around him is overwhelming."[483] The trial judge added: "It is also noteworthy that defendant breached many rules the Court imposed during these proceedings. The Court, directly, and through counsel, on numerous occasions set forth rules to defendant which it expected him to follow, and defendant consistently violated those rules. He openly defies authority."[484]

Capano claims that his allocution became an "unmitigated disaster" because the trial judge maintained control over him. The trial judge showed understandable frustration with Capano's antics, and may have been harsh in his rebukes, but he also showed patience and restraint with Capano. Indeed, Capano's counsel admitted that the trial judge showed restraint despite Capano's repeated violations of the court's ruling on the scope of the allocution.[485]

Capano also argues that the trial judge improperly considered Capano's allocution when imposing the sentence of death. During the sentencing hearing, the trial judge summarized Capano's behavior and attitude during the entire trial. While lengthy, the quote below is important to understand the context in which the statements that Capano complains about were made:

In the end, the defendant claimed the right of allocution, the ancient avenue of a convicted criminal facing death to accept responsibility, express remorse, and ask for mercy, relying upon his good and contrite character to gain that mercy. As a lawyer, specifically instructed by his own lawyers on the limits of allocution, and further admonished by the Court before and during allocution, he specifically refused to ask for mercy, showed no remorse, and continued his attack on the decision of the jury, the disloyalty of those who testified against him, and the tactics of the investigators who assembled and presented the case against him, all specific violations of the right of allocution.

The selfishness, arrogance and manipulativeness of Thomas Capano destroyed his own family as well as the Fahey family. He did not hesitate to use his family to commit or suborn perjury or to ask for the mercy he specifically refused to ask for himself. His only remorse is for himself.

The most powerful mitigation presented does not involve the defendant. Rather, it is the impact on his remarkable daughters and a brother he involved in his criminal activities and then ridiculed and excommunicated from the family when guilt and circumstances forced him to tell the truth.

**483.** *State v. Capano*, Del. Super., No. IN97–11–0720, Lee., J. (March 16, 1999) (Mem. Op.), Mem. Op. at 10.

**484.** *Id.* at 11.

**485.** Tr. of 1/28/99, at 59–60.

Tom Capano does not face judgment today because his friends and family failed him. He faces judgment because he is a ruthless murderer who feels compassion for no one, and remorse only for the circumstances he finds himself in. He is a malignant force from whom no one he deems disloyal or adversarial can be secure, even if he is incarcerated for the rest of his life.

The trial judge did not emasculate Capano's right to allocution by considering his behavior or attitude during allocution.[486] Capano failed to adhere to the purpose of allocution. Although the limitations in the instructions were erroneous and although the trial judge may have been harsh in his reactions to Capano's antics, it was Capano alone who destroyed his opportunity to present evidence in mitigation. Instead, he used the opportunity to vilify others and transfer responsibility for Fahey's death.

The error of the trial judge in limiting Capano's right to discuss proper facts is harmless. In fact, it is a moot point for two reasons: First, Capano did not want to discuss *proper* facts; he wanted to assail people and institutions. This is not an acceptable use of the right of allocution. Second, he did in fact discuss a number of matters despite the trial court's limitations, and he was thus able to put before the jury much of what he wanted them to hear—although it is doubtful that he helped his own case. If there was any prejudice to Capano in the allocution episode, it was primarily self-inflicted.

Accordingly, we hold that as a matter of Delaware's law of allocution, any erroneous limitations placed on Capano's right of allocution and the trial judge's colloquy with Capano in front of the jury, although regrettable, did not prejudice Capano and do not entitle him to a new penalty hearing.

## XVI. Constitutionality of Delaware's Death Penalty Statute

Capano raises two challenges to the constitutionality of Delaware's statutory death penalty process. He first contends that the process violates his right to a jury trial because a trial judge may apply the death penalty under 11 *Del. C.* § 4209 where, as in this case, the jury did not *unanimously* find a statutory aggravating factor. Capano also argues that Delaware's sentencing procedure violates the Fourteenth Amendment Due Process Clause because it permits the trial judge to find a statutory aggravating factor without being bound by a jury verdict on the underlying issues of fact. This Court reviews *de novo* claims alleging that the trial court's decision to sentence Capano to death violated Capano's constitutional rights.[487]

### A. Right to a Jury Trial as Applied to the Penalty Hearing under the Delaware Death Penalty Statute

We note at the outset that the Delaware death penalty statute, like those of several other states, expressly contemplates non-unanimous and non-binding jury recommendations.[488] We must there-

---

486. *See, e.g., United States v. Hildebrand,* 8th Cir., 152 F.3d 756, 766 (1998) (drawing similar conclusion); *United States v. Li,* 2d Cir., 115 F.3d 125, 134 (1997) (same).

487. *See Williamson v. State,* Del. Supr., 707 A.2d 350, 354 (1998) (asserting that decisions implicating a constitutionally protected right are subject to *de novo* review in this Court).

488. 11 *Del. C.* § 4209, provides that "The jury shall report . . . its final vote by the number of each affirmative and negative votes" on "[w]hether the evidence shows beyond a reasonable doubt the existence of at least 1 aggravating circumstance . . . ." 11 *Del. C.* § 4209(c)(3). The trial court, "after considering the recommendation of the jury," must then establish the existence "[b]eyond a rea-

fore determine whether a defendant's right to a jury trial under Article I. Section 4 of the Delaware Constitution necessarily implies a right to a unanimous jury verdict on all facts.[489]

■■■■ The Delaware Constitution guarantees that "[t%]rial by jury shall be as heretofore."[490] This phrase incorporates by reference the common law right to trial by jury, and "any analysis of the right to a trial by jury, as it is guaranteed by the Delaware Constitution, requires an examination of the common law."[491] Based on a common law analysis, this Court has previously found that under the Delaware Constitution, "[u]nanimity of the jurors is … required to reach a verdict."[492] This jurisprudence relates to the determination of

guilt. Undertaking a similar inquiry in *State v. Cohen*,[493] however, we held that the right to trial by jury under the Delaware Constitution does not guarantee "the right … to have a jury determine punishment in a capital case."[494] Instead, the *Cohen* Court found that "the jury's historic role was limited to that of a trier of facts, *determining guilt or innocence.*"[495]

■■■■ We therefore conclude that the jury is not required to return a unanimous finding of an aggravating factor in its advisory role during the penalty phase. Although a jury's advisory report on statutory aggravating circumstances necessarily requires the jury to resolve factual disputes, this exercise is fundamentally different from a jury's fact-finding role in the guilt phase under the common law.[496]

---

sonable doubt [of] at least 1 statutory aggravating circumstance." *Id.* § 4209(d)(1).

**489.** There is nothing in Delaware jurisprudence to support Capano's suggestion that the phrase "reasonable doubt" in the death penalty statute is intended to mean "unanimous verdict." Indeed, Capano did not cite Delaware cases to support his contention, but instead relied on decisions from other jurisdictions. *See, e.g., State v. Brown*, 138 N.J. 481, 651 A.2d 19, 33 (1994) ("We perceive the requirement of proof beyond a reasonable doubt as practically, if not theoretically, synonymous with the requirement of unanimity."), *overruled on other grounds by State v. Cooper*, 151 N.J. 326, 700 A.2d 306, 331–32 (1997); *Fugate v. State*, 263 Ga. 260, 431 S.E.2d 104, 108 (1993) (same). It is worth noting that *Brown* applies the New Jersey Death Penalty Act, which requires a unanimous verdict for aggravating circumstances. *See* N.J. Stat. § 2C:11–3(C)(3)(c).

**490.** Del. Const., art. I, § 4.

**491.** *Claudio v. State*, Del. Supr., 585 A.2d 1278, 1298 (1991).

**492.** *Fountain v. State*, Del. Supr., 275 A.2d 251, 251 (1971).

**493.** Del. Supr., 604 A.2d 846, 851–52 (1992).

**494.** *Cohen*, 604 A.2d at 852.

**495.** *Id.* (emphasis added); *see also Apprendi v. New Jersey*, 530 U.S. 466, 478–79 & n. 4, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (noting that, at common law, "'after trial and conviction are past,' the defendant is submitted to 'judgment' by the court") (quoting 4 W. Blackstone, Commentaries on the Laws of England 368 (1769)).

**496.** *Cf. Spaziano v. Florida*, 468 U.S. 447, 459, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984) ("The fact that a capital sentencing is like a trial in the respects significant to the Double Jeopardy Clause … does not mean that it is like a trial in respects significant to the Sixth Amendment's guarantee of a jury trial."). Capano suggests that *Jones v. United States*, 526 U.S. 227, 250–51, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) (discussing *Hildwin v. Florida*, 490 U.S. 638, 640–41, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989)), endorses the position that, in making a sentencing recommendation under a death penalty statute similar to Delaware's statute, a jury "necessarily engag[es] in the fact finding required for imposition of a higher sentence." Yet *Jones* also discusses a more recent case finding that, under the Sixth Amendment, a statute may confer on the trial judge the authority to determine the presence of aggravating factors and to sentence a defendant to death without the benefit of a jury verdict or recommendation. *See Walton v. Arizona*, 497 U.S. 639, 647–48, 110 S.Ct. 3047, 111 L.Ed.2d 511

First, as noted earlier, a jury at common law was charged with finding facts only in connection with a determination of guilt or innocence.[497] Here, the jury unanimously determined Capano's guilt beyond a reasonable doubt. By contrast, under Delaware's death penalty statute, a jury makes only recommendations relevant to punishment. Second, a jury's verdict at common law is binding—rather than advisory—as long as its conclusions are rational.[498] Under the Delaware death penalty statute, however, a jury in the penalty phase "functions only in an advisory capacity" and as the "conscience of the community."[499] Put differently, Section 4209 assigns to the trial judge "the ultimate responsibility for determining whether the defendant will be sentenced to life imprisonment or death."[500]

Based on these considerations, we conclude that a jury's advisory report under the Delaware death penalty statute does not fit within the jury's common law role as fact-finder. As a result, the jury's recommendations under Section 4209 are not subject to the unanimity requirement, and

Capano is therefore not entitled to a unanimous jury finding as to the existence of a statutory aggravating factor before the trial judge imposes a death sentence.

## B. Application to the Death Penalty Statute of the United States Supreme Court's Decision in Apprendi

Capano's second constitutional challenge to Delaware's death penalty procedure is based on the United States Supreme Court's recent decision in *Apprendi v. New Jersey*.[501] Under Capano's reading of *Apprendi*, the Delaware statute violates the Due Process Clause because it permits the trial judge to find a statutory aggravating factor without being bound by a jury verdict on the underlying issues of fact. Capano's argument thus concludes that, in the language of the *Apprendi* decision, the Delaware statute "remove[s] from the jury the assessment of facts that *increase* the prescribed range of penalties to which the defendant is *exposed*."[502]

But here, the penalty phase did not "increase" Capano's "exposure" to the

---

(1990). If a trial judge can make sentencing determinations under *Walton* and can disregard a jury's recommendation under *Spaziano*, 468 U.S. at 464–65, 104 S.Ct. 3154, there is no reason to think that the jury's recommendation under the Delaware statute constitutes "factfinding *required* for imposition of a higher sentence." *Jones*, 526 U.S. at 250, 119 S.Ct. 1215 (emphasis added).

**497.** *See Cohen*, 604 A.2d at 852.

**498.** A trial court may never disregard a jury's acquittal and it may disregard a jury's conviction only if no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), *quoted in Davis v. State*, Del. Supr., 453 A.2d 802, 803 (1982) (*per curiam*); *id.* at 318 n. 10, 99 S.Ct. 2781 ("[T]he factfinder in a criminal case has traditionally been permitted to enter an unassailable but unreasonable verdict of 'not guilty.' ").

**499.** *Cohen*, 604 A.2d at 849, 856.

**500.** *Id.* at 849. The United States Supreme Court has held that this arrangement is permissible under the Sixth Amendment. *See Hildwin v. Florida*, 490 U.S. 638, 640–41, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989) ("[T]he Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury."). Similarly, the Eighth Amendment to the federal constitution does not require that the statute " 'define the weight the sentencing judge must accord to an advisory jury verdict.' " *Dawson v. State*, Del. Supr., 673 A.2d 1186, 1196 (1996) (quoting *Harris v. Alabama*, 513 U.S. 504, 512, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995)).

**501.** 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

**502.** *Apprendi*, 530 U.S. at 490, 120 S.Ct. 2348 (emphasis added).

"prescribed range of penalties." His exposure to the death penalty had already been determined when the jury unanimously returned the verdict of guilt beyond a reasonable doubt of first degree murder.

The New Jersey statute at issue in *Apprendi* was not a death penalty statute, and the holding in *Apprendi* does not bear on any issue involved in this case. The statute there was designed to provide punishment beyond the statutory maximum for the underlying crime where the criminal conduct was motivated by animus against minority groups. After a jury finds a defendant guilty of a statutory crime, the New Jersey statute provides for a separate proceeding in which the trial judge alone is authorized to impose an additional sentence beyond the statutory maximum.[503]

Under the New Jersey statute struck down in *Apprendi*, the judge may impose the additional sentence if the judge finds by a preponderance of the evidence that the defendant's motivation in committing the underlying crime was to intimidate the victim based on the victim's race, gender, or religion.[504] The Supreme Court invalidated the New Jersey statute on the ground that the statute constituted an additional element of the underlying crime—*i.e.*, the defendant's motivation—that must be submitted to a jury and proven beyond a reasonable doubt before the maximum authorized penalty may be increased.[505]

In our view, *Apprendi* neither explicitly nor implicitly invalidates the Delaware death penalty statute. First and most important, the *Apprendi* Court explicitly preserved the line of cases upholding death penalty procedures similar to Section 4209:

> [T]his Court has previously considered and rejected the argument that the principles guiding our decision today render invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death.[506]

The dissent in *Apprendi* characterizes this analysis as too formalistic because "the Arizona first-degree murder statute [in *Walton v. Arizona*] authorizes a maximum penalty of death only in a formal sense."[507] In reality, the dissent argues, "the Arizona sentencing scheme removes from the jury the assessment of a fact that determines whether the defendant can receive that maximum punishment."[508] Although this analysis may present a valid criticism of the majority's reasoning, the fact remains that a majority of the Court concluded that the holding in *Apprendi* did not disturb the line of decisions approving of death penalty statutes like that in Delaware.

503. *Id.* at 468–69, 491, 120 S.Ct. 2348.

504. *See id.*

505. *See id.* at 490–98, 120 S.Ct. 2348.

506. *Id.* at 496, 120 S.Ct. 2348 (citing *Walton v. Arizona*, 497 U.S. 639, 647–49, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990)).

507. *Id.* at 540, 120 S.Ct. 2348 (O'Connor, J., dissenting). In *Walton,* the Supreme Court upheld Arizona's death penalty statute. Under the Arizona scheme, once a jury returns a

guilty verdict for first degree murder, the trial court holds a separate sentencing hearing to determine whether aggravating and mitigating factors are present. *See Walton,* 497 U.S. at 643–44, 110 S.Ct. 3047. The trial court is directed to impose a death sentence where the court finds beyond a reasonable doubt that one aggravating factor is present and where the court finds that the mitigating factors do not outweigh the aggravating factors. *See id.* This statute is thus similar to the Delaware procedure under section 4209.

508. *Id.* at 541, 120 S.Ct. 2348.

Even if the Supreme Court had not *explicitly* preserved the death penalty cases, the language in *Apprendi* makes it clear that the Court did not intend to disturb the holdings in these cases. Notwithstanding the dissent's concern over their perception of the breadth of the majority's reasoning, the holding in *Apprendi* is narrow: "Other than the fact of a prior conviction, any fact that *increases the penalty* for a crime *beyond the prescribed statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt."[509] Moreover, the Court previously held that "the finding of aggravating facts fall[s] within the traditional scope of capital sentencing as a choice between a greater and a lesser penalty, *not as a process of raising the ceiling of the sentencing range available.*"[510]

 Under Delaware's death penalty procedure, when a jury finds a defendant guilty of first degree murder, the jury *authorizes* the statutory maximum penalty: the death sentence, subject to the penalty phase and the judge's decision on sentencing. Once the jury during the guilt phase of the trial authorizes the maximum penalty, " 'it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed . . . .' "[511] We therefore conclude

that the holding in *Apprendi* does not implicitly or explicitly affect the Supreme Court's previous decisions permitting judges to find statutory aggravating factors without a jury verdict on the underlying factual questions.

 The New Jersey statute that was struck down in *Apprendi* is also distinguishable from Delaware's death penalty statute. The aggravating factors described in Delaware's Section 4209 do not constitute additional elements needed to establish guilt of a "capital murder" offense that a jury must unanimously find beyond a reasonable doubt. These aggravating factors relate only to the penalty phase where the jury acts as an advisory body to the sentencing judge. The *Apprendi* Court distinguished an "element" of a crime from a "sentencing factor" according to whether "the required finding expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict."[512] As we noted earlier, a conviction at the guilt phase by a unanimous jury under the first degree murder statute constitutes the *authorization* for the later imposition of the death penalty.[513] Because the finding of an aggravating factor does not "expose the defendant to a greater punishment than that *authorized*" by a first degree murder conviction, the aggravating factor is not an

---

**509.** *Id.* at 490, 120 S.Ct. 2348 (emphasis added). Evidently the consideration motivating the Court in its decision was the fear that a defendant would not have notice of the full extent of the potential penalty from the face of the indictment. Under the Due Process Clause, a defendant may not be subject to additional penalties beyond the prescribed statutory maximum on the basis of additional elements that are not mentioned in the definition of the charged crimes and that are proven only by a preponderance of the evidence. *See id.* at 478–79, 120 S.Ct. 2348 ("The defendant's ability to predict with certainty the judgment from the face of the felony indictment flowed from the invariable linkage of punishment with crime.") (citing 4 W. Black-

stone, Commentaries on the Laws of England 369–70 (1769)).

**510.** *Jones v. United States,* 526 U.S. 227, 251, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) (emphasis added).

**511.** *Apprendi,* 530 U.S. at 497, 120 S.Ct. 2348 (quoting *Almendarez–Torres v. United States,* 523 U.S. 224, 257 n. 2, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (Scalia, J., dissenting)).

**512.** *Apprendi,* 530 U.S. at 494, 120 S.Ct. 2348.

**513.** *See* 11 *Del. C.* § 636(b) (referring to 11 *Del. C.* § 4209).

additional element of the first degree murder offense.[514] In addition, the Delaware statute requires that the trial judge find aggravating circumstances beyond a reasonable doubt.[515] The New Jersey hate crime statute, by contrast, required a finding by a preponderance of the evidence that the underlying crime was motivated by a desire to intimidate.[516]

■■■ Accordingly, we conclude that the death penalty process in 11 *Del. C.* § 4209 does not violate the right to a trial by jury under the Delaware Constitution and does not violate the Due Process Clause of the Fourteenth Amendment.

## XVII. Aggravating Circumstance Instruction

Capano argues that the aggravating circumstance instruction given to the jury in connection with its sentencing recommendation was erroneous. According to Capano, this instruction defined the relevant aggravating circumstance in such a way as to allow the jury to recommend the death penalty if it found the same degree of intent required to convict of first degree murder.

■■■ Review of this claim is *de novo.*[517] We do not agree with Capano's argument because we find that the instruction in this case sufficiently narrowed the class of people eligible for the death sentence.

■■■ The statutory aggravating circumstance in question is that "the murder was premeditated and the result of substantial planning."[518] In making a sentencing recommendation, the jury was required to answer two questions. First, whether this aggravating circumstance existed.[519] Second, whether the aggravating circumstances it found (statutory or non-statutory) outweighed any mitigating circumstances it found.[520] In this case, the jury found by a vote of 11 to 1 that the statutory aggravating circumstance existed. The jury also found by a vote of 10 to 2 that the aggravating circumstances in the case outweighed the mitigating circumstances also present.[521]

The aggravating circumstance instruction delivered by the trial judge to the jury in this case is as follows:

> This statutory aggravating circumstance requires a finding of premeditation. In order for a murder to be premeditated, the defendant must have thought about it, considered it, or deliberated about it beforehand. The design to kill must arise from the sedate, deliberative process and not a rash or impulsive, though intentional act. This statutory aggravating circumstance also requires that the murder was the result of substantial planning. Substantial planning is planning which is considerable or ample for the commission of the crime.[522]

**514.** *Apprendi,* 530 U.S. at 494, 120 S.Ct. 2348 (emphasis added).

**515.** *See* 11 *Del. C.* § 4209(d)(1)(a).

**516.** *See Apprendi,* 530 U.S. at 468–69, 491, 120 S.Ct. 2348.

**517.** *See Chance v. State,* Del. Supr., 685 A.2d 351, 354 (1996).

**518.** 11 *Del. C.* § 4209(e)u.

**519.** 11 *Del. C.* § 4209(c)(3)a.1. The trial judge can impose the death penalty only if the judge finds beyond a reasonable doubt the existence of at least one statutory aggravating circum-

stance and finds that the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist. *See* 11 *Del. C.* § 4209(d)(1).

**520.** 11 *Del. C.* § 4209(c)(3)a.2.

**521.** As the jury was instructed, its answers to these two questions were, in effect, a recommendation for either the death penalty or life imprisonment. *See Manley v. State,* Del. Supr., 709 A.2d 643, 647 n. 2 (1998).

**522.** Tr. of 1/28/99, at 126. The instruction requested by Capano is as follows:
> This statutory aggravating circumstance applies to those murders which may be

We find no merit in Capano's argument that this instruction fails to distinguish for the jury between the aggravating circumstance of "premeditation" and "substantial planning" and the "intent" element of first degree murder.

Due process requires aggravating circumstances to "genuinely narrow the class of persons eligible for the death penalty and ... reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder."[523] The aggravating circumstances must "permit the sentencer to make a principled distinction between those who deserve the death penalty and those who do not."[524] In determining whether these criteria are met, "we find the relevant inquiry to be whether 'the sentencer fairly could conclude that an aggravating circumstance [in this case, as defined in the jury instructions] applies to every defendant eligible for the death sentence....' "[525]

The instruction in this case fulfilled these criteria. The instruction defines the

aggravating circumstance in a way that excludes intentional killings that are not a result of calm deliberation and preparation. The instruction requires that the planning be substantial, *i.e.*, "considerable or ample," not merely the amount of planning necessary for the act resulting in death.[526] Moreover, the instruction specifically excludes killings that are "rash or impulsive, though intentional." In contrast, a first degree murder conviction requires only that the killing be intentional.[527] Therefore, Capano's argument is without merit.

### XVIII. Statutorily Mandated Review of Capano's Death Sentence

This Court must conduct a mandatory, limited review of the Superior Court's imposition of the death sentence.[528] Under 11 *Del. C.* § 4209(g)(2)b, we must examine the evidence in the record to determine whether it supports the Superior Court's finding of a statutory aggravating circumstance. We must then address both determinations required by subparagraph

characterized as executions (or contract murders). This statutory aggravating circumstance requires a finding of heightened premeditation, i.e., a cold-blooded intent to kill that is more contemplative, more methodical, more calculating and controlled than that necessary to sustain a conviction of first degree murder.
This instruction is drawn from *State v. Manley*, Del. Super., 1997 Del. Super., Cr. I.D. Nos. 9511007022, 9511006992, 1997 WL 27094, Barron, J. (Jan. 10, 1997) (ORDER). *See also Stevenson v. State*, Del. Supr., 709 A.2d 619, 637–38 (1998) (noting that this instruction is "based upon ... guidance from Florida's jurisprudence"). Our tacit approval of this instruction in *Stevenson* does not entitle all capital defendants to an identical definition of the aggravating circumstance codified at 11 *Del. C.* § 4209(e)(1)u.

**523.** *Lewis v. Jeffers*, 497 U.S. 764, 776, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) (quoting *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)).

**524.** *Id.* (citation omitted).

**525.** *Steckel v. State*, Del. Supr., 711 A.2d 5, 13 (1998) (quoting *Arave v. Creech*, 507 U.S. 463, 474, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993)); *see also id.* ("After review of § 4209(e)(1), we conclude that no one of those factors could be applied to every defendant convicted of first degree murder in Delaware.").

**526.** *See United States v. Tipton*, 4th Cir., 90 F.3d 861, 896 (1996) (approving instruction requiring "substantial planning and premeditation," with "substantial planning" defined as "planning that is considerable, or ample for the commission of a crime at issue in this case: murder").

**527.** *See* 11 *Del. C.* § 231 (a) ("A person acts intentionally with respect to an element when: (1) ... it is the person's conscious object to engage in conduct of that nature or cause that result.").

**528.** *See* 11 *Del. C.* § 4209(g); *Zebroski v. State*, Del. Supr., 715 A.2d 75, 82 (1998).

a. of Section 4209(g)(2).[529] Under this analysis, we first consider whether the imposition of the death penalty was arbitrary or capricious. Second, we consider whether the death penalty in the present case was disproportionate to that imposed in similar cases. When undertaking these inquiries, we must consider as a whole the aggravating and mitigating evidence as it bears upon the circumstances of the crime and the character of the defendant.[530]

### A. Statutory Aggravating Circumstance

 Capano does not argue that the evidence was insufficient to support the Superior Court's finding of a statutory aggravating circumstance. The jury found by a vote of 11 to 1 that "the murder was premeditated and the result of substantial planning."[531] The trial court found that the State had proven this statutory aggravating factor beyond a reasonable doubt. There was substantial evidence, which has been discussed at length in sections of this Opinion, to support this finding.

### B. Death Penalty Not Arbitrary or Capricious.

 This Court must review the death sentence to consider whether the imposition of the death sentence was arbitrary or capricious. Capano does not argue that it was. Nonetheless, we find that the record "reflects that the Superior Court's decision to impose the death penalty was 'the product of a deliberate, rational and logical deductive process.' "[532] The court recognized that, in determining the punishment, the weighing of aggravating and mitigating circumstances is qualitative not quantitative and must take into account the totality of the circumstances present.[533]

In addition to the statutory aggravating circumstance, the trial court found that the State had proved by substantial and reliable evidence the existence of the following non-statutory aggravating circumstances: "1) Substantial impact of the murder upon friends, family and co-workers of Fahey; 2) Past actions of defendant seeking to harm an ex-lover;[534] 3) Defendant's vindictiveness; 4) Defendant's criminal

**529.** 11 *Del. C.* § 4209(g)(2) provides in pertinent part:

> The Supreme Court shall limit its review under this section to the recommendation on and imposition of the penalty of death and shall determine: a. Whether, considering the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender, the death penalty was either arbitrarily or capriciously imposed or recommended, or disproportionate to the penalty recommended or imposed in similar cases arising under this section.

**530.** *See Zebroski*, 715 A.2d at 82–83; *Wright v. State*, Del. Supr., 633 A.2d 329, 339 (1993) (citing 11 *Del. C.* § 4209(g)(2)a.).

**531.** 11 *Del. C.* § 4209(e)(1)u. As discussed above, the trial court gave a correct instruction to the jury defining this aggravating circumstance.

**532.** *Steckel v. State*, Del. Supr., 711 A.2d 5, 14 (1998) (quoting *Ferguson v. State*, Del. Supr.,

642 A.2d 772, 778 (1994) (quoting *Red Dog v. State*, Del. Supr., 616 A.2d 298, 310 (1992))).

**533.** *See State v. Capano*, Del. Super., No. IN97–11–0720, Lee., J. (March 16, 1999) (Mem. Op.), Mem. Op. at 18. *See State v. Cohen*, Del. Supr., 604 A.2d 846, 849 (1992) (stating that the balancing of aggravating and mitigating circumstances involves "reasoned judgment as to what factual situations require the imposition of the death and which can be satisfied by life imprisonment in light of the totality of the circumstances present").

**534.** A former lover, Linda Marandola, testified at the sentencing hearing to a pattern of harassment by Capano over a number of years, in the 1970s and 1980s, including sending her letters telling her to leave Delaware, and making harassing phone calls. Tr. of 1/20/99, at 79–95, 165–66. At one point in 1993 Capano talked to a third party about hiring someone to hurt an ex-lover, apparently Marandola. *See id.* at 167–74.

conspiracies;[535] 5) Defendant's continuing manipulative behavior; 6) Defendant's lack of remorse; 7) Defendant's disdain for authority; and 8) Defendant remains a threat to direct crimes of vengeance while incarcerated."[536]

The trial court also found the existence of six mitigating factors: "1) Defendant's lack of any prior criminal record; 2) The need for his daughters to have him in their lives; 3) The need for his mother to have him in her life; 4) The need of other family members to have him in their lives; 5) The intense guilt which Louis and, particularly, Gerard would feel for their part in participating in these proceedings which might result in defendant's death; and 6) Defendant's community service."[537]

The Superior Court carefully weighed the aggravating and mitigating circumstances in this case, articulating the grounds for its decision to impose the death penalty. The court concluded (in part) as follows:

> Defendant planned, over a period of time, to kill Anne Marie Fahey and to dispose of her body so that it could not be found. He then blamed the murder on an ex-lover who had testified against him. The crime defendant committed was horrific. The crime epitomized the makeup of his character: vindictive and controlling.
>
> * * *
>
> The circumstances of the murder here are similar to those in Gattis. No one, except the defendant, ever will know exactly how or why Anne Marie Fahey died. What is certain is that it was not a crime of passion but, rather, a crime of control. By all accounts, she had ceased to be defendant's lover but had never escaped his sphere of influence, control

and manipulation. Defendant's premeditation and planning was for a contingency that, perhaps, he hoped would never happen, but did, on the evening of June 27, 1996. He chose to destroy a possession rather than lose it; to execute an escaping chattel.

The only mitigating circumstances of significance to this Court concern defendant's daughters and the impact of the crime on Gerard. Defendant's daughters' love for their father is deep and genuine and they want him in their lives. However, during this trial, defendant has shown that he will take advantage of his daughters to accomplish an end which benefits himself. Their love for him is great. However, since defendant's past history is a prime indicator of his future behavior, it is clear that defendant poses a threat of harm to his daughters' well-being.

Gerard does not want defendant sentenced to death; he will feel great responsibility for it. Gerard bears no blame; instead, the blame goes directly to defendant. Defendant involved Gerard in his murder plans. Defendant committed the murder. Defendant is the one who must accept all blame, but does not because of his flawed character. Gerard should understand that defendant is reacting in his normal way: to strike out at the disloyal subject and punish that person who attempts to do what is right and not immoral.

Absent the harm to his daughters and to Gerard, there is nothing in defendant's life which would call for the imposition of a life sentence. Defendant will not adjust well in prison; he will constantly scheme to by-pass prison rules; he will defy prison authority; he will continue to

---

**535.** Perillo, a fellow inmate of Capano's, testified at trial that Capano sought Perillo's help in finding someone to burglarize MacIntyre's house. Tr. of 11/24/98, at 56–58.

**536.** *Capano,* Mem. Op. at 16.

**537.** *Id.* at 17.

manipulate those who love him from within the prison walls. He poses a threat of harm even while incarcerated. He committed a horrific crime. That crime and his antisocial behavior outweigh any mitigating circumstances. The sentence of death is warranted in this case.[538]

Based on the record and the deliberate, rational, logical deductive process reflected in the trial court's opinion, we conclude that the trial court did not impose the death sentence either arbitrarily or capriciously under 11 *Del. C.* § 4209(g)(2)a.

### C. Death Penalty Proportionality Review

In conducting the statutorily-mandated proportionality inquiry, the Court "refers to the 'universe' of cases involving first degree murder charges that have included a penalty hearing and after the conclusion of which the sentence has become final."[539] Those cases appear as an appendix to this decision. An exact comparison of these cases is not practicable, "but a review of some objective factors, including the gravity of the offense, the circumstances surrounding the crime, and the harshness of the penalty is helpful in reaching a determination of whether or not this case fits within a pattern of Delaware death sentence precedent."[540]

Capano argues that his death sentence is disproportionate. According to Capano, the universe of cases in which the death penalty has been imposed involves cases with "multiple victims" "and/or multiple statutory aggravating factors."[541] Capano argues that his case is "significantly less aggravated," and that "in single-victim cases, arising from a fractured personal relationship, death sentences are not routinely imposed."

Capano's argument is not persuasive. First, the fact that Fahey was Capano's only victim in this case does not meaningfully distinguish other cases meriting the death penalty. Nor does the fact that this killing involved a "fractured relationship." Like others sentenced to death in Delaware, Capano was found guilty of an unprovoked, cold-blooded murder of a defenseless person.[542] Moreover, we have stated that the "deliberate, cold-blooded killing, in execution style, of a helpless spouse or lover, is deserving of society's harshest condemnation."[543] The evidence in this case was that Capano spent months planning to kill Fahey, his one-time lover.

Capano relies on *Taylor v. State*,[544] and *Williamson v. State*,[545] cases involving brutal murders in which the defendant was not sentenced to death. In *Taylor*, the

---

**538.** *Id.* at 18–21.

**539.** The relevant universe of cases may be found in Appendix A attached hereto. *Zebroski*, 715 A.2d at 84 (quoting *Lawrie v. State*, Del. Supr., 643 A.2d 1336, 1344 (1994)). Changes in the death penalty statute enacted in 1991 create dissimilarities between cases decided before and after that year but pre-1991 decisions are still relevant. *See Lawrie*, 643 A.2d at 1350.

**540.** *Zebroski*, 715 A.2d at 84 (citation omitted).

**541.** In making this argument, Capano relies on the following cases: *Gattis v. State*, Del. Supr., 637 A.2d 808, 822 (1994) (two statuto-

ry aggravating factors); *Weeks v. State*, Del. Supr., 653 A.2d 266, 271–74 (1995) (multiple victims, three statutory aggravating factors); *Clark v. State*, Del. Supr., 672 A.2d 1004 (1996) (same).

**542.** *See, e.g., Zebroski*, 715 A.2d at 84–85; *Ferguson*, 642 A.2d at 789; *Gattis*, 637 A.2d at 823; *Sullivan v. State*, Del. Supr., 636 A.2d 931, 950–51 (1994).

**543.** *Weeks*, 653 A.2d at 274 (quoting *Gattis*, 637 A.2d at 823).

**544.** Del. Supr., 685 A.2d 349 (1996).

**545.** Del. Supr., 669 A.2d 95 (1995).

defendant stabbed his pregnant girlfriend after breaking into her apartment.[546] In *Williamson,* the defendant surprised and strangled his victim in front of a woman whom he had bound and raped.[547] In *Taylor* and *Williamson* the qualitative nature of the mitigation evidence was different from that involved in this case. Although Taylor and Williamson could have justified a sentence of death, their cases nevertheless are distinguishable on a fundamental level because there is no suggestion in those cases of substantial planning and premeditation as was found in this case. Cases imposing the death penalty have given weight to the existence of a plan to carry out the murder.[548]

▇▇▇ Second, the fact that there is only one statutory aggravating factor in this case does not make imposition of the death penalty disproportionate. The number of statutory aggravating factors does not indicate fully the gravity of the offense and the totality of the circumstances surrounding the crime. As the trial court recognized, Capano's planned murder of Fahey was "horrific."

In *Zebroski,* we found that the death penalty was not disproportionate where only one statutory aggravating factor was found but in which there were a number of

nonstatutory aggravating circumstances.[549] Similarly, in this case, there were substantial nonstatutory aggravating circumstances.[550] The trial court discussed several instances of reprehensible behavior by Capano.[551] During his incarceration before trial, Capano conspired with another inmate to have MacIntyre's house burglarized in order to intimidate her into not testifying truthfully.[552] Perhaps most egregiously, Capano kept his knowledge of Fahey's fate hidden from her family for over two years in order to escape detection.[553] Accordingly, we hold that the imposition by the Superior Court judge of a death sentence in this case was not disproportionate to sentences imposed on other defendants in the relevant universe of cases.[554]

### XIX. Conclusion

For the reasons set forth herein, the judgment of the Superior Court is affirmed. The matter is remanded to the Superior Court for the purpose of setting a new execution date.

STEELE, Justice, with whom CHANDLER, Chancellor, joins concurring.

I join in and agree with the majority's judgment to affirm. I believe that the ma-

---

**546.** *Taylor,* 685 A.2d at 349–50.

**547.** *Williamson,* 669 A.2d at 96–97.

**548.** *See, e.g., Weeks,* 653 A.2d at 274 ("Weeks plotted the death of his wife at least two days in advance. . . ."); *Sullivan,* 636 A.2d at 949–50 (quoting trial court's statement that "a killing during the course of a robbery or burglary becomes egregiously heinous when it is preceded by a substantial period of planning, reflection, and calculation by the killer as occurred here").

**549.** *Zebroski,* 715 A.2d at 83.

**550.** *Cf. Steckel,* 711 A.2d at 14 (noting that the non-statutory aggravating factors were "sub-

stantial both in their number and their gravity").

**551.** Mem. Op. at 10–11.

**552.** *Cf. Jackson v. State,* Del. Supr., 684 A.2d 745, 754 (1996) (noting as a non-statutory aggravating factor that "while in prison Jackson had conspired to murder a State witness who would testify against him").

**553.** *See Weeks,* 653 A.2d at 274 ("Immediately following the killing, Weeks showed no remorse. Instead, he sought to prevent detection of his involvement in the killing.").

**554.** *See* Appendix A attached.

jority opinion carefully and persuasively determines that the trial judge's immediate response to Gerry's comment about the impending lie detector test by striking the reference and by issuing a clear cautionary instruction to the jury cured any potential prejudice to Capano. Further, I agree that the majority opinion thoughtfully makes the case that when the trial judge admitted Lyons' testimony about the circumstances that induced Gerry's alleged further disclosure that any error by so doing was harmless. I, therefore, concur with the majority's ultimate conclusion that neither ruling "warrant[s] a reversal of Capano's conviction and sentence."

I respectfully would hold, notwithstanding any concurrence in the result, and contrary to Part III B of the majority Opinion, that the trial judge properly admitted Lyons' testimony. In my view, therefore, the trial judge committed no error whatsoever.

I agree with the majority's conclusions that:

1. the trial judge's limiting instructions minimized the impact of Lyons' testimony about the timing of Gerry's full disclosure of the alleged facts and of Gerry's revelation that he believed that he would have to be more forthcoming before he "went and took the lie detector test" that, inferentially, might be required by the FBI; and,

2. given the totality of the evidence of planning, that portion of it supplied by Gerry as part of his fuller disclosure "was not an indispensable or critical part of the State's case."

However, two important considerations lead me to the conclusion that the trial judge correctly allowed Lyons' testimony explaining the circumstances surrounding Gerry's fuller disclosure.

First, trial judges regularly meet the needs of parties to explain (and juries to understand) salient facts in a case where there are legitimate risks of a misunderstanding of the relevance of that evidence, or where the danger exists that, though relevant, the evidence might create unfair prejudice. Evidence is often admitted for a limited purpose, with proper cautionary instructions, and legitimately so. Evidence has only one ultimate purpose—"that the truth may be ascertained and proceedings justly determined."[555] When a trial judge "restricts the evidence to its proper scope and instruct[s] the jury accordingly,"[556] he or she does so with ascertainment of the truth uppermost in mind.

Second, regardless of the prosecutor's recasting of Lyons' testimony in his closing, Lyons never attempted to comment on the truthfulness of Gerry's disclosure before or after Gerry's decision to disclose more fully what he "knew" to federal agents. Lyons, though his attorney, was in no position to support Gerry's credibility at either point in time. I have no reservation in concluding that the jury clearly understood that very point.

I fully endorse the majority's view, explained in Section II of the Opinion, on the Delaware Courts' approach to the admissibility or exclusion of evidence. Entirely consistent with that view, is my belief that it is better to let the jury know the actual, truthful explanation of why at that particular moment Gerry expanded his testimony, with appropriate caution, than to leave them to speculate on a wide range of irrelevant, untruthful possibilities for his apparent epiphany.

**The Reference to a Polygraph Test**

I agree that any reference to a polygraph test *may be* potentially mischievous

---

**555.** D.R.E. 102.

**556.** D.R.E. 105.

and should, therefore, be brought to the trial judge's attention and carefully screened with enhanced scrutiny to assure that no other appropriate alternative evidence is available to establish the relevant operative fact sought to be admitted and that a restrictive instruction be crafted to instruct the jury on the limited purpose for which the evidence is being admitted.[557] I further agree that *Whalen* may not be read broadly to permit references to a lie detector test to prove a limitless range of operative facts. Nevertheless, a *"per se exclusionary rule"* would go too far when there may be no other basis for admitting critical evidence, the trial judge conducts an appropriate Rule 403 analysis and then formulates a clear cautionary instruction for the jury.

Here, I see little meaningful difference between admitting polygraph evidence to prove that under all of the circumstances a confession was voluntary (as in *Whalen*) and admitting evidence that a witness believed he would have to submit to a polygraph—a belief which caused him to divulge more expansively his knowledge of facts relating to issues in this case. In light of the trial judge's cautionary instruction, I believe there is no basis to conclude that either (1) the jury would simply blatantly ignore the instruction and blindly find that Gerry both took the test and passed it, or (2) the jury proceeded, contrary to the instruction, to find through speculation about unreliable evidence that Gerry ultimately told the truth.

## Lyons' Testimony and Attorney Vouching

While I agree that *if* it was error to admit the Lyons testimony that it was harmless error, and therefore concur in the conclusion to affirm on this point, I respectfully depart from the majority's view that the references were dubious or

problematic under the circumstances of this case and would rule that the references were properly admitted.

Lyons' actual testimony mentions only that he told Gerry that "yes," he would or might be required to take a polygraph test and that "you can't hold anything back." The purpose of this testimony was to explain the circumstances surrounding Gerry's fuller disclosure of what he, Gerry, believed to have occurred. At no time did Lyons attempt to characterize the testimony in any way to bolster Gerry's credibility. I recognize the points made by the majority in support of their view that there was "potential that Lyons' status as an experienced lawyer *may have* imparted credibility to Gerry's testimony ...." I note and accept as reasonable the majority's view that "... a jury *would be likely* to infer that Gerry did not disregard Lyons' emphatic directive to make full disclosure." (emphases added) I simply do not agree with those inferences in light of the cautionary instruction given to the jury and my own. I hope equally reasonable inference, that a jury does not, in our current culture, accept criminal defense attorneys as the paradigm for "truth, justice and the American way" (if there still be one). Explaining why Gerry offered additional detail at that point would assist the jury's understanding of relevant events. The trial judge immediately instructed the jury, appropriately limiting the inferences that they could fairly draw from the references to a prospective polygraph test or from Lyons' status as an attorney. Nothing in Lyons' actual testimony suggested that suddenly Gerry then started telling the truth and that he may not have been until that denouement. The jury had to understand from the cautionary instruction that they still had to resolve whether Gerry told the truth before and after he concluded that he would more

**557.** D.R.E. 105.

fully disclose what he knew. The jury knew that they remained free to conclude that this turncoat brother lied both before and after the fuller disclosure because the cautionary instruction told them as much. If error occurred, no matter how harmless, it occurred when the prosecutor, without objection, embellished the inference in his closing by asserting that Lyons said "you have to tell the complete truth," when in fact, Lyons made no such statement.[558]

I, therefore, would conclude that the trial judge did not abuse his discretion when he allowed Lyons to testify and when he permitted the State to elicit testimony that Gerry had disclosed additional information when confronted with the probability that he would face a polygraph test when the trial judge's instruction appropriately limited the jury's consideration of the circumstances under which it was admitted and the purpose for which it was admitted.

CHANDLER, Chancellor, with whom STEELE, Justice, joins concurring.

I join in and agree with the ultimate judgment to affirm in Chief Justice Veasey's Opinion for the Court. Nevertheless, I respectfully disagree with the analysis by the majority in two areas of the Opinion—Part III.B. and Part XV.

For reasons I briefly set forth below (as well as those raised in Justice Steele's concurrence, with which I fully agree and in which I also join), I do not agree with the majority's determination that the trial court erred when it (1) admitted Lyons' testimony about the lie detector test, and (2) limited the scope of Capano's allocution.

*1. Lyons' Lie Detector Testimony*

As do most jurisdictions, Delaware has a long-standing, and quite proper, prohibition against admission of the results of lie detector tests. Such a prohibition is warranted because the results of a lie detector examination are inherently unreliable, and their apparent scientific nature has the potential to mislead jurors into giving the results undue weight. Admission of *results* of lie detector tests, therefore, may constitute reversible error.[559]

The testimony in this case concerning a potential lie detector test, however, is quite different. Here, there was no evidence presented to the jury that a lie detector test was ever administered to Gerry Capano, let alone what the results of such a test might have been. Rather, the testimony in this case indicated that Gerry *believed* that he was *subject* to a lie detector test. This was offered to explain to the jury why Gerry changed his statement to investigators in the case. As the trial judge properly instructed the jury, in his limiting instruction, this evidence was provided to them so that they could perform their most basic function: evaluation of the reliability of evidence from which they could draw conclusions of fact. Given the trial judge's adequate and explicit limiting instruction, and given the nature of the evidence presented, this is not a case in which the unduly persuasive value of the *results* of a pseudo-scientific lie detector test tainted the jury's deliberations. Because the majority appears to impose unnecessarily restrictive standards on the admission of relevant testimony that happens to include the words "lie detector," I cannot join in the majority's finding of error. I do join in the majority's ultimate conclusion that any error (had there been one) was harmless beyond a reasonable doubt.

Likewise, I respectfully disagree with the majority's conclusion that the trial court erred in admitting Lyons' testimony because it amounted to a "subtle and indi-

---

558. Tr. of 1/13/99. at 66–68.

559. *See Foraker v. State,* Del. Supr., 394 A.2d 208 (1978).

rect version of vouching for Gerry's credibility."[560] Relying upon *Graves v. State*,[561] the majority views Lyons' admonitions to Gerry "to make full disclosure" and Gerry's possible exposure to a lie detector test, together with Lyons' status as an experienced lawyer and former federal prosecutor, as the subtle equivalent of Lyons' vouching for Gerry's truthfulness in his disclosures to federal prosecutors. I confess that the majority's rationale is too subtle for me to grasp.

First, Lyons never testified explicitly, or implicitly, that he thought Gerry was being truthful, either before or after Gerry changed his story with the prosecutors. Second, none of the "reputational boasting" that occurred in *Graves* occurred here. Third, I think the majority has confused two distinct concepts. It is unproblematic for a jury to be provided information that may assist them in assessing the credibility of a witness. That is what occurred here. Lyons explained how he urged Gerry to "not hold anything back." The jury was entitled to consider that fact in its effort to assess whether Gerry was, at trial, telling the whole truth and whether the story he told to federal agents was the whole truth. What the majority then finds troubling is that Lyons' testimony might have been persuasive, that is, that the jury could have found that his advice had actually caused Gerry to have spoken truthfully to federal agents. But that conclusion is also unproblematic. The jury quite properly could consider whether a witness's testimony had changed because that witness had been advised to not hold anything back. Similarly, the jury quite properly could consider testimony that a witness's story had changed because the witness had

been warned that he faced perjury charges if he did not testify fully about what had happened. I find nothing problematic about a jury having the right to consider and assess whether information of this kind is helpful in determining whether a particular witness is credible or not.

The majority finds it "implicit in Lyons' testimony that Lyons *believed* his own admonitions to have been effective ... [and] [t]hus a subtle and indirect version of vouching for Gerry's credibility."[562] If I found such vouching were "implicit" (or explicit) in Lyons' testimony, I also would be concerned. The danger then would be that the jury would evaluate Gerry's credibility not on the facts (including, permissibly, the fact of Lyons' admonitions) but rather based on Lyons' presumably expert opinion (that he, Lyons, believed Gerry had followed his advice), thus impermissibly abdicating the jury's role as fact finder. The problem, in my view, with the majority opinion is that I see no such implicit vouching. The majority conflates legitimate factual testimony ("I told Gerry to make full disclosure") with illegitimate opining ("I am sure he did make full disclosure"). Nothing in the record indicates that the latter belief or opinion was expressed to the jury, either implicitly or explicitly.

In my opinion, it is not necessarily problematic for a lawyer to testify as a fact witness in the manner that occurred here. In this day and age, I think it highly unlikely that jurors would accord greater weight to a lawyer's testimony than to anyone else's, and certainly nothing in this bizarre case, where a lawyer was on trial for murder, would lead a juror to think that lawyers are trusted professionals to whom deference is owed.[563] In any event,

560. *Supra* at 595.

561. Del. Supr., No. 144, 1993, 1994 WL 416533, Walsh, J. (Aug. 1, 1994) (ORDER).

562. *Supra* at 595 (emphasis added).

563. *See, e.g.,* Marc Galanter, *The Faces of Mistrust: The Image of Lawyers in Public Opinion, Jokes, and Political Discourse,* 66 U. Cin. L. Rev. 805 (1998).

even if it was error to admit Lyons' testimony, I agree that it was harmless error.

### 2. Capano's Allocution

The majority has decided that the trial court committed error in restricting Capano's right of allocution. While I agree that any error in this context would have been harmless, I am forced to concur separately because I conclude that there was no error at trial.

As this Court recognized recently in *Shelton v. State*,[564] allocution, at present, serves two purposes for a convicted murderer: it permits him to ask for mercy and to attempt to impress a jury with his feelings of remorse.[565] The *Shelton* Court, purporting to rely on Superior Court Criminal Rule 32(a)(1)(c) and 11 *Del. C.* § 4209(c)(2), found that it was error for the trial court to limit a defendant, during an allocution not subject to cross-examination, from arguing that the jury had made factual errors leading erroneously to a finding of guilt. In my opinion, however, nothing in the Superior Court Rule or the death penalty statute mandates that a defendant be permitted to attack collaterally a jury verdict in this manner. To allow a defendant to recast disputed facts in a way favorable to him, after the jury has already reached its verdict, goes beyond the legitimate evocation of mercy and communication of remorse and also attempts to cause the jury to doubt its own verdict in a way that is not subject to cross-examination or other effective correction by the prosecution. In short, such a proceeding is likely to produce confusion and other mischief. To the extent the majority concludes that *Shelton* requires that Capano should have been allowed to present again a factual theory which the jury had rejected, as evidenced by its conviction, it is my opinion that *Shelton* itself is in error and should be overruled. Therefore, on the allocution issue, I respectfully concur in the result, but I do not join in that aspect of the Opinion finding that the trial court's limitations on allocution constituted error.

## APPENDIX A

Cases Decided Under 11 *Del. C.* § 4209
As Amended in 1991 by 68 Del. Laws Ch. 189 **

| | |
|---|---|
| Name: | Meri–Ya C. Baker |
| Criminal ID: | 90011925DI |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on appeal: | No. 360, 1992, 1993 WL 557951, Holland, J. (Dec. 30, 1993) |

| | |
|---|---|
| Name: | Tyreek D. Brown |
| Criminal ID: | 9705011492 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on appeal: | No. 314, 1998, 1999 WL 485174, Hartnett, J. (Mar. 1, 1999) |

| | |
|---|---|
| Name: | Justin L. Burrell |
| Criminal ID: | 9805012046 |
| County: | Kent |

**564.** Del. Supr., 744 A.2d 465 (2000).

**565.** *See Shelton*, 744 A.2d at 492.

** The universe of cases prior to 1991 is set forth in appendices to prior opinions by this Court, and those appendices are incorporated herein by reference. *See, e.g., Lawrie v. State*, Del.Supr., 643 A.2d 1336, 1352–56 (1994).

**APPENDIX A**

Sentence: Life Imprisonment
Decision on appeal: 766 A.2d 19 (2000)

Name: Luis G. Cabrera
Criminal ID: 9703012700
County: New Castle
Sentence: Life Imprisonment
Decision on appeal: 747 A.2d 543 (2000)

Name: James B. Clark, Jr.
Criminal ID: 9406003237
County: New Castle
Sentence: Death
Decision on appeal: 672 A.2d 1004 (1996)

Name: Charles M. Cohen
Criminal ID: 90001577DI
County: New Castle
Sentence: Life Imprisonment
Decision on appeal: No direct appeal taken

Name: James T. Crowe, Jr.
Criminal ID: 9508008979
County: New Castle
Sentence: Life Imprisonment
Decision on appeal: No. 333, 1997, 1998 WL 736389, Walsh, J. (Oct. 8, 1998)

Name: David F. Dawson
Criminal ID: 88K00413DI
County: New Castle (venue changed)
Sentence: Death
Decision on appeal: 637 A.2d 57 (1994)

Name: Curtis Demby
Criminal ID: 9412011308
County: New Castle
Sentence: Life Imprisonment
Decision on appeal: 744 A.2d 976 (2000)

Name: Byron S. Dickerson
Criminal ID: 90011926DI
County: New Castle
Sentence: Life Imprisonment
Decision on appeal: No. 353, 1992, 1993 WL 541913, Veasey, C.J. (Dec. 21, 1993)

Name: Cornelius E. Ferguson
Criminal ID: 91009926DI
County: New Castle
Sentence: Death
Decision on appeal: 642 A.2d 772 (1994)

Name: Donald Flagg
Criminal ID: 9804019233
County: New Castle
Sentence: Life Imprisonment
Decision on appeal: No direct appeal taken

Name: Robert A. Gattis
Criminal ID: 90004576DI

## APPENDIX A

| | |
|---|---|
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 637 A.2d 808 (1994) |

| | |
|---|---|
| Name: | Arthur Govan |
| Criminal ID: | 92010166DI |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on appeal: | No. 363, 1993, 1995 WL 48359, Walsh, J. (Jan. 30, 1995) |

| | |
|---|---|
| Name: | Robert W. Jackson, III |
| Criminal ID: | 92003717 |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 684 A.2d 745 (1996) |

| | |
|---|---|
| Name: | Mark A. Kirk |
| Criminal ID: | 9612002650 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on appeal: | No. 532, 1997, 1999 WL 415802, Berger, J. (Apr. 29, 1999) |

| | |
|---|---|
| Name: | David J. Lawrie |
| Criminal ID: | 92K03617DI |
| County: | Kent |
| Sentence: | Death |
| Decision on appeal: | 643 A.2d 1336 (1994) |

| | |
|---|---|
| Name: | Thomas M. Magner |
| Criminal ID: | 9509007746 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on appeal: | No. 224, 1997, 1998 WL 666726, Walsh, J. (July 29, 1998) |

| | |
|---|---|
| Name: | Frank W. Moore, Jr. |
| Criminal ID: | 92S03679DI |
| County: | Sussex |
| Sentence: | Life Imprisonment |
| Decision on appeal: | No. 214, 1993, 1994 WL 202289, Holland, J. (May 9, 1994) |

| | |
|---|---|
| Name: | Jack F. Outten |
| Criminal ID: | 92000786DI |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 650 A.2d 1291 (1994) |

| | |
|---|---|
| Name: | James W. Perez |
| Criminal ID: | 93001659 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on appeal: | No. 207, 1993, Moore, J. (Feb. 3, 1994) |

| | |
|---|---|
| Name: | James Allen Red Dog |
| Criminal ID: | 91001754DI |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 616 A.2d 298 (1992) |

| | |
|---|---|
| Name: | Jose Rodriguez |

## APPENDIX A

Criminal ID: 93001668DI
County: New Castle
Sentence: Life Imprisonment .
Decision on appeal: No. 466, 1993, 1994 WL 679731, Walsh, J. (Nov. 29, 1994)

Name: Reginald N. Sanders
Criminal ID: 91010161DI
County: New Castle (venue changed)
Sentence: Life Imprisonment
Decision on appeal: 585 A.2d 117 (1990)

Name: Nelson W. Shelton
Criminal ID: 92000788DI
County: New Castle
Sentence: Death
Decision on appeal: 652 A.2d 1 (1995)

Name: Steven W. Shelton
Criminal ID: 92000787DI
County: New Castle
Sentence: Death
Decision on appeal: 650 A.2d 1291 (1994)

Name: Donald J. Simmons
Criminal ID: 92000305DI
County: New Castle
Sentence: Life Imprisonment
Decision on appeal: No direct appeal taken

Name: Brian David Steckel
Criminal ID: 9409002147
County: New Castle
Sentence: Death
Decision on appeal: 711 A.2d 5 (1998)

Name: Willie G. Sullivan
Criminal ID: 92K00055
County: Kent
Sentence: Death
Decision on appeal: 636 A.2d 931 (1994)

Name: Antonio L. Taylor
Criminal ID: 9404018838
County: Kent
Sentence: Life Imprisonment
Decision on appeal: 685 A.2d 349 (1996)

Name: Charles H. Trowbridge
Criminal ID: 91K03044DI
County: Kent
Sentence: Life Imprisonment
Decision on appeal: No. 234, 1995, 1996 WL 145788, Veasey, C.J. (Mar. 4, 1996)

Name: John E. Watson
Criminal ID: 91008490DI
County: New Castle
Sentence: Life Imprisonment
Decision on appeal: No direct appeal taken

## APPENDIX A

| | |
|---|---|
| Name: | Dwayne Weeks |
| Criminal ID: | 92010167 |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 653 A.2d 266 (1995) |

| | |
|---|---|
| Name: | Roy R. Williamson |
| Criminal ID: | 93S02210DI |
| County: | Sussex |
| Sentence: | Life Imprisonment |
| Decision on appeal: | 669 A.2d 95 (1995) |

| | |
|---|---|
| Name: | Jermaine M. Wright |
| Criminal ID: | 91004136 |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 671 A.2d 1353 (1996) |

| | |
|---|---|
| Name: | Craig A. Zebroski |
| Criminal ID: | 9604017809 |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 715 A.2d 75 (1998) |